```
               UNITED STATES DISTRICT COURT

                         FOR THE

               WESTERN DISTRICT OF VIRGINIA

                  CHARLOTTESVILLE DIVISION

* * * * * * * * * * * * * *
UNITED STATES OF AMERICA,   *CRIMINAL ACTION NO. 3:00-CR-00026
                            *      MAY 24, 2001  9:05 A.M.
            Plaintiff,      *      EXCERPT OF JURY TRIAL
                            *        OPENING STATEMENTS
vs.                         *
                            *
COLEMAN LEAKE JOHNSON, JR., * Before:
                            * HONORABLE NORMAN K. MOON
            Defendant.      * UNITED STATES DISTRICT JUDGE,
* * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA
APPEARANCES:

For the Plaintiff:      THOMAS J. BONDURANT, ESQUIRE
                        ANTHONY P. GIORNO, ESQUIRE
                        Assistant U.S. Attorney
                        P.O. Box 1709
                        Roanoke, VA 24008

For the Defendant:      FREDERICK T. HEBLICH, JR., ESQUIRE
                        801 E. Jefferson Street
                        Charlottesville, VA 22902

                        SCOTT L. REICHLE, ESQUIRE
                        Reichle & Reichle
                        P.O. Box 787
                        Suite A
                        5629 George Washington Memorial Hwy.
                        Yorktown, VA 23693

                        GERALD ZERKIN, ESQUIRE
                        530 E. Main Street, Suite 800
                        Richmond, VA 23219

Court Reporter:         Judy K. Webb, RPR
                        210 Franklin Road, S.W., Room 540
                        Roanoke, Virginia 24011
                        (540)857-5100 ext. 5333

        Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

U.S.A. v. Coleman Johnson, Jr. - 5/24/01

```
 1                         I N D E X

 2  OPENING STATEMENTS:                              PAGE NO.

 3  By Mr. Giorno                                        3

 4  By Mr. Zerkin                                        7

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Opening Statement by Mr. Giorno

1        (Court convened at 9:04 a.m.)
2        (Proceedings were held and previously transcribed under
3    separate cover.)
4            MR. GIORNO:  Ladies and gentlemen of the jury, as you
5    recall during the voir dire questioning of you, you had some
6    idea how this case would proceed in the event you found the
7    defendant guilty of the offense with which you found him
8    guilty, and, basically, this is what's called the punishment
9    phase in which you, the jury, will have to decide what the
10   appropriate punishment is in this case.
11           If you will recall, Judge Moon told you that at the
12   punishment phase you would be called upon to consider evidence
13   relating to what the government will represent to you to be
14   aggravating circumstances in favor of a sentence of death, and
15   you will also be required to consider and weigh mitigating
16   factors which the defendant may offer to you in which they
17   would suggest that you should not impose a sentence of death
18   for this crime.
19           As far as evidence at this particular phase, ladies
20   and gentlemen, at least from the government's standpoint we do
21   not anticipate putting on much more evidence than what you've
22   already heard at the trial, because it will be our position
23   that the thing that speaks the loudest in favor of the death
24   penalty in this case is the crime itself, the circumstances of
25   the crime, and particularly the motive for the crime, the

Opening Statement by Mr. Giorno

1   motive that led Coleman Leake Johnson to explode a bomb that
2   killed Tammy Baker and her unborn baby.  So we will ask that
3   you consider that evidence, and we do not anticipate putting
4   on an additional amount of evidence -- well, not a great deal
5   of evidence of aggravators for you to consider.
6          But I do want to touch base a little bit with you on
7   the aggravators that the government will be asking you to
8   consider in asking you to find unanimously.
9          The first aggravator is that the defendant
10  intentionally killed Tammy Baker.  The second aggravator is
11  that the defendant intentionally inflicted serious bodily harm
12  that resulted in the death of Tammy Baker.  The third one will
13  be that the defendant intentionally participated in an illegal
14  act, an illegal act meaning that the act basically anticipated
15  that the life of a person would be taken, or that he intended
16  that lethal force would be used in connection with the person,
17  and that the victim, Tammy Baker, died as a result of him
18  participating in this lethal act.
19         The fourth aggravator that the government will be
20  asking you to consider would be that the defendant
21  intentionally engaged in an act of violence knowing that that
22  act would create a grave risk of death to a person other than
23  one of the participants in the events of this case, other than
24  the defendant, such that the participation in that act
25  constituted a reckless disregard, a reckless disregard for

