IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA,              :
                                       :
v.                                     :
                                       :    Case No. 3:00-CR-00026
COLEMAN LEAKE JOHNSON, JR.             :
                                       :
                    Defendant.         :
_____      :

## **INTRODUCTION**

Coleman Leake Johnson, Jr. has spent the last twenty-four years — nearly half of his life — in federal custody. Despite harsh conditions of confinement, he has matured into an exemplary citizen who strives to better the lives of others from behind prison walls. His family is now in desperate need of that support. Mr. Johnson's mother's health is rapidly failing, and their family is unable to provide adequate assistance.

Mr. Johnson, however, can't help his family because of an overly severe federal sentence, imposed when the U.S. Sentencing Guidelines were mandatory. A jury convicted Mr. Johnson of using an explosive to damage a building affected by interstate commerce, 18 U.S.C. § 844(i). ECF 252, ¶ 1. Because the explosion resulted in death, a cross reference to U.S.S.G. § 2A1.1(a) applied. *Id.* at ¶ 11. This established a base offense level of forty-three and a minimum guideline sentence of life imprisonment, despite Mr. Johnson's lack of criminal history. *Id.* The government sought the death penalty, but the jury found that justice did not require a sentence of death. *See* Exhibit N, Decision Form

E.  The jury also did *not* find that Mr. Johnson should be sentenced to life imprisonment without possibility of release.  *Id.* Instead, they chose to allow the Court sentence Mr. Johnson. *Id.* At that time, the Court had no choice (because of the Guidelines) but to sentence Mr. Johnson to life.

The mandatory Guidelines made it impossible for the Court to meaningfully consider the § 3553(a) factors and fashion an appropriate sentence in this case. This Court should grant Mr. Johnson's motion for a sentence reduction because of his unusually long sentence, his family's need, and his rehabilitation.

## PROCEDURAL AND FACTUAL BACKGROUND

A Western District of Virginia Grand Jury indicted Mr. Johnson on May 16, 2000, in connection with a December 3, 1997, bombing in Louisa, Virginia that caused the death of Tammy Lynn Baker and terminated her pregnancy. *See* ECF 3, ECF 252, at ¶ 6. The federal investigation into Mr. Johnson lasted over two years. ECF 252 at ¶ 4. He was charged with one criminal count – the malicious damaging, by means of an explosive, of a building used in or affecting interstate commerce, in violation of 18 U.S.C. § 844(i).

Mr. Johnson proceeded to trial and on May 23, 2001, and the jury found him guilty. Notably, however, the jury found in its special verdict form that Mr. Johnson *did not* commit an "intentional killing after substantial planning and premeditation." Exhibit B, Special Verdict Form, at 1, 3. Because the explosion resulted in death, a cross reference to U.S.S.G. § 2A1.1(a) in the U.S. Sentencing Guidelines raised Mr. Johnson's base offense

level to forty-three. The resulting guideline was life imprisonment. Since the sentencing Guidelines were mandatory at the time, it was impossible for the jury or the Court to sentence Mr. Johnson to anything less than life. *See United States v. Booker*, 543 U.S. 220, 234 (2005). The government requested the death penalty. However, the jury did not find that this was an appropriate sentence and left the Court to sentence Mr. Johnson. Exhibit N. At *that* time, the Court had no choice but to sentence Mr. Johnson to life. Now, because of *Booker*, this Court has the opportunity to reduce that sentence.

Mr. Johnson filed three (3) requests for a sentence reduction with the Bureau of Prisons (BOP). All three were either denied, returned to Mr. Johnson, or ignored and more than 30 days has elapsed since the requests. This motion represents Mr. Johnson's first request to the Court for compassionate release.

## **ARGUMENT**

Evaluation of a motion for sentence reduction under 18 U.S.C. § 3582(c)(1)(A) involves three discrete steps. First, the court must have the authority to rule on the motion. 18 U.S.C. § 3582(c)(1)(A). If it does, then the court must determine whether the petitioner presents an "extraordinary and compelling" reason for a sentence reduction under U.S.S.G. §1B1.13(b). 18 U.S.C. § 3582(c)(1)(A)(i). If both requirements are met, the Court proceeds to the final step — evaluating whether the § 3553(a) sentencing factors support a sentence reduction. 18 U.S.C. § 3582(c)(1)(A). Here, this Court has the authority,

extraordinary and compelling reasons exist, and the § 3553(a) factors support a sentence reduction.

**I.      This Court has authority to rule on Mr. Johnson's compassionate release motion.**

This Court has authority to rule on this motion. The Comprehensive Crime Control Act of 1984, 18 U.S.C. § 3582(c)(1)(A) initially permitted sentence reductions "only upon motion of the Director of the Bureau of Prisons." 18 U.S.C. § 3582(c)(1)(A) (2012). However, the BOP rarely granted inmate "compassionate release" requests. *See United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020) (citing 2013 Department of Justice Inspector General report which found that only twenty-four incarcerated persons were released annually by BOP motion). Further, BOP mismanagement in evaluating prisoners' requests led to time delays so substantial that inmates often died while awaiting the BOP's decision. *Id.*

In response to this disuse and inefficiency, Congress enacted Section 603(b) of the 2018 First Step Act, titled "Increasing the Use and Transparency of Compassionate Release." § 603(b), 132 Stat. at 5239. Section 603(b), true to its name, extended the availability of sentence reductions by allowing incarcerated persons to bring their own § 3582(c)(1)(A) motions upon BOP denial or inaction. *Id.* In the words of one of the First Step Act's co-sponsors, § 603(b) "expands" and "expedites" compassionate release. 164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018) (statement of Sen. Ben Cardin). The First Step

Act's amendments signaled congressional commitment to a more generous sentence reduction policy.

After first requesting that the BOP file a motion on their behalf, a petitioner has two avenues to lawfully bring their own motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). To be heard, the petitioner must *either* (1) have "fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the [petitioner's] behalf" *or* (2) wait "30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). Once 30 days have elapsed following a request, the petitioner has satisfied this threshold requirement, regardless of whether the BOP has issued a decision. *See Reed v. United States*, No. 4:96-cr-22-3, 2024 U.S. Dist. LEXIS 111026, at *7 (E.D. Va. June 24, 2024).

