IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

UNITED STATES OF AMERICA,          :
                                   :
v.                                 :
                                   :      Case No. 3:00-CR-00026
COLEMAN LEAKE JOHNSON, JR.         :
                                   :
                    Defendant.     :
_____    :

## DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION FOR COMPASSIONATE RELEASE

Mr. Johnson, who is currently serving a life sentence, is requesting that this Court grant him compassionate release because of the following "extraordinary and compelling" reasons: 1) that he would be facing a lower sentence today; 2) the health of his family; 3) "other reasons" such as the combination of Mr. Johnson's medical circumstances, incapacitation of his mother for whom he is the only caretaker, and outstanding post-sentencing rehabilitation; and 4) the § 3553(a) sentencing factors, which favor a sentence reduction. The Government argues against each of these, opposing Mr. Johnson's motion, but each of the Government's arguments fall short.

Mr. Johnson asks this Court to exercise its discretion and reduce his sentence to time served. His current life sentence is disproportionate considering the recent average sentences of those similarly situated. Further, Mr. Johnson's mother's deteriorating condition and his sister's inability to care for her counsels in favor of immediate release.

Mr. Johnson's rehabilitation while incarcerated cannot be contested and the Government does not even attempt to do so. (*See, e.g.,* Government Response at p. 38). His rehabilitation also tips the balance of the § 3553(a) sentencing factors in favor of a sentence reduction, in combination with his low recidivism risk, medical ailments, and comprehensive release plan.

## ARGUMENT

I.   **Mr. Johnson's unusually long life sentence constitutes an "extraordinary and compelling reason" for a sentence reduction.**

    A.   <u>Mr. Johnson is not attacking the validity of his sentence, so *Ferguson* does not foreclose relief.</u>

Mr. Johnson's sentence, in light of *United States v. Booker*, is unusually long and is an extraordinary and compelling reason for compassionate release. U.S.S.G. §1B1.13(b)(6).  The Government contends Mr. Johnson's argument that his sentence is "unusually long" after *Booker* is a guise and that he is actually challenging the validity of his judgment with a claim of legal error, which is foreclosed by *United States v. Ferguson*, 55 F.4th 262, 270 (4th Cir. 2022). This is not accurate.

Mr. Johnson is not attacking the validity of his sentence; therefore, *Ferguson* does not foreclose relief. The government tries to use *Ferguson* to slam the door shut on Mr. Johnson's claim as a matter of law. It first attempts to collapse the distinction between Ferguson's claim about sentencing error and Mr. Johnson's claim of sentencing disparity, confusing the substance of each in the process. However, in *Ferguson* itself, the Fourth

Circuit plainly and preemptively rejected the government's argument here, calling one just like it "inapt." *Id*. at 271. There, Ferguson filed, in substance, a § 2255 claim wrapped up in a compassionate release motion: he challenged the instructions the jury received, the government's failure to inform him of an additional penalty, the district court's calculation of his sentencing guidelines, and the efficacy of his counsel. 55 F.4th at 266. In doing so, he tried to align his arguments with the defendant's claims in *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). The Fourth Circuit rejected Ferguson's claim for compassionate relief wholesale, in large part because granting it would "require the district court" to evaluate whether his original convictions were valid. *Id*. at 271. The court stated, "The defendants in McCoy," much like Mr. Johnson, made a fundamentally different claim than Ferguson: they "argued that a change in the sentencing law that occurred after their sentencings (but did not apply retroactively) merited a reduction in their sentences to conform to that change." *Id*. The court refused to conflate Ferguson's improperly filed claim about sentencing error with sentencing disparity claims, like the ones properly raised under 18 U.S.C. § 3582 here and in *McCoy*. The Fourth Circuit described the comparison between the claims in the two cases—*Ferguson* and *McCoy*—as "inapt." *Id*. So too is the government's comparison of Ferguson here.

While the Fourth Circuit has not readdressed this issue since the 2023 amendments to the Guidelines concerning compassionate release, it has emphasized the appropriateness of considering intervening changes in law or policy within the context

of a compassionate release, rather than *habeas* analysis. For example, in *United States v. Davis*, 99 F.4th 647 (4th Cir. 2024), a recent compassionate release case decided after the Sentencing Commission's amendments to Section 1B1.13, the Fourth Circuit held that the district court abused its discretion by failing to consider the defendant's arguments that, if he were sentenced today, two intervening changes in law would warrant a substantially shorter term of imprisonment. *Id.* at 656-58. The Fourth Circuit found that these arguments did not serve to "attack the validity of his sentence," and that, contrary to the district court's conclusion, his compassionate release motion did not "sound in habeas." *Id.* at 657. The *Davis* court made it clear: the comparison between the claims of defendants like Mr. Johnson, on the one hand, and a defendant like Ferguson, on the other, holds no water.