Opening Statement by Mr. Giorno

1  human life.
2           We will also ask you to consider an aggravator which
3  says that the murder of Tammy Baker was carried out in
4  connection with another act, specifically the damage to the
5  building that you heard about; also, that the act created a
6  grave risk to death -- of death to additional persons.  And
7  that, of course, will be based upon the placement of the bomb
8  and where it was placed and the fact that other people may
9  have had access to it we suggest creates the risk of death to
10 other individuals.
11          There will also be what the law refers to as
12 non-statutory aggravators, specifically that the defendant
13 knowingly terminated Tammy Baker's pregnancy as a result of
14 the use of this explosive device.
15          You will hear as evidence of aggravating factors the
16 impact on the victim's family, the effect that Tammy Baker's
17 death had on her brother, her mother, and other family members
18 who consider her dear.
19          You will hear evidence concerning the defendant's
20 future dangerousness and why a sentence of life imprisonment
21 would not be enough to ensure that he would not engage in
22 further acts of violence in the future.
23          You will hear as an aggravator that the defendant
24 committed this crime only after substantial planning and
25 premeditation.  That's the premeditation aspect that we talked

1  about earlier in which I told you the government would offer
2  evidence to prove in the guilt phase, and which we would also
3  reemphasize here in the punishment phase.
4          And finally, ladies and gentlemen, we're going to be
5  asking you to consider and we will be relying very heavily on
6  the aggravating factor of pecuniary gain.  Pecuniary gain,
7  which is a legal term, means nothing more than greed.
8          It's going to be the government's position that the
9  primary motivating factor in this case was the basis and the
10 most vilest of human motives, which is greed.  And that,
11 ladies and gentlemen, is going to the statutory factor that
12 the government is going to hammer on the hardest.  Not to
13 minimize the other aggravators that are present, but that will
14 be one we're going to be asking you to pay particularly close
15 attention to from the government's standpoint.
16         The Judge is going to tell you when he instructs you
17 that it will be your role as jurors to weigh the aggravating
18 factor that you find to exist, weigh the mitigating factors
19 that you might find to exist, and then decide what the
20 appropriate punishment is.
21         The Judge will also tell you, though that this
22 weighing process is not just a matter of going back there and
23 saying there's five aggravators and there's four mitigators,
24 or there's five mitigators and four aggravators and that will
25 decide the punishment.  These aggravating factors, mitigating

Opening Statement by Mr. Zerkin

1  factors will be entitled to different weight.  You are
2  entitled to give those factors such weight as you think is
3  appropriate.  You may consider one to be a heavy weight, you
4  may consider another factor to be a light weight.  You do hot
5  have to weigh all the factors equally; you give them such
6  weight as you determine.
7         And you, ladies and gentlemen of the jury, are the
8  only ones, the only ones who can determine the question of
9  death.  You are the only ones who have the power to sentence
10 the defendant to death for this crime.
11         I suggest to you, ladies and gentlemen, from the
12 evidence in this case and for the reasons we will develop at
13 the punishment stage, that after you have heard all of the
14 evidence, that after you have weighed all the factors and
15 mitigators, you will determine that a sentence of death is
16 appropriate in this case.
17         THE COURT:  Mr. Zerkin.
18         MR. ZERKIN:  May it please the Court.  Ladies and
19 gentlemen, as you can probably imagine, I was hoping never to
20 have to address you in this fashion.  It would have been more
21 than sufficient for me if my participation in this case was
22 limited to questioning a few witnesses during the guilt phase,
23 as I did, and be done with it.
24         But you have decided that Mike Johnson planted the
25 bomb that killed Tammy Baker, so now we must move on to the

Opening Statement by Mr. Zerkin

1  terrible question of whether the facts of this case require
2  that Mike Johnson be executed for that crime or whether there
3  is something sufficiently redeemable, or something
4  sufficiently troubling about his life, or just something at
5  all that matters to you that he should be allowed to live the
6  remainder of his life in prison.
7       I tell you, frankly, that while we may disagree with
8  your decision, we told you, many of you, during voir dire that
9  we would vigorously contest Mike's guilt, that while we may
10 disagree with that decision, we respect it.  You have been
11 extraordinarily attentive during the trial, and you obviously
12 took your responsibilities in this case very seriously, and we
13 know that you will continue to do so.
14       Now, however, the United States will seek to convince
15 you, as Mr. Giorno has indicated, that you should decide that
16 Mike Johnson must die.  And to convince you that death is
17 necessary, it will rely, as I think he has also implied, that
18 it will rely mostly on the same evidence that you have already
19 heard: on the testimony of Lenny Mayle, Eric Tarwater, Calvin
20 Perry, Robert Collier, and the like.
21       You've already heard part of our penalty phase
22 evidence, quite frankly, in the previous phase.  You heard the
23 tip of the iceberg.  Most obviously, you heard the testimony
24 of Mike's aunt, Cathy Walling; his sister Cathy, nicknamed as
25 Sissy; his friend Sandy Marble, all of whom testified about