The BOP received Mr. Johnson's initial request for compassionate release on March 7, 2022 and denied his request on April 15, 2022. The BOP received his second request on September 25, 2023, and rejected his request the same day. Exhibit A, Request for Compassionate Release. Mr. Johnson filed a *pro se* motion for a sentence reduction on December 11, 2023.[1] ECF 245, 1. This motion is intended to supplement that *pro se* motion.

---

[1] After filing his motion, Mr. Johnson made a third request to the BOP, which was received on January 24, 2024 and has not been returned.

II.    **Mr. Johnson's unusually long LIFE sentence, his mother and niece's dire need for care, and his rehabilitation together constitute an "extraordinary and compelling reason" for a sentence reduction.**

In November 2023 the U.S. Sentencing Commission's amendments to U.S.S.G. §1B1.13, the Guidelines' governing policy statement for § 3582, went into effect. The Sentencing Commission modified Section 1B1.13's language to allow incarcerated persons' power to move for a sentence reduction, reflecting the change made in the First Step Act. *See* U.S.S.G. §1B1.13(a). The amendments also expanded §1B1.13's list of "extraordinary and compelling reasons" that justify a sentence reduction. Four categories of "extraordinary and compelling reasons" existed prior to the 2023 amendments: (1) the petitioner's medical condition, (2) their health and age, (3) family circumstances, and (4) a catchall provision for unenumerated, yet valid, reasons. *See* U.S.S.G. §1B1.13 (2018). These categories were maintained and, in some areas, broadened in scope. *See, e.g.,* U.S.S.G. §1B1.13(b)(3)(C)-(D) (adding parents, immediate family members, and individuals whose relationship with the defendant is akin to that of an immediate family member to the list of recognized "family").

The Sentencing Commission added two new categories as well. Petitioners can now also seek a sentence reduction because of abuse suffered while in custody — or an unusually long sentence. *See* U.S.S.G. §§1B1.13(b)(4), (6). Even before the amendment, some circuits, including the Fourth, had already begun to grant defendants' sentence reduction motions based on unusually long sentences. *See McCoy*, 981 F.3d at 282 (holding

that since §1B1.13 only references motions brought by the BOP, courts ruling on motions brought by defendants may consider *any* potentially "extraordinary and compelling reason" at their discretion). The amendments made that justification an expressly sanctioned path to relief.

As currently constructed, §1B1.13 provides five specific extraordinary and compelling circumstances for sentence reduction. *See, generally,* U.S.S.G. §1B1.13(b). There is also a catchall provision for "any other circumstance or combination of circumstances" which are "similar in gravity" to the enumerated circumstances. U.S.S.G. §1B1.13(b)(5). Any single circumstance may be extraordinary and compelling on its own, but also, a *combination* of circumstances, even if insufficient in isolation, can be extraordinary and compelling when aggregated. U.S.S.G. §1B1.13(b). Mr. Johnson has several individual circumstances that are each extraordinary and compelling, but they are even more extraordinary and compelling in combination.

A.    Mr. Johnson's sentence, in light of *United States v. Booker*, is unusually long.

Per U.S.S.G. §1B1.13(b)(6) an "unusually long sentence" is an extraordinary and compelling reason for compassionate release. U.S.S.G. §1B1.13(b)(6) states, in part, that "if a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the *Guidelines Manual* that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason." U.S.S.G. §1B1.13(b)(6).

However, that change in law must be one that "would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances." *Id.*

In *United States v. Booker*, the Supreme Court held that the mandatory Federal Sentencing Guidelines violated the Sixth Amendment right to a trial by jury. *See* 543 U.S., at 220. The Supreme Court remedied this constitutional issue by making the sentencing Guidelines *advisory*, not mandatory, giving courts the power to consider a wide range of factors and sentence a defendant fairly. *Id.* at 246. Post-*Booker*, federal judges can and often do hand down sentences that lie below the Guideline's advisory range. Because of this discretion, judges can tailor sentences to better fit the nature and circumstances of the offense and defendant. However, *Booker*'s holding was not retroactive. So, defendants that exhausted their appeals prior to the Supreme Court's decision have no direct recourse. *See Jones v. United States*, 431 F. Supp. 3d 740, 741 (E.D. Va. 2020) (lamenting that the non-retroactivity of *Booker* "has created a lost generation, a group caught in a national purgatory, where individual citizens pay penance for the constitutional errors of the sovereign").

Neither the Supreme Court nor the Fourth Circuit have decided whether *Booker* and its consequences may be considered within the "extraordinary and compelling" analysis. *See United States v. Johnson*, No. 1:97-cr-314-AJT, 2023 U.S. Dist. LEXIS 138382, at *15 (E.D. Va. Aug. 8, 2023). However, district courts within the Fourth Circuit have

consistently considered pre-*Booker* sentencing to be a salient factor when granting a sentence reduction. *See id.* at *16 ("The Court finds little jurisprudential reason not to consider *Booker* in determining whether extraordinary and compelling reasons exist."); *see also United States v. Browning*, No. 2:98-00134, 2022 U.S. Dist. LEXIS 97648, at *9 n.7 (S.D. W. Va. June 1, 2022). In both *Johnson* and *Browning*, the district courts rejected the government's push to adopt the Sixth Circuit position that ignores *Booker* and other non-retroactive changes in law in "extraordinary and compelling" analyses. *See Johnson*, 2023 U.S. Dist. LEXIS 138382, at *15-16; *see also Browning*, 2022 U.S. Dist. LEXIS 97648, at *9 n.7.