The government goes to great lengths to restyle Mr. Johnson's motion as a collateral attack on his sentence. *See* Government Response pp. 14-17. However, this is not the case. Mr. Johnson's claim is not based on error, Mr. Johnson's claim is based on the sweeping changes in sentencing brought by *Booker* and the subsequent reduction in the imposition of life sentences. The current, more flexible sentencing structure is better able to account for both defendants' individual culpability and mitigating factors. Mr. Johnson's less culpable *mens rea* could not be afforded its due attention at sentencing, resulting in a life sentence that is markedly out of step with current sentencing averages. In broad strokes, there is a disparity between his original guideline range and the one he

would receive were he sentenced today. That disparity constitutes an "extraordinary and compelling" reason to grant relief.

On May 23, 2001, the jury found Mr. Johnson guilty; however, the jury found in its special verdict form that Mr. Johnson did not commit an "intentional killing after substantial planning and premeditation." ECF 268 at Exhibit B, Special Verdict Form, at 1, 3. In fact, the jury unanimously found beyond a reasonable doubt that "Coleman Leake Johnson, Jr., intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person . . . such that participation in the act constituted a reckless disregard for human life . . ." The jury specifically did not find that Mr. Johnson intentionally killed the victim, or that he intentionally inflicted serious bodily injury that resulted in the death of the victim, or that he intentionally participated in an act contemplating that the life of a person would be taken. *Id.* at 1-2. Further, the jury could not unanimously find that the aggravating factors proved so outweighed the mitigating factors that justice mandated a death sentence, nor could they find that Mr. Johnson should be sentenced to life in prison without the possibility of release. *Id.* at 2. Instead, the jury unanimously left sentencing up to the Court. It appears from the record that the base offense level at the time of Mr. Johnson's sentencing was 43 based upon the felony murder law; however, his *mens rea* was found to be "reckless" not intentional.

When Mr. Johnson was originally sentenced, the Court had no discretion because the guidelines were mandatory. Today, in the post-*Booker* world, the Judge would have

discretion as to what sentence to impose on Mr. Johnson; an option not available at the time of his original sentencing. District courts in this Circuit have considered the discretion provided by *Booker* as a basis to grant compassionate release. *United States v. Johnson*, 2023 U.S. Dist. LEXIS 138382 (E.D. Va., Aug. 8, 2023).

This type of claim, that disparity constitutes an "extraordinary and compelling" reason to grant relief, unlike the one brought in *Ferguson*, is legally cognizable through a motion for compassionate release and has been successful throughout this Circuit. *See United States v. McCoy*, 981 F.3d 271, 285-286 (4th Cir. 2020) (finding that non-retroactive changes in law creating a disparity between sentence at the time of conviction and the sentence that could be imposed under current law were an "extraordinary and compelling reason" for granting compassionate release under 28 U.S.C. § 3582(c)(1)(A))); *United States v. Coley*, 2023 WL 2873398 at *3 (W.D. Va. Apr. 10, 2023) (collecting cases). Simply put, disparities in sentencing do constitute an "extraordinary and compelling" reason to grant relief under 18 U.S.C. § 3582(c)(1)(A) in this Circuit.

    B.    <u>The Sentencing Commission did not exceed its congressionally delegated authority in promulgating subsection (b)(6).</u>

In its Response, the Government spends a significant amount of time discussing the history of compassionate release, so it need not be repeated here. However, of note, in May 2023 the Sentencing Commission achieved a quorum and adopted revised guidelines that became effective November 1, 2023. Included in the revisions were policy statements addressing motions for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)

when a defendant alleges that "extraordinary and compelling" reasons warrant a reduction. *See* U.S. SENT'G COMM'N, GUIDELINES MANUAL §3E1.1 (NOV. 2023). As is relevant to Mr. Johnson's motion, the revisions include a policy statement that addresses when an "unusually long sentence" can be a reason for a court to grant a sentence reduction under § 3582(c)(1)(A). The Government contends that policy statements, U.S.S.G. §§1B1.13(b)(6) and (c), are unconstitutional because the Commission exceeded its authority.

The Commission did not exceed its authority when it promulgated U.S.S.G. §§ 1B1.13(b)(6) and (c). The Government states that the Sentencing Commission "was not granted unbounded discretion," and as the Supreme Court has explained, "[b]road as" the Commission's "discretion may be," it "must bow to the specific directives of Congress." *United States v. LaBonte*, 520 U.S. 751, 753, 757 (1997). The Sentencing Commission has "bowed" to the specific directives of Congress. *See Mistretta v. United States*, 488 U.S. 361, 379 (1989) (reasoning that the discretion vested in the Commission does not violate the nondelegation doctrine because the Sentencing Reform Act "sets forth more than merely an 'intelligible principle' or minimal standards" to guide that discretion).