1  Mike's affinity for babies and for kids.  And you heard from
2  Bill Truitt.
3          If you remember Mr. Truitt, he was the career army
4  man who spoke here, and a career military person.  He became
5  the friend of Mike Johnson.  He found something decent enough
6  in Mike to become friends with him, despite the obvious
7  differences in their ages.
8          And you heard the same from his lifelong friend, his
9  child playmate and neighbor Bonnie Ferrell Lindsey, who rode
10 bikes with him as a kid.  And, of course, you didn't have to
11 just rely on their testimony to understand that there was
12 something to Mike Johnson more than his participation in this
13 crime.
14         You saw the pictures, not recent fabrications,
15 pictures of the time of Mike with his nieces and nephews.  And
16 notwithstanding the testimony of his ex-wife, Angel Rayl,
17 about how Mike didn't want to have anything to do with their
18 child, Sarah, you even saw Mike responding tenderly to Sarah
19 immediately after her birth and lying in her bed, his feeding
20 her, even his changing her diaper.  Thus, as you have already
21 seen, there is much more to Mike Johnson than the terrible act
22 of killing Tammy Baker, of which you have convicted him.
23         Now, you've also seen a glimmer of another part of
24 the story of Mike Johnson; indeed, the government presented
25 that evidence.  You remember Amanda Lewis.  In response to

1  Mr. Bondurant's questioning of Mike's mother, it became
2  obvious that Mike was sleeping with this 17-year-old girl, who
3  was five months pregnant, not only in his mother's house, but
4  walking by her at night to go upstairs to his bedroom.  She
5  was on the sofa when they would come in night after night, and
6  she did nothing about that.
7          You will hear much more evidence as to the lack of
8  parental guidance Mike received.  That is a gross
9  understatement of the evidence that you're going to hear
10 today.  You'll hear how Mike grow up in an extraordinarily
11 dysfunctional environment.  You've heard about three men in
12 Dianne Johnson's life: William Miller, her first husband;
13 Coleman Johnson, Sr., Mike's father; and Hylan Brooks.
14         You heard Bo, her first son, Mr. Miller's son, you
15 heard him testify the other day, and he will appear here
16 again, and you'll hear more from him.  And you will also hear
17 from Dianne's next child, Sissy, who was her first child with
18 Coleman Johnson.  And what has she told you so far?  That she
19 didn't even grow up with her mother.  She grew up with her
20 grandparents.  And you will hear more of her history and where
21 she grew up, and you will hear about the difference between
22 that and where Mike was.
23         She lived with her grandparents, as Bo did.  And
24 you'll also hear that, as I said, Bo grew up with his
25 grandparents and not with Dianne.  As you've already seen, Bo

1  and Sissy became responsible members of the community.  Mike
2  wasn't so lucky.
3         As terrible and as painful as it is for me to say it
4  and for some people in this courtroom to hear it, Mike had the
5  misfortune of being raised by his mother.  It was a life of
6  chaos and abuse; abuse directed not at Mike specifically, but
7  abuse which he was forced to watch.  It was all around.  It
8  was everywhere.  And you will hear much about that environment
9  in which he grew up.
10        That environment was created, first you will hear, by
11 Coleman, Sr. and Dianne.  It included endless screaming
12 matches, not just arguments, things being thrown, and even
13 physical abuse by Coleman against Dianne.  It continued even
14 after Coleman and Dianne separated.  They separated, they
15 divorced, and they never really detached, and that chaos
16 continued.
17        It didn't end with Coleman and Dianne, however.
18 Mike's youth and adolescence also saw an endless parade of men
19 moving in with Dianne.  Hylan Brooks was merely the last, long
20 after the damage had been done, after Jim Surry, who she
21 married; after Garland Hawk; after Donald; after Jerry, after
22 others, and beginning with Coleman, Sr.  Almost every one of
23 them was a serious alcoholic.  And chaos and at least verbal
24 abuse was the common denominator in all of these
25 relationships, and Mike lived through it all.

1    You'll hear how Bo Miller had to rescue Mike, his
2 brother, older brother, had to rescue him from the chaos in
3 which he was living, and how when Mike was very young, Dianne
4 ran off with a man named Jim Surry, dragging Mike along when
5 he was, really, an infant, and disappearing for three months.
6    And when they returned, Mike was clearly traumatized.
7 He wouldn't allow his shoes to be taken off.  They had to wait
8 until he fell asleep to remove the shoes from his feet, and
9 his feet were damaged.  He was, in short, a mess.  He was a
10 mess physically and he was a mess emotionally.  And this was
11 as an infant.
12    The emotional chaos in which Mike was raised
13 continued.  You will hear how Bo had to rescue him from raging
14 battles later in life.
15    Of course, to anticipate the testimony, you need
16 think back only to the cross-examination of Dianne Johnson by
17 Mr. Bondurant.  You saw only a hint of her volatility.  She
18 dug in her heels and she was ready for battle.  She was ready
19 to argue.  She was ready to do the fight.  And you'll hear
20 much about her volatility.  You will hear about her temper and
21 how that temper defined Mike's world.
22    And you saw another hint from Mr. Lee, the aviation
23 specialist, the teacher, who talked about Dianne -- again,
24 government evidence, government witness -- talked about Dianne
25 coming to the school because she was upset about something