Fourth Circuit precedent endorses these district court decisions. As recently as April 2024, the Fourth Circuit upheld the consideration of non-retroactive changes in law. *See United States v. Davis*, No. 21-7325, 2024 U.S. App. LEXIS 9399, at *18 (4th Cir. Apr. 18, 2024) (concluding that recent Supreme Court precedent and the 2023 Guidelines amendments "confirm and amplify" the view that "nonretroactive changes in law remain relevant when a court has to decide when and how to modify a sentence"). As a result, incorporation of *Booker* into §1B1.13(b)(6) analysis aligns with Fourth Circuit precedent.

The advisory Guidelines system ushered in by *Booker* is such a sea change in federal sentencing law that it has created a "gross disparity" between Mr. Johnson's current sentence and the one he would receive if sentenced today. Although his sentencing guideline remains life imprisonment, this is not a barrier to relief. Section 1B1.13(b)(6) requires a "gross disparity" between the sentence received and the sentence

"*likely to be imposed*" today, not the current Guideline range. U.S.S.G. §1B1.13(b)(6) (emphasis added); *c.f.* §1B1.10(b)(2)(A) (limiting sentence reduction to the low end of the amended guideline range). This is consistent with the pre-amendment practice, shared by this Court and others, to grant sentence reductions even when the Guidelines recommendation remained a life sentence. *See United States v. Ismel*, No. 3:94-cr-00008, 2022 U.S. Dist. LEXIS 73846, at *6-7 (W.D. Va. Apr. 22, 2022); *see also United States v. Russo*, 643 F. Supp. 3d 325, 333-34 (E.D.N.Y. 2022).

Statistics from the Sentencing Commission's Judiciary Sentencing Information (JSIN) confirm the significance of the *Booker* holding. Mr. Johnson's primary guideline was § 2A1.1, his Final Offense Level was forty-three, and he had a Criminal History Category of I. Among defendants who share those characteristics and were sentenced between 2019-2023, the mean length of imprisonment was *415 months*. *See* JSIN, *available at* https://jsin.ussc.gov/. Because the Guidelines' recommendation remains life imprisonment, this average is only possible because of *Booker*. Since judges gained more sentencing discretion, the rate of life sentences among federal offenders has fallen precipitously. *See* United States Sentencing Commission, *Life Sentences in the Federal System* 5 (2022) (finding that in 2001 life sentences made up 0.39% of all federal sentences imposed, but by 2021 they composed only 0.1% of all sentences—a roughly four-fold decrease). Judges now commonly impose sentences below the Guidelines' advisory range. *See, e.g.*, United States Sentencing Commission, *Career Offenders Quick Facts, Fiscal*

*Year 2019* 2 (noting that over half of all defendants sentenced as "career offenders" in 2023 received a downward variance below the Guidelines range).

Not only do typical § 2A1.1 defendants now receive far fairer sentences than Mr. Johnson did, but he was also found to be significantly less culpable than the average § 2A1.1 defendant. Crucially, Mr. Johnson's jury found that there was *not* an "intentional killing after substantial planning and premeditation." Exhibit B, at 3. Such a finding weighs heavily in favor of a sentence of a term of years, rather than a life sentence. However, in 2001, that fact could not tip the scales at trial since the Guidelines mandated life imprisonment. It can and should be weighed now. It is not unprecedented to do so. For example, in *United States v. Degout* and *United States v. Ismel*, this Court heard two compassionate release motions from co-defendants who had been convicted of "murder during and in relation to a drug conspiracy." *United States v. Degout*, No. 3:94-cr-00008, 2023 U.S. Dist. LEXIS 112037, at *14 (W.D. Va. June 8, 2023). However, only Mr. Ismel's motion was granted. The Court reduced Mr. Ismel's **double life** sentence to 360 months. *Id.* at *13.  This Court justified the contrasting rulings by emphasizing that "Degout's offenses are among the most serious this Court sees. He both pulled the trigger to intentionally kill a man and threatened to kill another to cover his wrongdoing." *Id.* Contrary to Mr. Degout, neither Mr. Ismel (not the trigger man) nor Mr. Johnson committed the physical act of intentional murder that made Mr. Degout's conduct so

heinous. This Court's decision should reflect that distinction by providing Mr. Johnson with a sentence reduction as well.

The *Booker* decision led to a sweeping reduction in the imposition of life sentences. The current, more flexible sentencing structure is better able to account for both defendants' individual culpability and mitigating factors. Mr. Johnson's less culpable *mens rea* could not be afforded its due attention at trial, resulting in a life sentence that is markedly out of step with current sentencing averages.

There is a "gross disparity" between the life sentence Mr. Johnson received and the sentence that would likely be imposed now. There is no bright line that distinguishes the point at which a sentencing disparity becomes "gross." However, determination of that point should involve due consideration of "the psychological, emotional, and social challenges inherent in incarceration" and the loss of liberty. *United States v. Robinson*, No. 11-147-01-JJM-LDA, 2024 U.S. Dist. LEXIS 67456, at *7-8 (D.R.I. Apr. 10, 2024). In *Robinson*, the Court weighed those factors and deemed a five-year difference between the sentence then-imposed and the sentence that would now be imposed to be a "gross disparity." *Id.* Another district court, grappling with the difficulty of abstractly measuring the disparity between a life sentence and term of years, concluded that the difference between life and anything less was "gross." *United States v. Allen*, No. 1:09-cr-320-TCB, 2024 U.S. Dist. LEXIS 28049, at *14 (N.D. Ga. Feb. 12, 2024). The general hope of release, absent in a life

sentence, inspired the court's decision. *Id.* So too did the possibility for good time credits that a term of years offers. *Id.*

Mr. Johnson has served twenty-four years of his sentence. While, as will be discussed below, he is plagued by nagging medical conditions resulting from BOP healthcare mismanagement, he suffers from no chronic or terminal illnesses. He is in relatively good health (or would be if he provided the proper medical treatment – discussed below) and only in his early fifties. A sentence reduction to time-served would remedy the gross sentencing disparity created by this egregious life sentence.

B.    Mr. Johnson's mother has been incapacitated by several chronic diseases and other afflictions, and Mr. Johnson is the only caregiver available.