Further, a historical look at the Commission shows it did not exceed its authority when it promulgated U.S.S.G. §§ 1B1.13(b)(6) and (c). It was established in 1984 as an independent commission in the judicial branch of the United States, with the purpose of

establishing sentencing policies and practices of the federal criminal justice system that (1) assure the meeting of the purposes of sentencing as set forth in 18 U.S.C. § 3553 (a)(2); (2) provide certainty and fairness in meeting the purposes of sentencing and avoiding unwarranted sentencing disparities while maintaining sufficient flexibility to permit individualized sentences; (3) reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process; and (4) develop means of assessing the degree to which sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2). 28 U.S.C. § 991. *See United States v. Fields,* No. 5:12-cr-00002, 2024 U.S. Dist. LEXIS 165706 (W.D. Va. Sep. 12, 2024).

Among other duties, the Commission, by a vote of four of its seven members, pursuant to its rules and regulations and consistent with all relevant federal statutes, shall promulgate guidelines for use by a sentencing court in determining a sentence to be imposed. 28 U.S.C. § 994(a)(1). The Commission also is tasked with promulgating general policy statements regarding application of the guidelines, or other aspects of sentencing or sentence implementation that in the view of the Commission would further the purposes set forth in 18 U.S.C. § 3553(a)(2), including the appropriate use of the sentence modification provisions set forth in 18 U.S.C. § 3582(c). 28 U.S.C. § 994(a)(2). The Commission further is directed to review and revise the guidelines and submit proposed guidelines amendments to Congress for review. 28 U.S.C. § 994(p). Policy statements, like

the one at issue here, are not subject to the 180-day waiting period applicable when the Commission passes a Guidelines Amendment. *United States v. Colon*, 707 F.3d 1255, 1260-61 (11th Cir. 2013); *United States v. Horn*, 679 F.3d 397, 406 (6th Cir. 2012). However, "to the extent practicable, the Commission shall endeavor to include amendments to policy statements and commentary in any submission of guideline amendments to Congress and put them into effect on the same November 1 date as any guideline amendments issued in the same year." *U.S. Sentencing Comm'n, Rules of Practice and Proc. 4.1.*

Congress also directed that the Commission, in promulgating general policy statements regarding the sentence modification provisions in 18 U.S.C. § 3582(c)(1)(A), "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The only qualification is that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 944(t). Out of this directive, the Commission promulgated U.S.S.G. §§ 1B1.13(b)(6) and (c).

In *United States v. Fields,* Judge Urbanski stated, "[i]n reviewing the revised policy statement and considering the requirements of the statute, it appears that the Commission fulfilled the statutory prerequisites." 2024 U.S. Dist. LEXIS 165706, at *13. Further, the changes to the policy statement were made after input from Congress. *Sent. Comm. Public Meeting Tr. from April 5, 2023, at 5-7*. Then, after the motion to adopt the amended policy statement passed the amendments were adopted by the Commission

and submitted to Congress on April 27, 2023. Even though the Commission is not required to, it submitted all the proposed amendments, including the policy statement regarding "unusually long sentences," to congress. Congress did not act to modify or disapprove the amendments, and they became effective on November 1, 2023. *See* 88 Fed. Reg. 28,254-01, 28,255, 28,258-28,259, 2023 WL 3199918 (F.R. May 3, 2023); *Fields*, U.S. Dist. LEXIS 165706, at *14.

In support of its contention that subsection (b)(6) conflicts with § 3582(c)(1)(A)'s plain text, context, and purpose the Government cites *United States v. LaBonte*, 520 U.S. 751, 753, (1997). There, the Court commented that while the Commission is charged with establishing sentencing policies and practices, its discretion is not "unbounded." Although the Commission's discretion is broad, "it must bow to the specific directives of Congress." *Id*. at 757. In determining whether a guideline accurately reflects Congress' intent, the court looks at the statutory language, and if the guideline is at odds with the plain language of the statute, "it must give way." *Id.*

However, *LaBonte* dealt with a different issue; Congress directed the Commission to assure that the guidelines specified a prison sentence "at or near the maximum term authorized for categories of" adult offenders who commit their third felony drug offense or violent crime. *Id*. at 752 (citing 28 U.S.C. § 994(h)). At issue was what Congress meant by "maximum;" the maximum term available for the offense of conviction including any applicable statutory sentencing enhancements or the maximum term available without

such enhancements, as the Commission had determined. *Id*. at 752-53. The Court found that, applying the maxim that "Congress said what it meant" and giving the words their ordinary meaning, the word "maximum" most naturally connoted the "greatest quantity or value attainable in a given case." *Id*. at 757 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990); Webster's New International Dictionary 1396 (2d ed. 1958); Black's Law Dictionary 979 (6th ed. 1990)). The Court concluded that the phrase, "maximum term authorized is unambiguous and requires a court to sentence a career offender 'at or near' the 'maximum' prison term available once all relevant statutory sentencing enhancements are taken into account." *Id*. at 762.