1  that happened to Mike, and kicking the other student's car and
2  being drunk and driving into a ditch.  And you will hear more
3  about that.
4          The government has talked to you, has made much
5  during this case about how protective Dianne Johnson was,
6  overly protective, always coming to his defense.  That was
7  their evidence, it was what they put on during the guilt
8  phase.  And they were right about that evidence.  That's
9  exactly what it was like, and you will hear more of it.
10         You will hear about Mike Johnson's life from his
11 family, his aunt, his sister, and his brother.  Now, the
12 government has alleged that Mike Johnson will be dangerous in
13 the future.  But as you will learn from Dr. Mark Cunningham,
14 who is an expert in what is called risk assessment, that that
15 allegation is simply not supported by any evidence.  Rather,
16 all the relevant information and data indicate that
17 Mr. Johnson will not be dangerous in prison.
18         And that's what we're talking about here; don't
19 forget that.  We're not talking about whether Mr. Johnson
20 would be dangerous on the street, whether he would do a crime
21 like this again.  The question is whether he would be
22 dangerous in prison, because there is no parole, and the
23 sentence he receives if he is not sentenced to death is life
24 in prison without parole.  So that is the only question for
25 you, and it is that which Dr. Cunningham will address.

Opening Statement by Mr. Zerkin

1       I will forewarn you that Dr. Cunningham's testimony
2  will take some time.  I know we have a holiday weekend coming
3  up.  I know we have wasted some of your time along the way,
4  and I know the government and the judge and the defense all
5  apologize for not always be ready to put on something so we
6  could move ahead.  Sometimes those things just happen and
7  they're unavoidable.  But given the seriousness of the
8  decision you must make, an awesome one, I'm confident that you
9  will find Dr. Cunningham's testimony worth hearing.
10      After the evidence is presented, you will know
11 several things.  You will know that Mike Johnson suffered a
12 terrible childhood and adolescence, terrible, horrific.  It
13 was characterized by abuse and by abandonment.  You will hear,
14 for example, that Jim Surry, who I mentioned before, who
15 Dianne ran off with, and -- for three months, and Mike coming
16 back and not wanting to take his shoes off; that he was an
17 alcoholic, too, and he engaged in these pitched battles with
18 Dianne.
19      But Mike actually developed a deep relationship with
20 him because he was the only male father figure he had.
21 Coleman never provided that to him.  He ignored him.  He
22 didn't do anything for him.  When Mike lived with him, he just
23 went about his business.  Coleman didn't provide it.  The
24 father figure was Jim Surry.  Jim Surry ends up walking away
25 and disappearing, just left, didn't leave a note and was gone.

1           Now, Mike has, despite having lived through all of
2  those experiences, despite that background, Mike Johnson has
3  qualities, we will show you, which makes his life worth
4  saving, that Mike will not be dangerous if incarcerated, and
5  that the government has not proven that it is necessary that
6  Mike Johnson die at the hands of the executioner rather than
7  in prison.
8           Understand none of this evidence is offered to
9  justify or excuse the killing of Tammy Baker.  As Judge Moon
10 has told you, I believe, I think at the beginning of the case
11 when he talked about mitigation, maybe it was during voir
12 dire, that's not the purpose of mitigation.  If it was a
13 justification or an excuse for a crime, he wouldn't be guilty
14 of the crime.  If you have an excuse, like self-defense,
15 you're not guilty.  That's not what this is about.
16          What mitigation is about, and what each of you agreed
17 you would consider, would consider in determining the
18 appropriate sentence was mitigating evidence, which doesn't
19 provide a justification or an excuse, but which is intended to
20 give you a sense of who the person is that you are being asked
21 to sentence to death.
22          After you've heard that evidence and have some
23 appreciation for Mike Johnson beyond the crime of which you
24 have convicted him, we will ask you to spare his life.
25          (Further proceedings were held and transcribed under

1 separate cover.)

2      (Court recessed at 5:30 p.m.)

3

4                    CERTIFICATE

5 I, Judy K. Webb, certify that the foregoing is a

6 correct transcript from the record of proceedings in

7 the above-entitled matter.

8

9 /s/  Judy K. Webb          Date: 3/19/01