U.S.S.G. §1B1.13(b)(3) states that a sentence reduction may be warranted if a petitioner's minor child or incapacitated family member needs care and the petitioner is the only available caregiver. U.S.S.G. §1B1.13(b)(3). Prior to the amendment, Section 1B1.13 only gave relief to petitioners seeking to aid their minor child or spouse/partner. U.S.S.G. §1B1.13 cmt. n.1(C) (2018). However, courts evaluating defendants' motions following the 2018 First Step Act amendments to § 3582, untethered from the strictures of §1B1.13, expanded the list of suitable familial relationships. *See, e.g., United States v. Griffin*, No. 1:95-cr-00751, 2020 WL 7295765, at \*2-3 (S.D. Fla. Dec. 8, 2020) (granting petitioner's motion for a sentence reduction to care for his sister). The Sentencing Commission's November 2023 amendments then expanded §1B1.13(b)(3)'s applicability to include parents, other immediate family members, and non-immediate family

members whose relationship is nonetheless comparable to that of an immediate family member. *See* USSG §1B1.13(b)(3)(C)-(D). The incapacitation of Mr. Johnson's mother, Ms. Dianne Johnson, and her family's inability to care for her is an extraordinary and compelling reason for sentence reduction on its own, as well as in combination with Mr. Johnson's unusually long sentence and rehabilitation.

The first requirement for relief under §1B1.13(b)(3) is the family member's incapacitation. The Sentencing Commission does not expound upon the definition of "incapacitation," but temporary conditions, like the recovery phase following a joint-replacement surgery, are typically rejected. *See United States v. Steele*, No. 1:20-cr-13-4, 2024 U.S. Dist. LEXIS 79595, at *7 (S.D. Ohio May 1, 2024) (citing *United States v. Jones*, No. CR 13-252, 2021 U.S. Dist. LEXIS 50950, 2021 WL 1060218, at *10 (W.D. Pa. Mar. 18, 2021) ("[H]ip or knee replacement surgery typically does not leave a person 'incapacitated.'"). However, chronic conditions that leave the affected individual incapable of self-care, such as dementia or Parkinson's Disease, have been recognized as incapacitating. *See United States v. Shaw*, No. 9:95-cr-8094, ECF No. 262, at 28-30 (S.D. Fla. Mar. 11, 2024) (concluding that the defendant's mother's acute dementia rendered her incapacitated); *see also United States v. Haldorson*, No. 15 CR 623, 2024 U.S. Dist. LEXIS 25705, at *6 (N.D. Ill. Feb. 14, 2024) (holding that the defendant's father was incapacitated by Parkinson's Disease and diabetes symptoms).

If the ailing family member is deemed "incapacitated," then the petitioner must also demonstrate that they are the "only available caregiver." U.S.S.G. §1B1.13(b)(3)(C). Courts carefully gatekeep "caregiver" status to ensure that other potential helpers are truly unable to provide the necessary care. For example, in *United States v. Shaw*, the district court found the defendant's sister to be "generally available," but concluded that the mother's condition required additional, full-time care. *Shaw*, 9:95-cr-8094, ECF No. 262, at 30. Similarly, in *United States v. Stokes*, the district court rejected the argument that other family members in the state were available to care for the defendant's incapacitated family members, since they were occupied with "work and familial obligations, and their own health issues." No. 3:19-CR-307 (SRU), 2024 U.S. Dist. LEXIS 9845, 2024 WL 216643, at *2 (D. Conn. Jan. 19, 2024). Many family members may be able to provide *some* assistance, but very few can provide the extensive aid that an incapacitated person requires.

Further, a *prior* caregiver may not necessarily remain equipped to be a *current* caregiver. The ailing family member's condition may worsen over time, leaving previously capable caretakers overwhelmed. *See Stokes*, 2024 U.S. Dist. LEXIS 9845, at *5 (concluding that even though the defendant's brother and aunt had previously provided adequate care to his mother, her worsening health made the defendant's assistance indispensable). Also, the caretaker's own health may suffer, a not uncommon occurrence given the taxing nature of around-the-clock care. In *United States v. Aman*, the defendant's

son's caretaker provided assistance at the price of lost sleep and missed doctor's appointments. *United States v. Aman*, No. 20-CR-80062-RAR, 2024 U.S. Dist. LEXIS 124915, at *9 (S.D. Fla. July 16, 2024). Her physical condition worsened as a result, contributing to the court's conclusion that she was no longer an adequate caregiver. *Id.*

Finally, one cannot merely point to the nearest nursing home or elderly care facility and deem them an available caregiver. *See Haldorson*, 2024 U.S. Dist. LEXIS 25705, at *9 ("[T]he theoretical possibility of nursing home care that might be paid for in part by public assistance benefits does not, at least in this case, undercut the proposition that there are no other 'available caregivers.'"). As the *Haldorson* Court aptly identified, holding otherwise would render §1B1.13(b)(3)(C) a "dead letter" because that remedy would be available for "*any* incapacitated parent." *Id.* (emphasis in original).

Ms. Delina Cooley, Ms. Johnson's attending healthcare professional and a physician assistant, wrote a letter for the Court that describes the myriad afflictions that leave Ms. Johnson incapacitated. Exhibit C. She has dementia, COPD, chronic stage three kidney disease, spinal arthritis, recurrent major depressive episodes, ataxic gait, and other issues. *Id.* Not only does she share the dementia diagnosis that the petitioner's incapacitated mother in *Shaw* dealt with, but she also has a host of other chronic illnesses. In her own letter, Mr. Johnson's sister also mentions the strokes that their mother had in recent years. Exhibit D, Declaration of Susan Richardson at Exhibit 1. It is no surprise,

then, that Ms. Cooley concluded that Ms. Johnson is "in need of medical attention and personal care." Exhibit C.