The Government contends that the Commission has done the same thing with "extraordinary and compelling", and they did with "maximum" in *Labonte.* However, this is not the case. As stated in *Fields,* "Applying the same maxim and giving the words their ordinary meaning, 28 U.S.C. § 994(t) charges the Commission with defining what constitutes 'extraordinary and compelling reasons for sentence reductions.'" U.S. Dist. LEXIS 165706, at *15. Congress stated that "the Commission ... shall describe what should be considered extraordinary and compelling reasons for sentence reductions, including the criteria to be applied and a list of specific examples." *Id*. The Court went on to say, "this language is broad and does not on its face preclude an 'unusually long sentence' along with the other criteria found in U.S.S.G. §§1B1.13(b)(6) and (c) from being considered 'an extraordinary and compelling' reason for a sentence reduction." *Id*.  To

the contrary, the language is unambiguous that the Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reductions ... and a list of specific examples." *Id.* at \*16.

The government argues that "no reasonable interpretation" of "extraordinary and compelling," can encompass nonretroactive or intervening changes in case law and that the Commission's interpretation of the statute as set forth in § 1B1.13(b)(6) therefore is invalid. However, prior to the promulgation of § 1B1.13(b)(6), several courts found that just such changes in case law can be "extraordinary and compelling reasons" for a sentence reduction. *See McCoy*, 981 F.3d at 286. This point is also contemplated in *Fields*. U.S. Dist. LEXIS 165706, at \*17 (W.D. Va. Sep. 12, 2024) ("Of course, *McCoy* has been superseded by § 1B1.13(b)(6), but to say that no reasonable interpretation of extraordinary and compelling can include nonretroactive or intervening changes in case law is belied by *McCoy* and other courts that reached similar conclusions)(citing *United States v. Ruvalcaba*, 26 F.4th 14, 28 (1st Cir. 2022)(citations omitted).

The government also argues that §1B1.13(b)(6) conflicts with 18 § U.S.C. 3582(c)(1)(A)'s plain text, context, and purpose. However, the Fourth Circuit's has held, in *Davis*, that a change in case law can constitute an extraordinary and compelling reason for compassionate release. *Davis*, 99 F.4th at 657 (finding that *Concepcion* and the Commission's policy statement in § 1B1.13 (b)(6) "serve to confirm and amplify" the court's earlier ruling in *McCoy* that "[n]on-retroactive changes in law remain relevant

12

when a court has to decide when and how to modify a sentence," and a court abuses its discretion when it fails to do so). The court in *Fields* took all of this into account and found that §§1B1.13(b)(6) and (c) of the guidelines are consistent with 18 U.S.C. § 3582(c)(1)(A) and 28 U.S.C. § 994(t) and that the Commission did not exceed its authority when it amended the policy statement. U.S. Dist. LEXIS 165706, at *21. The Court applied Commission's interpretation of what constitutes an extraordinary and compelling circumstance warranting a sentence reduction to Fields' case. Though not binding on this Court, Mr. Johnson asks that this Court apply the same reasoning to Mr. Johnson and apply the Commission's interpretation of what constitutes an extraordinary and compelling circumstance warranting a sentence reduction.

> C.    Sentencing disparities resulting from now-advisory sentencing guidelines are an "extraordinary and compelling" reason to grant relief under § 3582(c)(1)(A).

The Government's claim that there is not a "gross disparity" between the sentence Mr. Johnson received and the sentence he would have received if sentenced today has no merit. In addition to the many cases, data and statistics cited in Mr. Johnson's Motion for Compassionate Release, the Government's own statistics demonstrate this gross disparity. In its reply, the Government states that "according to the Sentencing Commission's Interactive Data Analyzer tool, from fiscal years 2015 to 2023, 57 offenders with a criminal history category I were sentenced under U.S.S.G. §§2K1.4 and 2A1.1 in the Commonwealth of Virginia. Twenty-nine of those individuals, that is 50.9%, were

sentenced to life imprisonment." Meaning the other half was *not* sentenced to life in prison. (Government Response, p. 29). In a footnote the Government also cites data that in the entire Fourth Circuit, 173 offenders with a criminal history category I were sentenced under U.S.S.G. §§2K1.4 and 2A1.1. Fifty-four of those individuals, that is **31.2%**, were sentenced to life imprisonment. Nationally, 1,013 offenders with a criminal history category I were sentenced under U.S.S.G. §§2K1.4 and 2A1.1. One hundred fifty-one, that is **14.9%**, were sentenced to life imprisonment. The Government contends that even when looking at these numbers, Mr. Johnson's sentence is not unusually long, despite that **68.8%** of people in the Fourth Circuit and **85.1%** of people nationally who are similarly situation to Mr. Johnson received *non-life sentences.*