No person other than Mr. Johnson can provide the care and attention that Ms. Johnson requires. Mr. Johnson's sister, Ms. Catherine Earls, has struggled to provide care for their mother and her own disabled daughter in the past. She is now overwhelmed by Ms. Johnson's continually worsening condition, her daughter's disability, and her own health troubles. Ms. Earls's daughter, Avery, has cerebral palsy and herself requires 24-hour care. Exhibit D, at Ex. 1. Avery is "mute and can't walk. She has to be fed, bathed, and clothed. Special equipment is used to mobilize her." *Id.* Because of Avery's needs, Ms. Earls has not worked since 2008. *Id.* She is now incapable of giving her mother, who also needs "around the clock assistance," the care she needs. *Id.* Ms. Cooley confirmed that Ms. Earls "can't get [Ms. Johnson] the right care" and only Mr. Johnson can adequately provide for his mother. Exhibit C. Mr. Johnson's own daughter lives in Dayton, Virginia, has two minor children, and, because she did not establish a relationship with her father until after his incarceration, does not have any relationship with Mr. Johnson's mother. Until Mr. Johnson's release, Ms. Earls's own "life sentence" continues. Exhibit D, at 3.

There are also no other available caregivers within the family. Mr. Johnson's brother passed away in 2019 of brain cancer. *Id.* His father died of kidney disease in 2020. *Id.* Ms. Earls' husband, an Air Force veteran, passed away in 2017 from heart failure. *Id.*

Mr. Earls had begun working double shifts to support the family after Ms. Earls had to quit her job to provide full-time care for their daughter. *Id.* The stress, Ms. Earls described, caused Mr. Earls' health to deteriorate precipitously. *Id.* Ms. Earls' own physical and psychological health, her doctor warns, is now also at severe risk of declining if she does not receive the at-home assistance she needs. *Id.* If Mr. Johnson's motion is denied, the health of his mother, sister, and niece are all at risk.

      C.    <u>Mr. Johnson's exemplary work on himself and on behalf of others further supports a sentence reduction.</u>

Section 1B1.13(d), in part, states that "rehabilitation of the defendant is not, *by itself*, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. §1B1.13(d) (emphasis added). However, a petitioner's rehabilitation may still be weighed in an "extraordinary and compelling" analysis "in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.* Mr. Johnson's rehabilitation, undertaken while incarcerated in some of the BOP's most dangerous and violent prisons, is nothing short of extraordinary. When evaluated in combination with his unusually long sentence, his family's urgent need for care, and his own ailments, this rehabilitation warrants a sentence reduction.

Mr. Johnson has spent 22 years in BOP custody for this conviction and 24 years total in custody. Exhibit U, BOP Quarters History. Despite two-plus decades of imprisonment, he has had *a single* disciplinary infraction, which was 22 years ago. Exhibit

V, BOP Disciplinary History. A nearly spotless record is impressive for anyone who has served over twenty years. But it is even more so for Mr. Johnson who has been a model inmate and citizen while serving a life sentence with no possibility of release. His outstanding behavior cannot earn him good time credits and further infractions would not have lengthened his already endless sentence. Instead, his disciplinary record's brevity is a testament to Mr. Johnson's rehabilitation and character.

Mr. Johnson's work history demonstrates that he has not just stayed out of trouble but also become an exemplary inmate. Prior to its recent shutdown, Mr. Johnson worked for UNICOR.[2] He was the highest paid inmate at UNICOR's Petersburg facility upon its temporary closure and had transitioned into a mentorship and training role for other workers that were imminently re-entering society. Exhibit J, Work Performance and Special Achievement Awards, at 4. Supervisors continually lauded Mr. Johnson in performance evaluations. In a May 2007 evaluation, Mr. Johnson's supervisor at USP Florence commented that he "displayed exceptional work ethics and leadership" in his role as an administrative clerk. Exhibit J, at 1. In March 2012, his evaluator noted Johnson was among the first workers to return to UNICOR after contract negotiations led to a factory lay-in. *Id.* at 1. The evaluator praised Mr. Johnson's "extraordinary

---

[2] UNICOR is "a wholly, self-sustaining Government corporation that sells market-priced services and quality goods made by inmates," which helps incarcerated persons "in learning the skills necessary to successfully transition from convicted criminals to a law-abiding, contributing members of society." *Custody & Care: UNICOR*, Federal Bureau of Prisons, https://www.bop.gov/inmates/custody_and_care/unicor.jsp.

comprehension" of his role and added that he was the "perfect choice" for his promoted position. *Id.* By 2022, Mr. Johnson had become "the perfect example of what UNICOR needs in an employee." *Id.* at 4. In total, Mr. Johnson received a perfect score on 27 out of 28 performance evaluations over a span of 16 years at UNICOR. *See id.* at 1-4. He also received 17 monetary awards for special achievement in his employment capacity. *See id.* at 4-8.

Even though UNICOR's facility is no longer operational at FCI Petersburg, Mr. Johnson maintained steady employment as a Suicide Watch Cadre member since 2022. Exhibit M, Suicide Watch Cadre Records, at 1. As a watch companion, Mr. Johnson observes and communicates with inmates at risk of harming themselves or ending their own lives. *Id.* Mr. Johnson's role protects the safety of others and promotes their recovery. Mr. Johnson's work as a watch companion is especially moving. Mr. Johnson attempted suicide twice while incarcerated at the BOP – in 2008 and a few years before that. Both times he was hospitalized. After his second attempt, this was at Parkview Medical Center in Pueblo, Colorado, where doctors saved his life. Following his recovery from his second attempt, Mr. Johnson joined the Suicide Watch Cadre to help other inmates in crisis.

Mr. Johnson has also capitalized upon his term of imprisonment to better himself through *over 100* educational courses and programs. Exhibit W, Inmate Education Data; Exhibit O, Certificates of Achievement. His curriculum has included work skills courses like "Payroll Accounting" and "Using Hand Tools," as well as moral and character

improvement-based programs like "Handling Conflict," and "Decision Making." Exhibit W. Mr. Johnson also completed the Beckley Responsibility and Values Enhancement (B.R.A.V.E.) Program, whose classes focused on pro-social skills like "Responsibility" and "Respect." Exhibit L, BRAVE Certificate.