There is no bright line that distinguishes the point at which a sentencing disparity becomes "gross." One district court, grappling with the difficulty of abstractly measuring the disparity between a life sentence and term of years, concluded that the difference between life and anything less was "gross." *United States v. Allen*, No. 1:09-cr-320-TCB, 2024 U.S. Dist. LEXIS 28049, at *14 (N.D. Ga. Feb. 12, 2024). The general hope of release, absent in a life sentence, inspired the court's decision. *Id*. Mr. Johnson has served twenty-four years without any hope of release. Despite this, he has taken every opportunity to better himself and help others. A sentence reduction would remedy the gross sentencing disparity and return hope to Mr. Johnson's life. *United States v. Carvajal*, 2005 U.S. Dist. LEXIS 3076 at *15-16 (S.D.NY. 2005) ("Hope is the necessary condition of mankind, for

we are all created in the image of God.  A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life.").

## II.    Mr. Johnson's mother's deteriorating health is an extraordinary and compelling circumstance.

Mr. Johnson's mother has a myriad of afflictions that leave her incapacitated. She has dementia, COPD, chronic stage three kidney disease, spinal arthritis, recurrent major depressive episodes, ataxic gait, and other issues. There is no one else to take care of Ms. Johnson, other than Mr. Johnson. Mr. Johnson's sister, Ms. Earls, is now overwhelmed by Ms. Johnson's continually worsening condition, her daughter's disability, and her own health troubles, as previously discussed. Recently, she was in a car accident and her whole house lost electricity for multiple days. She does not have the capacity to care for Ms. Johnson. There is no one else who can step in. Mr. Johnson and Ms. Earls are Ms. Johnson's only living children. Mr. Johnson's daughter has no existing relationship with her grandmother and lives over five hours away in another state. Other than Ms. Earls' handicapped daughter, none of her other children live in North Carolina.[1] While Mr. Johnson does have acquaintances who are willing to support him, they are not able to take care of Ms. Johnson. They reside in Virgina and have no relationship to Ms. Johnson nor the ability to care for her. Mr. Johnson is the only person able to take care of his mother.

---

[1] One child lives in Virginia, another in Oregon, and another is attending college full time.

**III.     The Court Can grant Compassionate Release under U.S.S.G. 1B1.13(b)(5)**

Even if the court finds that Mr. Johnson does not meet the criteria of U.S.S.G. 1B1.13(b)(6), it can consider U.S.S.G. 1B1.13(b)(5), the "other reasons" category as a basis to grant his request for compassionate release. This category applies when "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in [enumerated reasons] (1) through (4), are similar in gravity to those described in [enumerated reasons] (1) through (4)." U.S.S.G. § 1B1.13(b)(5).   These categories include both medical circumstances of the defendant and family circumstances.

Courts have granted compassionate release based on 1B1.13(b)(5). *See United States v. Potts*, No. 1:20-CR-203-12, 2024 U.S. Dist. LEXIS 151069 (M.D.N.C. Aug. 22, 2024); *United States v. Young*, No. 07-cr-00229-LKG, 2024 U.S. Dist. LEXIS 180151 (D. Md. Oct. 2, 2024); *United States v. Hart*, No. 1:94-cr-00423, 2024 U.S. Dist. LEXIS 155080, at *23-24 (E.D. Va. Aug. 27, 2024).  For example, in *United States v. Hart*, the Court considered the defendant's medical circumstances, his significant time served since his offense conduct, changes in law leading to a sentencing disparity between his original sentence and that which he would receive if sentenced today, his age at the time of his offense conduct, the amount of time served since sentencing, his significant post-sentence rehabilitation efforts, his strong reentry plan, and his family support, along with the stated goals of the Sentencing Commission. 2024 U.S. Dist. LEXIS 155080, at *23-24. The Court found that the "totality

16

of these circumstances provided extraordinary and compelling 'Other Reasons' for a sentence reduction that are 'similar in gravity' to the others enumerated in the applicable Sentencing Guidelines." Id. at *24.  Federal judges are permitted to think expansively about what constitutes extraordinary and compelling reason for release, absent specific congressional limitations.  The "Sentencing Commission's latest guidance goes a long way to resolve any remaining questions of congressional intent" not answered by the Supreme Court in *Concepcion v. United States*, 597 U.S. 481 (2022). *United States v. Davis*, 99 F.4th 647, 657-58 (4th Cir. 2024).