Mr. Johnson has not only taken advantage of institutional opportunities offered to inmates, but he has also made proactive efforts to improve the lives of others. In 2008, Mr. Johnson organized the 2004 USP Florence Haiti Disaster Relief Fund in response to the devastating Hurricane Jeanne. Hurricane Jeanne caused the deaths of over 2,000 Haitians and compounded the country's turmoil stemming from President Aristide's removal by coup months earlier. Human Rights Watch, *Haiti: Events of 2004*, https://www.hrw.org/world-report/2005/country-chapters/haiti (last visited July 31, 2024). Johnson, through his Protestant congregation, gathered relief effort donations from himself and forty fellow inmates. USP Florence applauded the drive's success, rewarding Mr. Johnson and his congregation with a celebratory reception.

Mr. Johnson's most ambitious undertaking was his years-long campaign to start an inmate living organ donor program. Mr. Johnson lobbied BOP officials, organ banks, medical experts, and academics for advice or aid in his attempt to reverse the ban on inmate organ donations to non-family members. *See* Exhibit P. He offered to volunteer the little savings he had to cover the medical costs associated with any procedures and

requested that the donations occur discreetly. *Id.* at 2. Unfortunately, Mr. Johnson was ultimately unable to rally the institutional support required for such a change.

Mr. Johnson's mission was personal as his father was diagnosed with kidney failure in 2018. He and his father had compatible kidneys and intra-family inmate organ donations are permissible. However, despite BOP medical staff agreeing to meetings with Mr. Johnson and Mr. Johnson filling out countless notarized request and release forms, BOP inefficiency thwarted the donation process. *Id.* at 16-23. Mr. Johnson's father died of kidney failure in 2020.  This tragedy would not have occurred if Mr. Johnson were free or if the BOP had permitted the organ donation they promised. Nevertheless, Mr. Johnson's tireless efforts demonstrate his commitment to the betterment of others' lives through the limited means at his disposal.

Mr. Johnson's comprehensive rehabilitation is undoubtedly impressive, especially considering his life sentence. It becomes almost unbelievable when also considering the conditions he has endured. Mr. Johnson spent five years at USP Florence, during which he routinely witnessed violence. Only a few months before Mr. Johnson entered Florence in July 2003, the facility was labeled the "bloodiest" prison in America by an assistant U.S. attorney. Bob Williams, *Murder, Mayhem, Corruption and Snitches: BOP Florence Exposed*, Prison Legal News (Apr. 15, 2005), https://www.prisonlegalnews.org/news/2003/apr/15/ murder-mayhem-corruption-and-snitches-bop-florence-exposed/. USP Florence is also

an Aryan Brotherhood stronghold. *Id.* USP Florence's appalling conditions could induce even the most pacifistic inmates to commit violence or join a gang for protection.

Mr. Johnson did neither. He also refused to be tattooed and remains one of few untattooed inmates. Refusing to join a gang, get a tattoo, or commit violent acts has come at great risk to Mr. Johnson. At one time, he was threatened and ordered to stab and kill another inmate. Even with a knife placed in his hand and the obvious potential for retribution if he refused to carry out the killing, his commitment to what was right outweighed those fears. Mr. Johnson's fortitude was again tested when a massive 200 plus inmate riot broke out at Florence in 2008. Two inmates died and thirty more, as well as a guard, were injured. Guards exhausted all the facility's ammunition during the riot. Mr. Johnson watched as an inmate slashed his friend's throat. He witnessed countless beatings and gunshot wounds that remain etched in his memory. Yet, Mr. Johnson's supervisor noted in a performance review that not only was he not involved in the riot, but his productivity during that tumultuous period was "impressive." Exhibit J, at 1.

Mr. Johnson's surroundings hardly improved in 2008 when he was transferred to USP Victorville. The prison, colloquially known as "Victimville" for its ubiquitous violence, was the site of several murders while Mr. Johnson was there. Further, a 2016 Inspection Report by the District of Columbia Corrections Information Council (CIC) revealed that "over half of the inmates interviewed by the CIC reported being assaulted at Victorville or expressed fear for their safety or lives." District of Columbia Corrections

Information Council, *Inspection Report: USP Victorville*, Jan. 7, 2016. Once again, Mr. Johnson witnessed unspeakable violence. He saw a man get shanked in the neck in the chow hall. At another time, after a group murdered his mail room colleague, Mr. Johnson watched that the perpetrators dragged the victim's body to the guard's office, leaving a bloody trail in their wake. According to Mr. Johnson, "it was a normal occurance [sic] to see dried blood trails on the walkways." (From written correspondence with Mr. Johnson.)

Social science data also reveals that continued incarceration is unnecessary and wasteful once an inmate is rehabilitated. Less than 5% of formerly incarcerated persons who are released from life sentences recidivate. It is clear from Mr. Johnson's history while incarcerated that he has been "rehabilitated," and prison is no longer necessary.

Mr. Johnson's unusually long sentence, as well as his mother's urgent need for a caregiver, each individually serve as extraordinary and compelling reasons for this Court to grant a sentence reduction. These considerations combine with each other and Mr. Johnson's exceptional self-improvement to provide an even more extraordinary and compelling reason in support of a sentence reduction.

### III.    The § 3553(a) sentencing factors, when weighed, support a resentencing to time served.

Since Mr. Johnson's motion is properly before this Court and he has presented extraordinary and compelling reasons for sentence reduction, the 18 U.S.C. § 3553(a) sentencing factors must be weighed to impose a sentence that is "sufficient, but not

24

greater than necessary," to achieve the goals of incarceration. The § 3553(a) factors include:

> (1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely, (a) 'just punishment' (retribution), (b) deterrence, (c) incapacitation, [and] (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution.

*Rita v. United States*, 551 U.S. 338, 347-48 (2007). At Mr. Johnson's original sentencing, the Guidelines' mandatory life sentence precluded consideration of the § 3553(a) factors. But this Court can now consider the § 3553(a) factors in Mr. Johnson's case, and they counsel in favor of a resentencing to time served.