Mr. Johnson's medical circumstances continue to decline.  Since filing his original motion for compassionate release Mr. Johnson suffers from multiple continuing health issues that have not been treated properly by BOP medical staff. He has been plagued by recurring urinary tract infections (UTIs) since 2017 and received inadequate medical care since. *See* Exhibit 1, excerpt from BOP medical records. In just the last year Mr. Johnson has had four UTIs; one in April, July, August, and October. *Id.* For his October UTI, Mr. Johnson was taken to the emergency room, where he was prescribed antibiotics, but BOP did not give him those antibiotics for thirty days, so he is still suffering from this infection. *Id*. He is in continual pain, citing pain as an eight on a scale of 1-10 and often has blood in his urine.  He has tried to limit his intake of fluids to avoid the pain of trying to urinate. When he does urinate, he has to do so laying down. From this ongoing issue, Mr. Johnson currently suffers from urethral stricture, which is a buildup of scar tissue that often needs

surgery to address. *Id*. Without treatment, a urethral stricture can cause life-threatening complications, including kidney failure and severe infections.[2] Mr. Johnson was taken to outside urologist on August 6th, 2024, but was over two hours late to the appointment due to BOP management and, as a result, the doctor would not see him. Exhibit 1. The appointment thus needed to be rescheduled but never was.

Mr. Johnson's day-to-day health is further distressed by his Carpal Tunnel Syndrome (CTS) in his left wrist. Mr. Johnson was diagnosed with CTS twenty-seven years ago, yet BOP has only ever authorized CTS surgery on his right wrist, even as pain levels in his hand and fingers on his left side, his dominate side, continue to affect his daily life. Exhibit 1. Mr. Johnson has reported to BOP that his pain worsens every day, and his provider noted that he has difficulties and inabilities with Activities of Daily Living (ADL) because of CTS. *Id*. For example, in September Mr. Johnson fell out of his bunk and broke his hand because he lacked the grip strength to hold onto the rail due to the CTS. *Id*. The provider recommended that Mr. Johnson be evaluated for Carpal Tunnel Release (CTR), which is a surgery used to treat and potentially heal the painful condition known as carpal tunnel syndrome in both May and August of 2024, but BOP has not moved forward with this recommendation. *Id*.

And, as noted above his mother's health is continuing to deteriorate, and he is the only person who can care for his mother. Contrary to the government's motion, Mr.

---

[2] https://my.clevelandclinic.org/health/diseases/urethral-stricture

Johnson's mother does live with his sister who is completely overwhelmed trying to care for his mother and her severely disabled child. This combination of conditions, in addition to those previously stated, provide extraordinary and compelling reasons to grant this motion for compassionate release. U.S.S.G. § 1B1.13(b)(5).

## IV. The 3553(a) factors favor a reduced sentence, especially considering Mr. Johnson's rehabilitative efforts.

In balancing the § 3553(a) sentencing factors, this Court must contemplate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Mr. Johnson's offense was undoubtedly serious. But the severity of the offense is only one factor in a sentencing analysis. Beyond this observation, because there was no direct evidence in this case, only circumstantial evidence from witnesses.[3]

Further, the § 3553(a) factors of a need for a sentence to reflect the basic aims of sentencing, namely, a just punishment and deterrence have been satisfied. As previously noted, Mr. Johnson has been punished, he has served twenty-four years in prison. As to deterrence, the deterrent effect of the criminal justice system has been studied for

---

[3] One of the witnesses against Mr. Johnson was Mr. Eric Tarwater. Mr. Tarwater had a capias out for his arrest prior to trial, but an FBI agent on the case intervened and asked for the Virginia State Police to delay service so that it would not interfere with Mr. Johnson's trial. Mr. Tarwater later received a lighter sentence for his cooperation. Another witness against Mr. Johnson, Mr. Robert Collier, stated that he has heard that other witnesses in the case had received money and hoped for a deal in exchange for his testimony. Exhibit 2, Defendant's Motion for New Trial filed August 9, 2001. There is also evidence that Fawn West, another witness, gave false testimony. *Id.*

hundreds of years. Social science experts studying the impact of punishment on potential offenders now universally accept that general deterrence is primarily a function of the certainty of punishment, not its severity. Carnegie Mellon University Professor Daniel Nagin, considered the leading deterrence scholar in the United States, concluded that "[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment and that the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension." *See*, Daniel S. Nagin, Deterrence in the Twenty-First Century: A Review of the Evidence, 42 CRIME & JUST. 199, 207 (2013).