A.  Mr. Johnson is a college-educated, single-time offender whose conviction was entirely based upon circumstantial evidence. These characteristics favor a sentence reduction to time served.

In balancing the § 3553(a) sentencing factors, this Court must contemplate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Mr. Johnson's offense was undoubtedly serious. But the severity of the offense is only one factor in a sentencing analysis. *See, e.g., United States v. Lugo*, No. 01-cr-922 (NG), 2022 U.S. Dist. LEXIS 43458, at *25 (E.D.N.Y. Mar. 11, 2022) (granting reduction on murder conviction from life sentence to twenty-five years, even though "the gravity of Lugo's offense cannot be overstated). Beyond this observation, because there was no direct evidence in this case, only circumstantial evidence from witnesses, it is difficult to further assess the nature or circumstances of the offense itself.

25

Mr. Johnson's characteristics, however, strongly support a sentence reduction. First, he had no criminal record prior to the conviction at hand. With a resulting Criminal History Category of I, empirical evidence suggests that Mr. Johnson presents a low risk of recidivism. *See* U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* 6-8 (May 9, 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf (finding that "Criminal history score and Criminal History Category (CHC) are strong predictors of recidivism" and that offenders in CHC I had a rearrest rate of nearly half the next-lowest category). In this way, Mr. Johnson presents an *even stronger* case than similarly situated petitioners whose sentence reduction motions were granted. *See, e.g., Lugo*, 2022 U.S. Dist. LEXIS 43458, at *25 (granting a sentence reduction from life imprisonment to twenty-five years on murder, conspiracy to commit murder, and firearms charges, despite a long and violent criminal history which necessitated "a severe sentence").

Mr. Johnson's education level further suggests that he is deserving of a sentence reduction. Courts in the Fourth Circuit recognize continued education during incarceration as a relevant consideration under § 3553(a). *See United States v. Stockton*, No. ELH-99-352, 2020 U.S. Dist. LEXIS 169584, at *26-27 (D. Md. Sep. 16, 2020) (asserting that the petitioner's completion of education classes while in prison "warrants recognition under 18 U.S.C. § 3553(a)"). At the time of his sentencing, Mr. Johnson had completed a

portion of his college education. He built upon that foundation with a Business

Management Certificate from Pueblo Community College, where he maintained a 3.75

GPA.

      B.    <u>Mr. Johnson is not a danger and will not commit crimes if released; he has</u>
<u>been amply punished and rehabilitated by his 23-year sentence.</u>

Mr. Johnson does not pose a threat to the community and is unlikely to recidivate.

As explained above, his disciplinary record only contains a single infraction, which is

over twenty years old. Mr. Johnson's criminal record is similarly bare. He has no

convictions other than that for which he is currently imprisoned. Mr. Johnson has also

actively participated in courses like "Conflict Resolution" and "Release Empowerment,"

which have taught him healthy practices and habits for a crime-free return to society.

Exhibit W, at 1. His low risk to the community is evidenced by his Recidivism Risk

Assessment, with violence and general risk level scorings of "minimal." Exhibit R, FSA

Recidivism Risk Assessment, at 1.

Social science data regarding the relationship between age and criminality

corroborates the "minimal" recidivism risk assessment. Mr. Johnson is 52 years old and

is statistically less likely to recidivate than younger prisoners. *See United States v. Howard*,

773 F.3d 519, 533 (4th Cir. 2014) (citing evidence that rates of recidivism decrease as age

increases); *see also* Vera Inst. Of Justice, *It's About Time: Aging Prisoners, Increasing Costs,*
*and Geriatric Release* (April 2020), https://www.vera.org/publications/its-about-time-

aging-prisoners-increasing-costs-and-geriatric-release.

Mr. Johnson's rehabilitation should also guide the Court towards a sentence reduction. Post-sentencing rehabilitation is relevant to multiple § 3553(a) sentencing factors and should be considered when mulling a sentence reduction. *See Pepper v. United States*, 562 U.S. 476, 491 (2011). Mr. Johnson's post-sentencing conduct demonstrates that he is unlikely to commit crime if released and provides the most "up-to-date picture of his 'history and characteristics'" for re-sentencing. *Id.* at 492 (citing *United States v. Bryson*, 229 F.3d 425, 426 (CA2 2000) ("[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing.")). As more fully described above, Mr. Johnson's rehabilitation is extensive and well-documented, despite inhospitable circumstances. Mr. Johnson's post-sentencing conduct demonstrates that he is unlikely to reoffend. This weighs heavily in favor of a sentence reduction.

C.    Mr. Johnson's health problems support his compassionate release motion.

Mr. Johnson suffers from multiple continuing health issues that have not been treated properly by BOP medical staff. He has been plagued by recurring urinary tract infections during years of inadequate medical care. Exhibits F and S, Excerpts from BOP Medical Records. In 2017, BOP staff initially refused to give Mr. Johnson antibiotics to fight an acute flare-up. When Mr. Johnson blacked out from oxygen deprivation caused by the infection, he was finally rushed to John Randolph Medical Center. After a hospital transfer, a near-fatal bout of pneumonia, and six days of intense treatment with antibiotics, the worst of Mr. Johnson's symptoms subsided. However, the recurring UTIs

continue to make it difficult and painful to urinate. Exhibit F. Instead of receiving adequate medical attention, Mr. Johnson has had to resort to makeshift remedies like depriving himself of water to delay the inevitable.