Of course, 18 U.S.C. §3553, recognizes that general deterrence is a factor a court may consider in sentencing, however, the legislative history of the inclusion of general deterrence as a factor in 18 USC §3553 reveals Congress was concerned with planned and deliberate criminal conduct, particularly in the area of white collar crime, at a time when major white collar criminals often were sentenced to small fines and little or no imprisonment that could be written off as a cost of doing business. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). *See also, United States v. Phinazee*, 515 F.3d 511, 516 (6th Cir. 2008) (noting drug dealing was lucrative intentional conduct that needed to be deterred). However, federal courts have also recognized that incarceration is not the only aspect of a criminal prosecution and sentence that will act as a general deterrent, finding that §3553(a) "does not require the goal of general deterrence be met through a period of

20

incarceration." *United States v. Edwards*, 595 F.3d 1004, 1017 (9th Cir. 2010). Here, it has clearly been demonstrated to Mr. Johnson that his punishment is certain: he has spent twenty-four years in prison. Any further term of years provides no additional deterrence function.

Mr. Johnson's characteristics strongly support a sentence reduction. Evidence of his rehabilitation is astounding, especially given his own health troubles and the hardships of prison. Mr. Johnson suffers from multiple continuing health issues that have not been treated properly by BOP medical staff. He has been plagued by recurring urinary tract infections since 2017 and received inadequate medical care since. Mr. Johnson's day-to-day health is further distressed by his Carpal Tunnel Syndrome (CTS) in his left wrist. Mr. Johnson was diagnosed with CTS twenty-seven years ago, yet BOP has only ever authorized CTS surgery on his wrist, even as the Pain Scale has reached an eight-out-of-ten level.

Yet, Mr. Johnson does not let his ongoing, and extreme, pain keep him from working on himself and striving to make a difference, such as his dedication to his years-long campaign to start an inmate living organ donor program. Following its submission on July 31, 2024, the defense team learned the following information relevant to Mr. Johnson's rehabilitation – Defense counsel asked Mr. Johnson what changed for him after his second suicide attempt. When Mr. Johnson was hospitalized at Parkview Medical Center in 2008 following his second suicide attempt, he met a nurse, who told him to read

Jeremiah 29:11, "For I know the thoughts that I think toward you, saith the Lord, thoughts of peace, and not of evil, to give you an expected end." He told the nurse that he was a registered organ donor with "The Living Bank" in Houston, Texas. The nurse told him that if he killed himself, he would waste his opportunity to be an organ donor because his organs would be "tainted" by the required autopsy. This information, along with Mr. Johnson's involvement in the Christian inmate congregation at USP Victorville, changed his outlook on his life and he resolved never to attempt suicide again. This story further informs his work as a Suicide Watch Cadre, which he has done since 2022. Despite being in physical pain daily, Mr. Johnson has taken it upon himself to put in the hard work. He has bettered the lives of others and himself, through *over 100* educational courses and programs and his exemplary employment record.

This is even more astounding given the nature of a prison environment. Mr. Johnson previously noted the horrors of USP Florence and USP Victorville. The Government discounts these realities not by disputing that the atrocious conditions occurred but by stating that they happened before Mr. Johnson filed his motion as if this somehow negates their import. However, these are the conditions that Mr. Johnson not only survived but during which he was able to take part in rehabilitative efforts, including organizing 2004 USP Florence Haiti Disaster Relief Fund in response to the devastating Hurricane Jeanne. Further a significant number of Mr. Johnson's accolades occurred while he was at USP Florence and USP Victorville (*See* ECF 268, Exhibit O). This shows

how dedicated he was, and is, to his rehabilitation, that he had such empathy in a place labeled the "bloodiest" prison in America.[4]  Further, FCI Petersburg, where Mr. Johnson is currently incarcerated, is not without problems. In 2023, a Former Federal Bureau of Prisons (BOP) Lieutenant pled guilty to violating the civil rights of an inmate by showing deliberate indifference to the inmate's serious medical needs, resulting in the inmate's death.[5] Two others, one a nurse, were also indicted because they were allegedly willful in their decision to ensure an inmate — a 47-year-old man only identified as W.W. — did not receive necessary medical care. Further, the nurse is also charged with making a false report where she claimed, among other things, that the inmate exhibited no signs or symptoms of "acute distress" when she allegedly knew otherwise.[6]  W.W. died because of the incident.[7] In light of the danger, neglect, and maltreatment that are inevitable in prison life, Mr. Johnson's rehabilitation is even more astounding and favors his release.