Mr. Johnson's day-to-day health is further distressed by his Carpal Tunnel Syndrome (CTS) in his left wrist. Mr. Johnson was diagnosed with CTS *twenty-seven years* ago, yet BOP has only ever authorized CTS surgery on his right wrist, even as the Pain Scale has reached a ten-out-of-ten level and he becomes unable to hold items. Exhibit E, excerpt from BOP Medical Records; *see also* Exhibit S. As with his UTI, Mr. Johnson's own improvised pain relief strategies must take the place of professional care. He sleeps on his right side, mitigating left wrist pain but exacerbating his right hip problems. Surgery completed alleviated pain in his right wrist, yet the BOP refuses the same solution for Mr. Johnson's dominant left wrist. *Id.*

In 2017, when Mr. Johnson had to be rushed to John Randolph Medical Center, inadequate healthcare at the BOP almost ended his life. Healthcare at the BOP has worsened since 2017, meaning another issue caused by his unresolved urinary tract issue could cost him his life. A DOJ OIG report from February 2024 on inmate deaths in BOP institutions reports that, "The OIG identified several operational and managerial deficiencies that created unsafe conditions prior to and at the time of a number of these deaths." (DOJ OIG Releases Report on Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions, <u>Department of Justice</u>, February 15, 2024,

*https://oig.justice.gov/sites/default/files/2024-02/02-15-2024_0.pdf*.) Healthcare incompetence already took Mr. Johnson's father's life. It now makes Mr. Johnson's existence one of constant pain and mental anguish.

      D.      <u>Mr. Johnson has supportive work and living plans for after his release.</u>

Mr. Johnson's friends and family are ready and eager to welcome him home, as evidenced by the attached letters. Upon release, he would live with his mother, sister, and niece in North Carolina. Exhibit D, at Ex. 1. The four would live in Ms. Earls's home, which is insured and possesses ample space. *Id.* None of the current residents have criminal records or own firearms. *Id.* Mr. Johnson would also have access to reliable and insured transportation. *Id.*

Mr. Johnson's daughter, Sarah Marie Miller, and his grandchildren also await his release with eager anticipation and open arms. Sarah Marie's mother kept her from seeing Mr. Johnson throughout her entire childhood, though he continually tried to contact her so that she knew of his love and pride in her. In the meantime, Mr. Johnson completed two parenting courses in hopeful anticipation of a reunion. Exhibit O, Certificates of Achievement, at 18. As an adult, Sarah Marie, who bears the name Mr. Johnson gave her, reunited with her father. The two began to be, and remain, a constant and indispensable presence in each other's lives. Sarah Marie also has two children, ages 8 and 10, who talk with Mr. Johnson 3-5 times per week. Mr. Johnson's grandchildren are athletes, animal-lovers, and aspiring musicians. If released, Mr. Johnson hopes to regularly spend time

with his daughter and grandchildren in Dayton, Virginia. A sentence reduction not only

means freedom, but concert recitals and sporting events too.



*Pictured*: Mr. Johnson with his grandchildren (Exhibit Q)

Mr. Johnson also has two outstanding offers of employment. Carmen Garrison, a

North Carolina real estate agent and property manager, has offered to hire Mr. Johnson

for his maintenance skills. Exhibit T, at Email from Carmen. She is a lifelong acquaintance

of Mr. Johnson, familiar with his case and "significant maturity and moral improvement"

while incarcerated. *Id.* Ms. Garrison hopes this Court allows her "to support a deserving

individual's reintegration into society" through employment. *Id.*

Daniel Street, a licensed general contractor and business owner in nearby Virginia, has also offered Mr. Johnson immediate employment upon release. *Id.* at Email from Daniel Street. Mr. Street is a former trooper with the Virginia State Police, and as a result he "understand[s] the importance of community safety and the responsibility that comes with providing second chances." *Id.* Nonetheless, he strongly feels that Mr. Johnson will be an upstanding member of society. He too strongly urges this Court to facilitate Mr. Johnson's release "as a remedy to the needs of his desperate family." *Id.*

The congregation at Oak Grove Baptist Church, led by Pastor Greg Hurdle, also stands ready to support Mr. Johnson's transition. Exhibit D, at 4. Mr. Johnson is a devout Protestant and currently participates in both nightly and weekly religious services at FCI Petersburg. The continued support of a spiritual community is yet another structure that will ease Mr. Johnson's re-entrance into society.

E.    <u>A sentence reduction would remedy unwarranted sentence disparities between Mr. Johnson and other similarly situated defendants.</u>

As explained above, JSIN data demonstrates that the life sentence Mr. Johnson received is grossly disproportionate to that of similar and even less outstanding defendants. Additionally, the median sentence for those convicted of murder in the Fourth Circuit in 2023 was only 292 months. Cite: *Statistical Information Packet, Fiscal Year 2023,    Fourth    Circuit*,    U.S.    Sentencing    Comm'n    11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/4c23.pdf.    Though    Mr.    Johnson's

32

Guidelines recommendation remains life imprisonment, this Court should instead focus on the way in which district courts *actually* sentence defendants, not the sentence that is suggested, and sentence Mr. Johnson to time served.

## CONCLUSION

If released, Mr. Johnson plans to daily make a "positive impact on the planet." In addition to helping is sister, caring for his mother and niece, and spending time with his daughter and grandchildren, he plans to continue his mission to increase living organ donation and hopes to become a donor. Mr. Johnson respectfully asks this Court to exercise its discretion and reduce his sentence to time served. Mr. Johnson's current life sentence is disproportionate considering both his culpability and the recent average sentences of those similarly situated to him. Further, Mr. Johnson's mother's deteriorating condition and his sister's inability to care for her counsels in favor of immediate release. Mr. Johnson's rehabilitation while incarcerated bolsters the above "extraordinary and compelling" reasons for sentence reduction. His rehabilitation also tips the balance of the § 3553(a) sentencing factors in favor of a sentence reduction, in combination with his low recidivism risk, medical ailments, and comprehensive release plan.

Respectfully submitted,

/s/Abigail M. Thibeault[3]
Abigail M. Thibeault
Assistant Federal Public Defender
Maryland Atty ID 1803010004

Office of the Federal Public Defender
401 E. Market Street, Suite 106
Charlottesville, VA 22902
Ph. (434)220-3388
Fax (434)220-3390
abigail_thibeault@fd.org

---

[3] This submission was prepared with the substantial assistance of the Federal Public Defender's Office's Summer Intern, Brian Curtis, a First Year Law student at the University of Virginia.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 31, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

<u>/s/Abigail M. Thibeault</u>
Abigail M. Thibeault