Section 3553(a)(6) also requires consideration of the disparity between sentences, which encompasses the disparity in sentences imposed for the same conduct at different points in time. Several other individuals convicted of murder, and sentenced to life

---

[4] *See* https://truthout.org/articles/prisoners-say-routine-use-of-lockdowns-has-led-to-more-violence-and-suicides/

[5] https://www.justice.gov/usao-edva/pr/former-petersburg-fci-bureau-prisons-lieutenant-sentenced-violating-civil-rights

[6] https://oig.justice.gov/news/press-release/two-federal-bureau-prisons-employees-charged-violating-civil-rights-inmate

[7] https://www.wric.com/news/crime/two-federal-prison-employees-indicted-in-connection-with-inmates-death-at-petersburg-facility/

imprisonment have been granted compassionate release. *See United States v. Rodriguez*, 2020 US Dist. LEXIS 181004 (S.D.N.Y, Mar. 30, 2020) (life sentence reduced to thirty years for RICO defendant who participated in a torture/murder of a government informant); *United States v. Underwood*, 2020 U.S. Dist. LEXIS 8378 (S.D.N.Y., Jan 15, 2021) (life sentenced reduced to time served (33 years) for defendant who was a leader of a violent heroin trafficking organization that was responsible for five murders and one attempted murder aimed at eliminating and intimidating competitors, informants, and actual potential witnesses); *United States v. Lopez,* 2020 U.S. Dist. LEXIS 200076 (D. Haw. Oct. 27, 2020) (the defendant was convicted of drug trafficking and murder charges and was granted release after serving twenty-five years); *United States v. Quinones*, 2021 U.S. Dist. LEXIS 37628 (S.D. N.Y. Feb. 27. 2021) (co-defendant of Rodriguez, life sentence reduced to 35 years, he was above Rodriguez in gang structure, participated in murder/torture of government informant); *United States v. Rios*, 2020 U.S. Dist. LEXIS 230074 (D. Ct. Dec. 8, 2020) (defendant convicted of RICO, RICO conspiracy, violent crime in aid of racketeering (VICAR) murder, and drug conspiracy, and was sentenced to three concurrent terms of life imprisonment reduced to 30 years); *United States v. Hunter*, 2020 U.S. Dist. LEXIS 176150 (D.D.C. Sept 25, 2020) (granting compassionate release and citing defendant's "correctional treatment, and community engagement" notwithstanding his "serious and disturbing" prior criminal history including second-degree murder, armed robbery, setting fire to his then girlfriend's home with her and a minor child inside, and

a prison disciplinary record "including violent altercations with other prisoners"); *United States v. Dawson*, No. ELH-94-0010, 2024 U.S. Dist. LEXIS 125619 (D. Md. July 17, 2024) (release granted for defendant who was serving two consecutive life sentences for murdering a federal witness to prevent her testimony); *United States v. Gluzman*, Docket No. 7:96-cr-323, 2020 U.S. Dist. LEXIS 131749 (S.D.N.Y. July 23, 2020) (granting compassionate release to defendant convicted of the premeditated murder of her spouse and sentenced to life); *United States v. Tidwell*, 476 F. Supp. 3d 66 (E.D. Pa. 2020) (granting compassionate release to defendant sentenced to life for murder in furtherance of a continuing criminal enterprise).

## <u>CONCLUSION</u>

For all the reasons argued in the opening motion for compassionate release and in this reply, Mr. Johnson asks the Court to grant his motion for compassionate release. His current life sentence is disproportionate considering the recent average sentences of those similarly situated to him. Further, Mr. Johnson's mother's deteriorating condition and his sister's inability to care for her counsels in favor of immediate release. Mr. Johnson's rehabilitation while incarcerated bolsters the above "extraordinary and compelling" reasons for sentence reduction. His rehabilitation also tips the balance of the § 3553(a) sentencing factors in favor of a sentence reduction, in combination with his low recidivism risk, medical ailments, and comprehensive release plan. Mr. Johnson could do

so much good if he were allowed to come back home to his mother, earn money through hard work, and volunteer in his community.

The First Step Act has changed the federal sentencing landscape in the United States; the statute "not only gives worthy prisoners second chances, but also gives the country's sentencing judges second chances. Just like prisoners who have evolved into better human beings during their lengthy periods of incarceration, judges also evolve with the passage of years on the bench." *United States v. Johnson*, No. 96-CR-932 (FB), 2024 U.S. Dist. LEXIS 189175, at *25 (E.D.N.Y. Oct. 16, 2024). Mr. Johnson is asking this Court for a second chance by granting his motion for compassionate release.

Respectfully submitted,

/s/Mary E. Maguire
Mary E. Maguire
Office of the Federal Public Defender
401 E. Market Street, Ste. 106
Charlottesville, VA 22902
Ph. (434)220-3388
Fax (434)220-3390
Mary_Maguire@fd.org

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on November 27, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

/s/Mary E. Maguire            
Mary E. Maguire
