CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

**AUG 0 9 2001**

MORGAN E. SCOTT, JR., CLERK
BY: _____
     DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

**UNITED STATES OF AMERICA,**

                    Plaintiff,

v.                              CRIMINAL CASE NO.   3:00CR0026

**COLEMAN LEAKE JOHNSON, JR.**

                    Defendant.


### MOTION FOR NEW TRIAL


COMES NOW, defendant, Coleman Leake Johnson, Jr., by counsel, and pursuant to Federal Rule of Criminal Procedure 33 moves for a new trial, representing the truth of the following:


### PROCEDURE

Coleman Leake Johnson, Jr., was convicted following a jury trial of violating 18 U.S.C. 844(i), the Federal arson statute. The jury was thereafter unable to reach a unanimous decision in the penalty phase of the trial.  After the discharge of the jury, the defendant moved for an extension of time until Johnson's scheduled sentencing date to file post-trial motions, which motion was granted by the court.  Johnson is scheduled to be sentenced on September 24, 2001.

178

**ARGUMENT**

**A.    THE GOVERNMENT VIOLATED ITS DUTIES UNDER BRADY AND GIGLIO TO DISCLOSE EXCULPATORY INFORMATION.**

**(1)  Eric Tarwater**

Eric Tarwater, a government witness whose testimony was crucial to the government's case, had been convicted in York County Circuit Court in 1996 of credit card fraud (Virginia Code § 18.2-192 and 95), a felony conviction that was made known to the jury at trial. He was sentenced to 12 months in jail, all of which was suspended conditioned on five years of good behavior and an indefinite period of supervised probation. He later failed to comply with the conditions of his probation and absconded. On December 23, 1999 a capias was issued for Tarwater's arrest.

The capias remained outstanding for more than a year because Tarwater's whereabouts were unknown. In April 2001 Johnson's counsel notified the York County Commonwealth's Attorney that Tarwater was expected to be a witness against Johnson, and disclosed the location and dates of the trial. Subsequently, the York County Commonwealth's Attorney was contacted by Assistant United States Attorney Thomas J. Bondurant, Jr., who requested that the capias not be served on Tarwater until after the trial. On May 1, 2001, the Commonwealth Attorney was contacted by Virginia State Police agent David Riley, the government's case

2

agent, who requested that the capias be held until after the trial.  The Commonwealth's Attorney agreed to hold the capias on the condition that Riley would bring Tarwater to court for the show cause hearing on June 26, 2001.[1]

The government did not disclose this information concerning its intervention on behalf of Tarwater to defense counsel, and counsel learned about it only coincidentally because Scott L. Reichle, an attorney representing Johnson, happened to be in York County Circuit Court on the afternoon of June 26, 2001 when Tarwater appeared at the show cause hearing.

**(2)  Robert Collier**

At the time of trial Robert Collier, another government witness whose testimony was crucial to the government's case, was incarcerated on state charges in the Powhatan Correctional Center.  In a letter dated May 28, 2001, to a friend named Tammy Clark[2], Collier wrote:

> I myself did get lucky.  They are going to cut me lose in June for my testimony in court and they gave a 3000 dollar check.  I can really use that when I get released.

Assuming that there had been some prior discussions with Collier about a sentence reduction and payment of reward money, this

---

1  Riley in fact did produce Tarwater for the hearing.  He intervened on Tarwater's behalf with the Commonwealth's Attorney and as a result the Commonwealth recommended a disposition whereby Tarwater received a jail sentence of 14 days, to be served on weekends, which recommendation was approved by the court.

2 Although she was not a witness, she was a resident of the Davis Mobile Home Park and a friend of Amanda Lewis, both of which figured prominently in

information should have been disclosed to the defense and was
not.

Constitutional due process requires that the government
provide to the defense all exculpatory evidence in its
possession. Brady v. Maryland, 373 U.S. 83 (1963). This has
been expanded to include impeachment material, including a
promise of leniency made to a government witness in exchange for
his testimony, even if the prosecutor who uses the witness at
trial is unaware of the promise. Giglio v. United States, 405
U.S. 150 (1972). In United States v. Bagley, 473 U.S. 667 (1985)
the Supreme Court eliminated any distinction between exculpatory
evidence and impeachment evidence in due process considerations.
However, even if "evidence favorable to the accused" is not
disclosed, it is significant only if the evidence is "material,"
that is, "there exists a 'reasonable probability' that had the
evidence been disclosed the result of the trial would have been
different." Kyles v. Whitley, 115 S.Ct. 1555, 1566 (1995). A
"reasonable probability" of a different result is shown when the
failure to disclose favorable evidence "undermines confidence in
the outcome of the trial." Kyles, 115 S.Ct. at 1566.

In the case of Tarwater it is clear that the government did
not disclose that the U. S. Attorney's office and the lead case
agent, Riley, had intervened on Tarwater's behalf to delay

the trial.

execution of the capias to keep him out of jail.  Nor was it
disclosed that the government had promised to intervene on
Tarwater's behalf to help him obtain a lenient sentence on his
probation violation.

The information that was not disclosed is material because
it goes to the heart of Tarwater's credibility.  Tarwater was the
only witness to testify that Johnson solicited him to commit a
murder in the time period shortly before Tammy Baker was killed.
He also testified that after Baker's death Johnson told him he no
longer needed someone to commit a murder.  None of this testimony
was corroborated by other evidence or testimony.  As we now know,
Tarwater had a powerful reason to provide testimony helpful to
the government:  to stay out of jail.  Without this information
the jury had no way to accurately evaluate Tarwater's
credibility, and the failure to disclose this evidence undermines
confidence in the jury's verdict.

The situation with Collier is somewhat different because all
we know from his letter is that he claims that he will released
early from prison and that he has received $3,000 of the reward
money.  Assuming that he was promised this consideration before
he testified, the failure to disclose this information is
likewise a material omission withheld from the jury that
undermines confidence in the verdict.  As with Tarwater, the
issue is credibility.  Collier's testimony was important because

he claimed that Johnson admitted to him that he killed Tammy

Baker, an assertion made by only one other witness, the

government's jailhouse snitch, Calvin Perry.  At trial it seemed

that Collier was testifying without regard to any motive or

influence; now that is questionable.

**B.   The government violated due process rights by allowing the false testimony of Tarwater and Collier to go uncorrected.**

At trial the government elicited from both Tarwater and

Collier statements to the effect that they had received no

promises or other consideration for their testimony.  This was

clearly a misrepresentation on the part of Tarwater because he

had already received assistance from the government in having his

arrest on the probation violation delayed.  One assumes that

Tarwater also received assurances that the government would ask

the Commonwealth's Attorney for leniency because of his

cooperation with the government.

As for Collier, it defies common sense to believe that

Collier did not receive promises of a sentence reduction and

payment of reward money prior to his testimony when he is writing

just three days after the trial that he expects to be released

soon and that he has already received a check.  If he had

received such promises, then his testimony to the contrary would

be false.  Significantly, the government emphasized his testimony

in its closing argument, telling the jury that his version of the

defendant's confession was identical to the version allegedly
provided by the defendant to Calvin Perry.

The knowing use by the government of false evidence is a
violation of due process, Miller v. Pate, 386 U.S. 1 (1967), and
the failure of a prosecutor to correct the testimony of a witness
who falsely testifies that he received no promise of consider for
his testimony is also a violation of due process. Napue v.
Illinois, 360 U.S. 264 (1959). As to such testimony, the test of
materiality is whether "there is any reasonable likelihood that
the false testimony could have affected the judgment of the
jury." United States v. Agurs, 427 U.S. 97 (1976).

**C.   The consideration provided to government witnesses**
**violated the federal anti-bribery statute.**

The defendant moved *in limine* for the exclusion of
government witnesses Eric Tarwater and Leonard Mayle for the
reason that the promises of consideration for their testimony
violated 18 U.S.C. § 201(c)(2), a motion that was rejected by
this court in its memorandum opinion. Tarwater, Mayle and Robert
Collier all denied in their trial testimony that they had
received and promises or any consideration for their testimony.
Calvin Perry testified that he had received only promises that he
would be moved to facility that he preferred, and that the U. S.
Attorney would send a favorable letter to the Parole Board. As
discussed above, Tarwater certainly, and Collier probably did

7

receive promises of consideration in exchange for their testimony. Mayle, it is suspected, received part of the reward money. The defendant renews his motion to exclude the testimony of these witnesses based on violation of the anti-bribery statute.

## CONCLUSION

An evidentiary hearing is requested for the purpose of establishing the extent and nature of the promises of consideration made to government witnesses in exchange for their testimony, and to establish what consideration, such as disbursement of reward money and sentence reductions, was in fact provided to government witnesses. If the hearing shows that material evidence favorable to the defendant was not disclosed by the government, and/or that witnesses were allowed to testify falsely, then the defendant should be granted a new trial.

Respectfully Submitted,
COLEMAN LEAKE JOHNSON, JR.
By Counsel

Counsel:

Frederick T. Heblich, Jr.
801 East Jefferson Street
Charlottesville, VA 22906
(804) 244-2784

Gerald T. Zerkin
530 East Main St., Suite 800
Richmond, VA 23219-2428

```
Scott L. Reichle, p.d.
REICHLE & REICHLE, P.C.
P.O. Box 787
Yorktown, VA 23692
(757) 833-6909

Counsel for Defendant
```

### CERTIFICATE OF COUNSEL

I hereby certify that on this ____8th____ day of August, 2001, a true copy of the foregoing was mailed to Thomas J. Bondurant, Jr., Assistant United States Attorney, P. O. Box 1709, Roanoke, VA 24008-1709.

**EXHIBIT #1**

COMMONWEALTH VS. ERIC TARWATER

What happened to wife? Tarwater's girlfriend

8/15 Mailed Discovery

9/12: offer NP GLX2 (insuff. evid) waive PH
on credit card, P.G, 12 mos all susp for 5 yrs
(guidelines say probation/no incarceration) + ct. costs & gib.—
will get back to me.

3/20/97 - Δ failed to ct on S/C
- dismissed on motion of CA on recommendation
of prob. officer, Lewis Stretton

4/3/01 1:30 - SCOTT KEICHLE Ø RE TARWATER - HE IS A W
IN THE CAPITAL MURDER CASE + SCOTT DETERMINED THERE WAS
A CAPIAS OUT FOR HIM OUT OF YORK COUNTY FOR A PROBATION
VIOLATION. CLAIMS THE U.S. IS BRINGING TARWATER INTO
OUT OF STATE W/o ARRESTING. CLAIMS Δ WAS COMMITTED
ADDITIONAL OFFENSES.

4/4/01 - Δ TO R. MONTGOMERY → ADVISE OF ABOVE, SPOKE
W/ EMO W/s JHEREMEY — s CALL U.S. ATT'Y Ø TO
TOM BONDURANT (540) 857-2250 - LEFT VM MESSAGE
+ ASKED HIM TO Ø ME. RMH

BONDURANT Ø BACK, ASKED IF WE COULD WAIT UNTIL AFT TRIAL
IN MAY TO SERVE CAPIAS, SAID DIDN'T THINK SO, HE SAID HE
THOUGHT TARWATER WAS LIVING IN VA BEACH - WORKING AT
NN SHIPYARD. SAID JOHN LEELY, ATF AGENT KNEW
WHERE HE WAS. (804) 560-0005. TRIAL BEGINS 5/2 +
GOES 1 MONTH. 100% W/s TRANSFER SOLICITED TO
DO THE MURDER. EMAIL TO R. MONTGOMERY CC EMAIL

5/2/01 Call from Lt Riley, ATF re: their need for Tarwater
@ murder trial - Needs us to "hold" Capias until after trial ok

Hahn, Ben

**To:**        Montgomery, Ron
**Cc:**        Addison, Eileen
**Subject:**    Eric Ross Tarwater

Ron,

I spoke with Tom Bondurant, AUSA, (540) 857-2250 who said he didn't know that a capias for Tarwater was outstanding.  I have not checked the court file but I assume that one is based upon what Scott Reichle relayed and the show cause paperwork in our file.  Bondurant said Tarwater was an important witness to his case and asked if we could wait until after the trial was over to serve the capias.  I said I didn't think we could just ignore a capias.  The case is to begin May 2nd and go for a month.  Bondurant said he thought Tarwater was living in Virginia Beach and working at Newport News Shipyard. He said that John Nealy, an ATF agent, (804) 560-0005 would know how to find him.

BMH

5/1/01 EMA saw Lt Riley They need us to "hold" Capias
until after their Capital murder trial . EMA agreed.
Riley will present D to Circuit Ct for S/c on 6/26
@ 1pm .          Ckd Ct file + Called Peggy Lewis. Capias
recalled.  Called Ashton Wray to advise of Ct date.
Sec'y put on his Calendar.

※ Charlottesville USAtty Office, Veronica Massey
   (804) 293-4283

1

*handwritten:* m/ 9/10/99

COUNTY OF YORK
COMMONWEALTH ATTORNEY

SEP 1 7 1999

RECEIVED

# COMMONWEALTH of VIRGINIA

JAMES L. FROST
CHIEF

*Department of Corrections*
*Division of Field Operations*
*Probation and Parole* September 10, 1999
*District 34*

838 MERRIMAC TRAIL
WILLIAMSBURG, VA 23185
Phone: (757) 253-4860
FAX: (757) 253-7219

Eileen M. Addison
Commonwealth's Attorney
Yorktown, VA. 23690

RE: Eric Ross Tarwater
Case#8183-01

On November 6, 1996 the above referenced subject was convicted of Credit Card Theft in the York County Circuit Court and sentenced to twelve(12) months in jail all suspended for five(5) years good behavior and indefinite supervised probation. In a April 1, 1998 show case hearing the subjects twelve(12) months suspended jail sentence was revoked and resuspended.

The subject was given a Provisional/Temporay Travel Permit on April 1, 1998 by Probation&Parole Officer Dale Jacobson to travel to Baltimore, Maryland for work related reasons. The subject was to return on May 18, 1998 and advise Officer Jacobson upon his return but failed to do so. A letter was sent to the subject's last known address of 26-E Moreland Drive Hampton, VA.23663 and was returned "Attempted not known". Based on the above information we would request a Show Cause Hearing in this matter as the subject's whereabouts are unknown.

Sincerely,

*William B. Wharton*

William B. Wharton
Surveillance Officer
District#34

cc: Hon. Prentis Smiley, Jr.
    Nancy B. Kane, Clerk of Circuit Court
    County of York



# Office of the Sheriff
### Chesapeake, Virginia
## FUGITIVE APPREHENSION UNIT
### SGT. J. O'SULLIVAN
### INV. V.L. WHITE
### INV. L. FOREHAND

**JOHN R. NEWHART, Sheriff**

Phone # - (757) 382-8383
FAX # - (757) 382-8943

## FUGITIVE APPREHENSION UNIT
### P.O. Box 15125
### Chesapeake, VA 23328

Date: 2.15.00
TO: York County Circuit Court

RE: Eric Ross Tarwater
Charges: Prob viol + credit Card theft
Grand Larceny

Subject Information: RACE _____ SEX _____ DOB _____ SSN _____
ADDRESS _____

I an enclosing our warrant for the above-named subject:

( ) PLEASE FILE AS A DETAINER
( ) IF LOCATED, PLEASE ARREST AND NOTIFY THIS OFFICE
( ) ADVISE IF SUBJECT WILL WAIVE EXTRADITION - WE WILL EXTRADITE
( ) PLEASE RETURN WITHIN 60 DAYS IF UNABLE TO LOCATE

Your warrant/summons for the above-named subject is being returned
for the following reason:

( ) RETURNED AT YOUR REQUEST
( ) UNABLE TO EXECUTE BEFORE RETURN DATE
( ) SUBJECT NOT AT ADDRESS PROVIDED
(X) OTHER: Returned to court subject travels last heard in New U.S. Coast
hostile Lawrds Oregon
court to much unfold

RECEIVED

FEB 16 2000

LYNN S. JENKINS, CLERK
CIRCUIT COURT, YORK CO., VA

Respectfully,

JOHN R. NEWHART
Sheriff

BY: Beth Price

**CAPIAS UPON INDICTMENT,**    Rule 3A:7    Case No. CR99R38 . 01
**PRESENTMENT, OR INFORMATION**

YORK COUNTY . . . . . . . . Circuit Court

COMPLETE DATA BELOW IF KNOWN

| RACE | SEX | BORN | | | HT. | | WGT. | EYES | HAIR |
| | | MO | DAY | YEAR | FT. | IN | | | |
| W | M | 11 | 20 | 1969 | 5 | 08 | 130 | BL | BR |

SSN  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

**ACCUSED:**

ERIC ROSS TARWATER

4110 FOURTH STREET

CHESAPEAKE, VA 23324-1525 . . . . . . . . AKA: . . . . . . . . . . . . . . .

TO: . . . . . . . . . SHERIFF OF YORK COUNTY . . . . . . . . . . . . or any other authorized officer:
                    DESIGNATION OF OFFICER
You are hereby commanded in the name of the Commonwealth to forthwith arrest the accused and
to bring him/ her before a judicial officer to answer a charge in this Court that he/ she committed an

offense in the . . COUNTY OF YORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                                        JURISDICTION       [ DESCRIBE OFFENSE ]
on or about . . . . JULY 05, 1996 . . . . . . . . . . , namely . . §18.2-192&95) . . . . .
PROB/VIOL:PO/WBW (CREDIT CARD THEFT: GRAND LARCENY,

RULE TO SHOW CAUSE RETURNED "NOT FOUND"

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

as charged in an
☐ indictment dated . . . . . . . . . . . . . .
☐ presentment dated . . . . . . . . . . . . .
☐ information dated . . . . . . . . . . . . .

Considerations on determining bail:
PLACE ON VCIN . . . . .

DECEMBER 23, 1999
. . . . . . DATE ISSUED . . . . . . . .

NANCY B. KANE . . . . . . . Clerk

by _____
                            DEPUTY CLERK

☐ CCRE Report Needed (if checked)
Status Review Date (Circuit Court Use Only)    RETURN DATE: ANY TUE. AT 1 PM

EXECUTED by arresting the Accused
named above on this day:                                                        , ARRESTING OFFIC

. . . . . . . . DATE AND TIME                    BADGE NO., AGENCY AND JURISDICTION

for _____
                                            SHERIFF

FORM CC-1301 8/90 (1143-01) 10/93)

# Virginia Courts Case Information

| Name List | Pleadings/Orders | Services | Main Menu | Logoff |

## York County Circuit  - Criminal Division
### Case Details

| Case Number:<br>CR99R38183-01 | Filed:<br>10/20/99 | Commenced By:<br>Reinstatement | Locality:<br>COMMONWEALTH OF VA |
|---|---|---|---|
| Defendant:<br>TARWATER, ERIC ROSS | Sex: Male | Race: White Caucasian | DOB: 11/20/**** |

| Address: CHESAPEAKE, VA 23324-1525 |
|---|

| Charge:<br>PROB/VIOL:PO/WBW | Code Section:<br>18.2-192&95 | Charge Type:<br>Felony | Class:<br>Unclassified |
|---|---|---|---|
| Offense Date:<br>07/05/96 | Arrest Date: | | |

## Hearings

| Number | Date | Time | Type | Courtroom | Plea | Duration | Jury | Jury Days | |
|---|---|---|---|---|---|---|---|---|---|
| 01 | 11/16/99 | 0100PM | Show Cause | CIR | | | | | Continue |
| 02 | 12/21/99 | 0100PM | Show Cause | CIR | | | | | Defendan |
| 03 | 06/26/01 | 0100PM | Show Cause | CIR | | | | | Revoked |

## Final Disposition

| Disposition Code:<br>Sentence/Provation Revoked | Disposition Date:<br>06/26/01 | Concluded By:<br>Probation Violation |
|---|---|---|
| Amended Charge: | Amended Code Section: | Amended Charge Type: |

| Jail/Penitentiary: Jail | Concurrent/Consecutive: Consecutive | Life or Death: |
|---|---|---|
| Sentence Time: 12 Month(s) | Sentence Suspended: 11 Month(s) 16 Day(s) | Operator License Su |
| Fine Amount Imposed: | Costs Imposed: $131.00 | Fines/Costs Paid: |
| Program Type Imposed: | Probation Type: | Probation Time: |
| Probation Starts: | Court/DMV Surrender: | Driver Improvemen |
| VA Alcohol Safety Action: | Restitution Paid: | Restitution Amount |

| Driving Restrictions: | Restriction Start Date: | Restriction End Date: |
|---|---|---|

**EXHIBIT #2**

```
 1   V I R G I N I A:
          IN THE CIRCUIT  COURT OF THE COUNTY OF YORK
 2
     ----------------------------------------------
 3   COMMONWEALTH OF VIRGINIA,

 4                            Plaintiff,

 5        vs.                              Case No.
                                           99R38183-01
 6   ERIC ROSS TARWATER,

 7                            Defendant.
     ----------------------------------------------
 8

 9             Stenographic report of all the testimony,

10   together with all the motions, objections and exceptions on

11   the part of the respective parties, the action of the Court

12   in respect thereto, and all other incidents during the trial

13   in the above-styled cause, held in the Circuit Court for the

14   County of York at Yorktown, Virginia, on June 26, 2001,

15   before the Honorable Prentis Smiley, Jr., Judge of said

16   Court.

17
                          -----oOo-----
18
     APPEARANCES:  EILEEN ADDISON, ESQ.
19                 Counsel for the Commonwealth

20
                   J. ASHTON WRAY, JR., ESQ.
21                 Counsel for the Defendant

22

23

24             Reported by: Sarah E. Poole

25                ORIGINAL
```

```
1                          I N D E X

2

3                            - - -

4

5                                                    PAGE

6    RULING OF THE COURT.......................      5

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        (The court reporter was sworn.)

2                        THE CLERK:  Commonwealth of Virginia

3      versus Eric Ross Tarwater.

4                        Is the Commonwealth ready?

5                        MS. ADDISON:  Yes, ma'am.

6                        THE CLERK:  At this time defendant ready.

7                        MR. WRAY:  We are.

8                        THE COURT:  Good afternoon, Mr. Wray.

9                        MR. WRAY:  Good afternoon, sir.

10                       MS. ADDISON:  Your Honor, I have spoken

11     with Mr. Wray and the -- as the Court is aware,

12     Mr. Tarwater's before the Court on a show cause for failing

13     to report to his probation officer, for absconding

14     supervision.

15                       Commonwealth's evidence would be that he

16     was placed on probation and cooperative initially, but then

17     in April of 1998, requested permission from his probation

18     officer to travel to Baltimore, Maryland, for work purposes.

19     He was to return to the Virginia area May 18th of 1998 and

20     return to the probation office when he did, when he got back

21     in Virginia.  He failed to do that.

22                       A letter was sent to his last known

23     address in Hampton and was returned attempted, not known.

24                       There has not been any contact with the

25     probation officer since that time.
```

1           MR. WRAY:  Judge, for the purposes of

2     evidence necessary to support the Commonwealth's proposition

3     on the show cause, we concede that what Ms. Addison has

4     related to the Court is and would be the evidence had the

5     Commonwealth offered it in a more formal fashion.  We

6     stipulate it would be sufficient for a finding.

7           THE COURT:  In violation of probation?

8           MR. WRAY:  Yes, sir.

9           THE COURT:  All right.

10          MR. WRAY:  I had a witness available to

11    me that has brought a number of circumstances to the

12    attention of the Commonwealth.  We have a recommendation to

13    offer the Court as to a disposition in this matter based on

14    a number of circumstances that have been represented to the

15    Commonwealth.

16          THE COURT:  All right.  I'll hear you.

17          MS. ADDISON:  That's correct, Your Honor.

18    And I believe what Mr. Tarwater has is 12 months at this

19    time suspended.  We'd ask the Court to revoke that 12 months

20    and resuspend all but 14 days on the same terms and

21    conditions as he was previously on returning him back to

22    supervised probation.

23          MR. WRAY:  There would be a request, Your

24    Honor, that he be allowed to serve that time on weekends.

25    It's my understanding the Commonwealth would have no

1    objection to that.

2                    MS. ADDISON:  That's correct, Your Honor.

3                    MR. WRAY:  I would ask that he be allowed

4    to surrender himself next Friday afternoon.

5                    THE COURT:  I'm not going to permit that

6    delay in reporting.  You talking about not coming this

7    coming Friday but the Friday week?

8                    THE DEFENDANT:  Correct.  I have to work

9    Saturday and makeup for today.

10                   THE COURT:  Well, you are going to have

11   several days to make up if you not careful, Mr. Tarwater.

12                   I will permit weekend confinement to

13   report June 29th, 6:00 p.m.

14                   The Court finds that you violated the

15   terms of your probation, revokes your suspended sentence,

16   imposes 12 months, resuspends all but 14 days for five years

17   under the same terms and conditions as previously imposed by

18   the Court's sentencing order.

19                   You are to report to jail this coming

20   Friday, June the 29th, 2001, at 6:00 p.m. to begin your

21   confinement.

22                   MR. WRAY:  Thank you very much, Your

23   Honor.

24                   THE COURT:  You are welcome, Mr. Wray.

25                   ----o0o----

```
 1

 2

 3

 4

 5   COMMONWEALTH OF VIRGINIA

 6   COUNTY OF YORK, to-wit:

 7

 8                    I, Sarah E. Poole, do hereby certify that

 9   the foregoing pages are a true and accurate transcript of

10   the proceedings had at the time and place mentioned.

11                    This 25th day of July, 2001.

12

13

14

15

16

17   _____
                        Court Reporter
18

19

20

21

22   My Commission expires July 31, 2004.

23

24

25
```

**EXHIBIT #3**





RICHMOND VA 23
PM
13 MAY
2001

TAMMY CLACK
13 Dean Ray CT.
Newport News, VA, 23605

23605+3200

Robert A. Collier #234042
Dorm-4 Bed #10
Powhatan Correctional Center
State Farm, VA. 23160

Tammy,
                                    5-28-01

          I was Trying to
Call you when I was
in Charlottesville Jail awaiting
Count. I wanted to tell
you that while My Mother
and stepfather where at Count
up there that Amanda told
Them that she is now
pregnant by Donie and
That she is not going
To tell him. she also said
That when she has it that
she is going to give the baby
away to Benny. I no that
you dont like me and I
dont blame you but, I thought
that Donie should know that
He has a baby on the way
I feel that Amanda is
very wrong for the way she
is going about this and I feel
that Donie should know about it
① If you dont think that
I am telling you the truth
Just call My Mother and
step father and ask Them, over

what Amanda said Bennay
tell Thur last week when we
we went to court court aginst
Mike Jonkson, you can call my
mothia at Rosemary Louback # 369-2251
or you can call my stepdad at work
# 247-0220, el am not trying to start
any thing, and el am not mad at
amanda, el just thought That Dorie
should no, amanda is staying with
of her older sister in the Wendsor
there phone # is 757-242-3154. el my
self did get lucky. They are going
to cut me lose in June for
my testimony in court and they
gave me a 3000 doller check, el
can really use that when el get
released. well take care and
tell Dorie el said Hy.

latter
Rob
Collier

THE VIRGINIA DEPARTMENT OF CORRECTIONS
HAS NEITHER CENSORED NOR INSPECTED THIS
ITEM. THEREFORE THE DEPARTMENT DOES
NOT ASSUME RESPONSIBILITY FOR ITS CONTENTS
POWHATAN CORRECTIONAL CENTER.

ORIGINAL

UNITED STATES DISTRICT COURT CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

FOR THE                     *for Charlottesville*

WESTERN DISTRICT OF VIRGINIA     AUG 1 0 2001

CHARLOTTESVILLE DIVISION     MORGAN E. SCOTT, JR., CLERK
BY: *Carolyn Proffitt*
DEPUTY CLERK

* * * * * * * * * * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | *CRIMINAL ACTION NO. 3:00-CR-00026 |
| | * MAY 14, 2001 9:05 A.M. |
| Plaintiff, | * JURY TRIAL |
| | * VOLUME I |
| vs. | * |
| | * |
| COLEMAN LEAKE JOHNSON, JR., | * Before: |
| | * HONORABLE NORMAN K. MOON |
| Defendant. | * UNITED STATES DISTRICT JUDGE, |

* * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA

APPEARANCES:

For the Plaintiff:     THOMAS J. BONDURANT, ESQUIRE
ANTHONY P. GIORNO, ESQUIRE
Assistant U.S. Attorney
P.O. Box 1709
Roanoke, VA 24008

For the Defendant:     FREDERICK T. HEBLICH, JR., ESQUIRE
801 E. Jefferson Street
Charlottesville, VA 22902

SCOTT L. REICHLE, ESQUIRE
Reichle & Reichle
P.O. Box 787
Suite A
5629 George Washington Memorial Hwy.
Yorktown, VA 23693

GERALD ZERKIN, ESQUIRE
530 E. Main Street, Suite 800
Richmond, VA 23219

Court Reporter:     Judy K. Taylor
P.O. Box 744
Lynchburg, Virginia 24505
(804)847-5722

Proceedings recorded by mechanical stenography,
transcript produced by computer.

ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE

WESTERN DISTRICT OF VIRGINIA

CHARLOTTESVILLE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
for Charlottesville
AUG 1 0 2001
MORGAN E. SCOTT, JR., CLERK
BY: Carolyn Proffitt
DEPUTY CLERK

```
* * * * * * * * * * * * *
UNITED STATES OF AMERICA,    *CRIMINAL ACTION NO. 3:00-CR-00026
                             *    MAY 15, 2001  9:05 A.M.
            Plaintiff,       *        JURY TRIAL
                             *        VOLUME II
                             *
                             *
COLEMAN LEAKE JOHNSON, JR.,  * Before:
                             * HONORABLE NORMAN K. MOON
            Defendant.       * UNITED STATES DISTRICT JUDGE,
* * * * * * * * * * * * * *  * WESTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:        THOMAS J. BONDURANT, ESQUIRE
                          ANTHONY P. GIORNO, ESQUIRE
                          Assistant U.S. Attorney
                          P.O. Box 1709
                          Roanoke, VA 24008


For the Defendant:        FREDERICK T. HEBLICH, JR., ESQUIRE
                          801 E. Jefferson Street
                          Charlottesville, VA 22902

                          SCOTT L. REICHLE, ESQUIRE
                          Reichle & Reichle
                          P.O. Box 787
                          Suite A
                          5629 George Washington Memorial Hwy.
                          Yorktown, VA 23693

                          GERALD ZERKIN, ESQUIRE
                          530 E. Main Street, Suite 800
                          Richmond, VA 23219

Court Reporter:           Judy K. Taylor
                          P.O. Box 744
                          Lynchburg, Virginia 24505
                          (804)847-5722

        Proceedings recorded by mechanical stenography,
transcript produced by computer.



ORIGINAL

UNITED STATES DISTRICT COURT

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
*for Charlottesville*
AUG 1 0 2001
MORGAN E. SCOTT, JR., CLERK
BY: *Carolyn Proffitt*
DEPUTY CLERK

FOR THE

WESTERN DISTRICT OF VIRGINIA

CHARLOTTESVILLE DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNITED STATES OF AMERICA,    \*CRIMINAL ACTION NO. 3:00-CR-00026
                             \*    MAY 16, 2001  9:00 A.M.
            Plaintiff,       \*         JURY TRIAL
                             \*         VOLUME III
vs.                          \*
                             \*
COLEMAN LEAKE JOHNSON, JR.,  \* Before:
                             \* HONORABLE NORMAN K. MOON
            Defendant..      \* UNITED STATES DISTRICT JUDGE,
\* \* \* \* \* \* \* \* \* \* \* \* \* \* WESTERN DISTRICT OF VIRGINIA
APPEARANCES:

For the Plaintiff:        THOMAS J. BONDURANT, ESQUIRE
                          ANTHONY P. GIORNO, ESQUIRE
                          Assistant U.S. Attorney
                          P.O. Box 1709
                          Roanoke, VA 24008


For the Defendant:        FREDERICK T. HEBLICH, JR., ESQUIRE
                          801 E. Jefferson Street
                          Charlottesville, VA 22902

                          SCOTT L. REICHLE, ESQUIRE
                          Reichle & Reichle
                          P.O. Box 787
                          Suite A
                          5629 George Washington Memorial Hwy.
                          Yorktown, VA 23693

                          GERALD ZERKIN, ESQUIRE
                          530 E. Main Street, Suite 800
                          Richmond, VA 23219

Court Reporter:           Judy K. Taylor
                          P.O. Box 744
                          Lynchburg, Virginia 24505
                          (804)847-5722


        Proceedings recorded by mechanical stenography,
transcript produced by computer.

ORIGINAL

UNITED STATES DISTRICT COURT

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA

FOR THE

FILED
for Charlottesville
AUG 10 2001

WESTERN DISTRICT OF VIRGINIA

CHARLOTTESVILLE DIVISION

MORGAN E. SCOTT, JR., CLERK
BY Carolyn Proffitt
DEPUTY CLERK

```
* * * * * * * * * * * * * *
UNITED STATES OF AMERICA,      *CRIMINAL ACTION NO. 3:00-CR-00026
                               *     MAY 17, 2001  9:05 A.M.
              Plaintiff,       *         JURY TRIAL
                               *         VOLUME IV
                               *
vs.                            *
                               *
COLEMAN LEAKE JOHNSON, JR.,    * Before:
                               * HONORABLE NORMAN K. MOON
              Defendant.       * UNITED STATES DISTRICT JUDGE,
* * * * * * * * * * * * * *  * WESTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:          THOMAS J. BONDURANT, ESQUIRE
                            ANTHONY P. GIORNO, ESQUIRE
                            Assistant U.S. Attorney
                            P.O. Box 1709
                            Roanoke, Virginia 24008

For the Defendant:          FREDERICK T. HEBLICH, JR., ESQUIRE
                            801 E. Jefferson Street
                            Charlottesville, VA 22902

                            SCOTT L. REICHLE, ESQUIRE
                            Reichle & Reichle
                            P.O. Box 787
                            Suite A
                            5629 George Washington Memorial Hwy.
                            Yorktown, VA 23693

                            GERALD ZERKIN, ESQUIRE
                            530 E. Main Street, Suite 800
                            Richmond, VA 23219

Court Reporter:             Judy K. Taylor
                            P.O. Box 744
                            Lynchburg, Virginia 24505
                            (804)847-5722

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

182

# ORIGINAL

UNITED STATES DISTRICT COURT

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
for Charlottesville
AUG 1 0 2001
MORGAN E. SCOTT, JR., CLERK
BY: Carolyn Proffitt
DEPUTY CLERK

FOR THE

WESTERN DISTRICT OF VIRGINIA

CHARLOTTESVILLE DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNITED STATES OF AMERICA,      \*CRIMINAL ACTION NO. 3:00-CR-00026
                               \*    MAY 18, 2001  9:30 A.M.
            Plaintiff,         \*        JURY TRIAL
                               \*        VOLUME V
vs.                            \*
                               \*
COLEMAN LEAKE JOHNSON, JR.,    \* Before:
                               \* HONORABLE NORMAN K. MOON
            Defendant.         \* UNITED STATES DISTRICT JUDGE,
\* \* \* \* \* \* \* \* \* \* \* \* \* \* WESTERN DISTRICT OF VIRGINIA

APPEARANCES:

For the Plaintiff:       THOMAS J. BONDURANT, ESQUIRE
                         ANTHONY P. GIORNO, ESQUIRE
                         Assistant U.S. Attorney
                         P.O. Box 1709
                         Roanoke, VA 24008

For the Defendant:       FREDERICK T. HEBLICH, JR., ESQUIRE
                         801 E. Jefferson Street
                         Charlottesville, VA 22902

                         SCOTT L. REICHLE, ESQUIRE
                         Reichle & Reichle
                         P.O. Box 787
                         Suite A
                         5629 George Washington Memorial Hwy.
                         Yorktown, VA 23693

                         GERALD ZERKIN, ESQUIRE
                         530 E. Main Street, Suite 800
                         Richmond, VA 23219

Court Reporter:          Judy K. Taylor
                         P.O. Box 744
                         Lynchburg, Virginia 24505
                         (804)847-5722

Proceedings recorded by mechanical stenography, transcript
produced by computer.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

**AUG 20 2001**

MORGAN E. SCOTT, JR., CLERK
BY: ~~*signature*~~
DEPUTY CLERK

UNITED STATES OF AMERICA,

              Plaintiff,

v.                        CRIMINAL CASE NO.   3:00CR0026

COLEMAN LEAKE JOHNSON, JR.

              Defendant.

## SECOND MOTION FOR NEW TRIAL

COMES NOW, defendant, Coleman Leake Johnson, Jr., by counsel, and pursuant to Federal Rule of Criminal Procedure 33 moves for a new trial, representing the truth of the following:

## PROCEDURE

Coleman Leake Johnson, Jr., was convicted following a jury trial of violating 18 U.S.C. 844(i), the Federal arson statute. The jury was thereafter unable to reach a unanimous decision in the penalty phase of the trial.  After the discharge of the jury, the defendant moved for an extension of time until Johnson's scheduled sentencing date to file post-trial motions, which motion was granted by the court.  Johnson is scheduled to be sentenced on September 24, 2001.

184

## ARGUMENT

**THE JURY WAS ERRONEOUSLY INSTRUCTED ON THE ELEMENT OF THE OFFENSE RELATING TO INTERSTATE COMMERCE.**

The statute under which Johnson was indicted, 18 U.S.C. §844(i), provides in relevant part:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both. . . .

During the presentation of its case-in-chief, the government presented evidence in support of the allegation that the building damaged by the bomb, to-wit, Tammy Baker's apartment, was "used in interstate commerce" or used "in an activity affecting interstate commerce." The evidence consisted almost entirely of the testimony of Sam Metello, the owner of the company (Starview Management) that owned and operated the apartment building where Tammy Baker resided, 114 Loch Lane in the town of Louisa, Virginia. Metello testified that at the time of the bomb explosion, December 3, 1997, three of the four apartments were rented: one to Mr. and Mrs. Stanley, one to Tammy Baker, and one to Mildred Payton. The other apartment was vacant. Mildred Payton received rent assistance from the government through the Section 8 program of the Department of Housing and Urban Development. Metello said that in the past some of the

2

apartments had been rented to tenants who had moved there from
outside Virginia, usually in connection with the North Anna
nuclear power plant.  Metello testified that he advertised for
tenants by placing ads in the local weekly newspaper in Louisa
and by posting notices at the power plant.  There was no evidence
presented to indicate that any of the tenants occupying the
building on December 3, 1997 had moved there from outside
Virginia.

At the conclusion of the presentation of evidence the court
instructed the jury on the law it was to apply.  As to the
elements of the offense, the court gave the following
instruction[1]:

> The defendant has been charge with damaging
> certain property by means of an explosive.  To find the
> defendant guilty of this charge, the government must
> prove five elements beyond a reasonable doubt:
>
>     ONE:  that the defendant acted maliciously;
>     TWO:  that the defendant damaged a building;
>     THREE: that the defendant used an explosive;
>     FOUR:  that as a direct and proximate result of
> the use of this explosive, Tammy Lynn Baker died; and
>     FIVE:  that the building was used in or affected
> interstate commerce.
>
>     Regarding the first element,--whether the
> defendant acted maliciously--it is not necessary that a
> defendant intend to damage specific property or harm a
> particular person.  Rather, the government must only
> prove that the defendant acted intentionally or with
> willful disregard of the likelihood that damage or
> injury would result to any property or person.
>
>     Regarding the fifth element—the rental of real

---

1  A copy of the instruction is attached as an exhibit.

3

estate is an activity that affects interstate commerce.

The Defendant's conduct "affected" interstate commerce if the conduct had demonstrated connection or link with such commerce. It is not necessary for the government to prove that the defendant knew or intended his conduct to affect commerce. It is only necessary that the natural consequence of the defendant's conduct affected commerce in some way. Only a minimal effect on commerce is necessary.

In short, you must consider all relevant evidence and only return a verdict of guilty on this charge if the government has proven each of these five elements beyond a reasonable doubt.

Johnson objected to this instruction and submitted a proposed instruction of his own. The objection was overruled and the proposed instruction refused.[2]

In effect the court conclusively instructed the jury as a matter of law that Tammy Baker's apartment was property used in or affecting interstate commerce rather than allowing the jury to make a finding of fact as to the interstate commerce element of the offense. Such a conclusive instruction is a violation of Johnson's Sixth Amendment right to a jury trial. United States v. Johnson, 71 F.3d 139, 143 (4th Cir. 1995), citing Sullivan v. Louisiana, 113 S.Ct. 2078 (1993). "[A] trial judge commits error of constitutional magnitude 'when he instructs the jury as a matter of law that a fact essential to conviction has been established by the evidence, thus depriving the jury of the

---

    2  In a pretrial motion Johnson had asked that the indictment be dismissed for the reason that the mere fact that Baker's apartment was residential rental property was insufficient to prove the interstate commerce element of the offense.

4

opportunity to make this finding.'" Johnson at 1429, quoting

United States v. White Horse, 807 F.2d 1426, 1429 (8th Cir.

1986).

Johnson involved the robbery of a credit union, and the

jurisdictional element of the offense was that it was insured by

the National Credit Union Share Insurance Fund.  At trial the

government put on evidence of the credit union's insured status,

and the defendant did not contest this issue.  The court

instructed the jury: "You are told that [the credit union] is a

credit union within the terms of that statute."  This instruction

was held to be error and the conviction was reversed and remanded

for a new trial.

The distinction between the present case and Johnson is

minimal.  The court here did not instruct the jury that the

damaged building itself was used in or affected interstate

commerce but the effect was as though it had. By instructing the

jury that "the rental of real estate is an activity that effects

interstate commerce," all that was left for the jury to decide

was whether the apartment had been rented, a fact that was

undisputed.  Although the issue of whether the rental of the

apartment at 114 Loch Lane to Tammy Baker, or some other use of

the property affected interstate commerce should have been

submitted to the jury for decision, the instruction improperly

preempted the issue.  Indeed, an instruction which effectively

removes an element of the offense from the jury's consideration
is unconstitutional even where the defendant has stipulated to
the element or its factual basis. United States v. Muse, 83 F.3d
672, 679 (4th Cir. 1996) citing Estelle v. McGuire, 502 U.S. 62,
69 (1991).

The instruction was also erroneous for the reason that it
misstates the law in two important regards.  First, it is
overbroad in defining the interstate commerce element; and
second, it instructs the jury to consider the "defendant's
conduct" in relation to an affect on interstate commerce.

It is clear from the Supreme Court's recent decision in
Jones v. United States, 178 f.3d 479 (2000) that the interstate
commerce element of 844(i) turns on the "use" of the property in
a "commerce-affecting" activity.  Rejecting the government's
reliance on the breadth of the statutory term "affecting. .
.commerce," the stated, "The key word is 'used'."  The court
explained, "Congress did not define the crime described in
§844(i) as the explosion of a building whose damage or
destruction might affect interstate commerce...[citation omitted]
[Congress] required that the damaged or destroyed property must
itself have been used in commerce or in an activity affecting
commerce."  The proper inquiry, then, "is into the function of
the building itself, and then a determination of whether that
function affects interstate commerce."  [citation omitted]

6

To the contrary, the jury in Johnson's case was instructed, "Fifth:  that the building was used in or affected interstate commerce."  The jury should have been instructed that it had to find "that the building was used in *an activity* affecting interstate commerce."  There is nothing in this instruction or any other instruction to indicate that the jury necessarily made a finding that the building in which Tammy Baker's apartment was located was "used in an activity affecting interstate commerce." Therefore, since it is impossible to tell whether the jury found that the building "affected" interstate commerce, as opposed to finding that it was "used" in an activity affecting interstate commerce, the verdict must be vacated.

The error discussed above was further compounded by the part of the instruction that refers to the defendant's conduct.  The defendant's conduct is irrelevant to the question of interstate commerce.  If, for example, Johnson had traveled from outside Virginia to set a bomb in Louisa his "interstate" activity would not satisfy the interstate commerce element of the offense if the property damaged by the bomb was not used in activity that affected interstate commerce.  Since it is impossible to know whether the jury found that the defendant's conduct affected interstate commerce, the verdict should be set aside.

7

**CONCLUSION**

It was a violation of Johnson's constitutional right to a jury trial for the court to conclusively instruct the jury as to an essential element of the offense. Also, the instruction was erroneous in its statement of the law as to the breadth of the interstate element and the effect of the defendant's conduct on interstate commerce. The conviction should be set aside and the defendant granted a new trial.

Respectfully Submitted,
COLEMAN LEAKE JOHNSON, JR.
By Counsel

Counsel:

Frederick T. Heblich, Jr.
801 East Jefferson Street
Charlottesville, VA 22906
(804) 244-2784

Gerald T. Zerkin
530 East Main St., Suite 800
Richmond, VA 23219-2428

Scott L. Reichle, p.d.
REICHLE & REICHLE, P.C.
P.O. Box 787
Yorktown, VA 23692
(757) 833-6909

Counsel for Defendant

8

CERTIFICATE OF COUNSEL

    I hereby certify that on this _17th_ day of August, 2001, a
true copy of the foregoing was mailed to Thomas J. Bondurant,
Jr., Assistant United States Attorney, P. O. Box 1709, Roanoke,
VA 24008-1709.

9

INSTRUCTION NO. 7

The defendant has been charged with damaging certain property by means of an explosive. To find the defendant guilty of this charge, the government must prove five elements beyond a reasonable doubt:

ONE: that the defendant acted maliciously;

TWO: that the defendant damaged a building;

THREE: that the defendant used an explosive;

FOUR: that as a direct and proximate result of the use of this explosive, Tammy Lynn Baker died; and

FIVE: that the building was used in or affected interstate commerce.

Regarding the first element, – whether the defendant acted maliciously – it is not necessary that a defendant intend to damage specific property or harm a particular person. Rather, the government must only prove that the defendant acted intentionally or with willful disregard of the likelihood that damage or injury would result to any property or person.

Regarding the fifth element – the rental of real estate is an activity that affects interstate commerce.

The Defendant's conduct "affected" interstate commerce if the conduct had a demonstrated connection or link with such commerce. It is not necessary for the government to prove that the defendant knew or intended his conduct to affect commerce. It is only necessary that the natural consequence of the defendant's conduct affected commerce in some way. Only a minimal effect on commerce is necessary.

In short, you must consider all relevant evidence and only return a verdict of guilty on this charge if the government has proven each of these five elements beyond a reasonable doubt.

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

AUG 2 7 2001

MORGAN E. SCOTT, JR., CLERK
BY:
DEPUTY CLERK

3:00CR00026

# Transcript of testimony of
# Eric Tarwater

185

COPY

```
                    UNITED STATES DISTRICT COURT

                            FOR THE

                 WESTERN DISTRICT OF VIRGINIA

                    CHARLOTTESVILLE DIVISION

* * * * * * * * * * * * * *
UNITED STATES OF AMERICA,  *CRIMINAL ACTION NO. 3:00-CR-00026
                           *    MAY 15, 2001
          Plaintiff,       *  TESTIMONY OF ERIC TARWATER
                           *    EXCERPT OF PROCEEDINGS
vs.                        *
                           * Before:
COLEMAN LEAKE JOHNSON, JR.,* HONORABLE NORMAN K. MOON
          Defendant.       * UNITED STATES DISTRICT JUDGE,
* * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA
APPEARANCES:

For the Plaintiff:    THOMAS J. BONDURANT, ESQUIRE
                      ANTHONY P. GIORNO, ESQUIRE
                      Assistant U.S. Attorney
                      P.O. Box 1709
                      Roanoke, Virginia 24008

For the Defendant:    FREDERICK T. HEBLICH, JR., ESQUIRE
                      801 E. Jefferson Street
                      Charlottesville, VA 22902

                      SCOTT L. REICHLE, ESQUIRE
                      Reichle & Reichle
                      P.O. Box 787
                      Suite A
                      5629 George Washington Memorial Hwy.
                      Yorktown, VA 23693

                      GERALD ZERKIN, ESQUIRE
                      530 E. Main Street, Suite 800
                      Richmond, VA 23219

Court Reporter:       Judy K. Taylor
                      P.O. Box 744
                      Lynchburg, Virginia 24505
                      (804)847-5722

          Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

---

2

U.S. . Coleman Johnson, Jr. - 5/15/01

1    ERIC R. TARWATER, GOVERNMENT'S WITNESS, SWORN

2                  DIRECT EXAMINATION

3  BY MR. GIORNO:

4  Q    Good morning, sir.

5  A    Good morning.

6  Q    Would you state your full name, please, for the Court.

7  A    Eric Ross Tarwater.

8  Q    Mr. Tarwater, how old are you, sir?

9  A    31.

10 Q    And what is your occupation?

11 A    I'm a sandblaster, spray painter.

12 Q    By whom are you employed?

13 A    Right now I'm framing for -- I'm unemployed from the

14 shipyard, laid off, and I'm framing houses with a friend of

15 mine.

16 Q    And where is that?

17 A    Virginia Beach.

18 Q    You said prior to that you work at the shipyard.  Is that

19 the Newport News shipyard?

20 A    Yes, sir.

21 Q    What you did you do for them?

22 A    I sandblasted and spray paint.

23 Q    On the ships?

24 A    Yes, sir.

25 Q    How long did you do that?

---

3

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  A    Approximately eight years.

2  Q    Okay.  Mr. Tarwater, have you ever been convicted of a

3  felony?

4  A    Yes, sir.

5  Q    What felony have you been convicted of?

6  A    Credit card fraud and possession of cocaine.

7  Q    When was the credit card fraud conviction?

8  A    It's been a few years.  Mid '90s, early '90s, something

9  like that.

10 Q    And you were convicted on that offense, and what kind of

11 time did you get in jail?

12 A    I got 12 months suspended.

13 Q    You got suspended time?

14 A    Yes, sir.

15 Q    When was your possession of cocaine conviction?

16 A    '97, I believe.

17 Q    How much time did you get on that?

18 A    I did approximately seven months.

19 Q    Okay.  Those are the only felonies you've ever been

20 convicted of?

21 A    Yes, sir.

22 Q    So you basically haven't had any since the possession of

23 cocaine charge?

24 A    No, sir.

25 Q    Have you in the past, sir, been a user of narcotics?  You

---

4

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  told the jury that you had been convicted of the possession of

2  cocaine.  Were you using cocaine?

3  A    Yes, sir.

4  Q    What drugs were you using?

5  A    Basically just cocaine and marijuana.

6  Q    When was the last time you used cocaine?

7  A    Since the time I was arrested.  I haven't used since I've

8  been released.

9  Q    And in your job, you have to take drug tests?

10 A    All the time.

11 Q    Was that when you worked at the shipyard?

12 A    Yes, sir.

13 Q    Of course this particular case, Mr. Tarwater, involves

14 the defendant, Coleman Johnson.  Do you know Coleman Johnson?

15 A    Yes, I do.

16 Q    How long have you known him, sir?

17 A    All my life.  Pretty much since we were children,

18 probably 20 years.

19 Q    Do you see him in the courtroom today?

20 A    Yes, I do.

21 Q    Can you identify him?

22 A    Right there.

23 Q    What kind of shirt?

24 A    A little collar-like polo shirt.

25      MR. GIORNO:  Let the record reflect he's identified

5

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

the defendant.

BY MR. GIORNO:

1  Q    With regard to your testimony here today, Mr. Tarwater,
2  have any promises been made to you by law enforcement?
3  A    No.
4  Q    Any promises made to you by the U.S. Attorney's Office?
5  A    No.
6  Q    Any promises made to you by the state concerning your
7  testimony?
8  A    No.
9  Q    You told the jury that you were in jail for this
10 possession of cocaine charge.  As a result of your
11 cooperation, was that charge dropped?
12 A    No.  I actually had to do a little bit more time.
13 Q    Okay.  Was that charge dismissed, or any charges other
14 than the possession of cocaine charge dismissed?
15 A    No.
16 Q    There has been some talk in this case about a reward.
17 Were you aware of a reward that's offered by the various law
18 enforcement agencies for information leading to the conviction
19 of someone?
20 A    Yes.
21 Q    Who told you about that reward?
22 A    David Riley.
23 Q    And do you recall when it was that Agent Riley told you

6

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  about the reward?
2  A    The day I met him, when I was in jail.
3  Q    That was when you were in jail --
4  A    For the cocaine.
5  Q    -- for the cocaine?
6  A    '97.
7  Q    Okay.  Was that in '97 or '98?
8  A    It may have been '98.  September.  I know it was in
9  September.  I'm not sure of the year.
10 Q    Okay.  And it was either '97 or '98?
11 A    Right.
12 Q    And do you recall what it was that Agent Riley told you
13 about the reward?
14 A    Just told me there was a reward, you know, for I guess
15 whoever could help them apprehend, you know, whoever did this
16 to this girl.
17 Q    Okay.  And I take it you talked to Agent Riley at the
18 time?
19 A    Right.  Well, there was actually two of them, Agent
20 Riley, and -- I don't remember the other guy's name.  He's
21 sitting right there, though.
22 Q    One of the other agents?
23 A    Yes, sir.
24 Q    Did Agent Riley or did anyone else promise you you would
25 get a reward?

7

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  A    No.
2  Q    Do you expect any reward for your testimony?
3  A    I don't expect anything.
4  Q    Okay.  After you began cooperating with the police
5  officers, did -- were you given any assistance by the
6  officers, for example, with finding a job?
7  A    Yes.
8  Q    Who helped you find a job?
9  A    A actually I found a job.  Mr. Riley just gave me a ride
10 there so I could get set up in a hotel room and stuff and talk
11 to my ex-boss.  I had already worked for him.
12 Q    He basically put you back in touch with your ex-boss, and
13 your ex-boss hired you?
14 A    Right.
15 Q    Were you given any assistance in finding a place to stay?
16 You mentioned a hotel room.
17 A    Well, my ex-boss gave me money, you know, to pay for the
18 hotel room and stuff, gave me a $500 advance.  That came out
19 of my paycheck, though.
20 Q    Any money given to you by the state police to help you
21 get on your feet?
22 A    I think it was like 200, $200 in expenses, or something
23 like that.
24 Q    Just $200?
25 A    I believe.

8

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  Q    And that was for what purpose?
2  A    Just when I first got out of jail so I could have me a
3  place to stay and get some clothes.  I pretty much had nothing
4  when I got out of jail.  I had lost all my clothes and
5  everything.
6  Q    You told the jury that you know the defendant, Coleman
7  Johnson.  You said you've known him since childhood?
8  A    Yeah.
9  Q    Where did you and he grow up together?
10 A    Newport News.
11 Q    Did you go to school together?
12 A    Yeah, for a little while, until I moved to Hampton.
13 Q    When did you move Hampton?
14 A    The end of middle school, right before I started junior
15 high school.
16 Q    Did you continue to maintain a relationship with
17 Mr. Johnson as far as being friends with him and things like
18 that?
19 A    On and off, whenever we saw each other.
20 Q    Did you learn whether or not Mr. Johnson had any special
21 skills with relation to cars?
22 A    He's always been good with cars.
23 Q    When you say "good with cars," what do you mean?
24 A    I mean he's very mechanical.  That's what he does; he's a
25 mechanic, and he knows a lot about vehicles.

## Page 5

1  Q   Can he change the tires?

2  A   He can do anything.

3  Q   What's anything?  What's involved?

4  A   He can rebuild motors, transmissions, he can redo your

5  electrical systems.  I mean he can do top to bottom.  Anything

6  there is has to do with a car, he can pretty much do it.

7  Q   Pretty much top to bottom, including electrical systems?

8  A   Everything.

9  Q   Was there a time, Mr. Tarwater, in the early '90s that

10  you were gone from the Tidewater area?

11  A   Yeah.

12  Q   Where did you go?

13  A   Arizona and California.

14  Q   How long were you in Arizona and California?

15  A   Probably five to six years.

16  Q   Do you recall when it was that you returned to the

17  Tidewater area from California?

18  A   Like '95.

19  Q   1995?

20  A   Yeah.

21  Q   When you moved back to the Tidewater area from

22  California, did you resume your friendship with the defendant?

23  A   Yeah.

24  Q   Okay.

25  A   I ran into him.

## Page 10

1  Q   Did there come a time where Mr. Johnson and you decided

2  to -- Mr. Johnson asked you something about a Corvette, asked

3  you to help him do something with regards to a Corvette?

4  A   Yes, sir.

5  Q   Do you recall when that was?

6  A   I'd say like September, October, something like that.  I

7  believe it was '97.

8  Q   Do you think it was that late?

9  A   I'm not real sure to tell you the truth.

10  Q   Not sure of the date?

11  A   As far as the year, I don't know.

12  Q   What did Mr. Johnson ask you to do?

13  A   Asked me to help him repossess a Corvette.

14  Q   To repossess a Corvette?

15  A   Right.

16  Q   What do you mean repossess a Corvette?

17  A   These are the words he used.  He meant to steal a car.

18  He needed a driver to steal a car.

19  Q   Did he ask you to help him do that?

20  A   Yes.

21  Q   Do you recall where it was you went to repossess this

22  Corvette?

23  A   In a trailer park behind the Cracker Barrel.  It's in

24  Newport News over behind -- well, in the location of Patrick

25  Henry Mall.

## Page 11

1  Q   Is that anywhere near I-64 and Jefferson Avenue?

2  A   Right at the exits.

3  Q   Right there at the I-64 and Jefferson Avenue exits?  When

4  you said trailer park -- you said behind Cracker Barrel?

5  A   Right.  When you come out of the trailer park, you go

6  around a little turn, and you're actually driving alongside of

7  the interstate.  You come around, the Cracker Barrel is there,

8  and you come out and you come up to Jefferson Avenue, and your

9  exits for the interstate right there to your left and

10  right.

11  Q   Do you recall what color the vehicle was?

12  A   I want to say tan, beige.  It was like a brownish color.

13  Q   And what did you do as far as taking -- repossessing that

14  Corvette?

15  A   I got it in, started it and drove it off.

16  Q   Where did you get the keys?

17  A   Mike had them.

18  Q   When you say "Mike," you're referring to the defendant?

19  Mike had the keys?

20  A   Yeah.

21  Q   Where did you take it?

22  A   First we took it to his house, and he decided he didn't

23  want to keep it in his yard, so we took it to the next street

24  over.  There was a little abandoned house there and had a lot

25  of bushes and stuff like that in the driveway.  And it was

## Page 12

1  real dark and nobody lived there, and I knew it would pretty

2  much be safe.  We were going to move it the next day, so we

3  just put it in the driveway and left it there overnight.

4  Q   Do you recall what time of the day or night it was that

5  you went to take this car?

6  A   It was pretty late.

7  Q   After dark?

8  A   Yeah.

9  Q   Okay.  So you said that you parked on the street, it was

10  in the vicinity of the defendant's home?

11  A   Yeah.  It was like a couple of blocks over from his

12  house, maybe just one street.  I'm not real sure.  I think

13  it's like the next street over from his mother's house.

14  Q   So you were initially taking it to his mother's house on

15  Maney Drive?

16  A   Right.

17  Q   You said that you were going to move it the next day.

18  Did you in fact move the Corvette the next day?

19  A   I don't recall if it was the next day or maybe two days

20  later, whatever, but I did move it again for him.

21  Q   Where did you move it to?

22  A   To Suffolk.

23  Q   Where in Suffolk?

24  A   I'm not real familiar with that area.  A warehouse that

25  he had over there that I guess he was renting from someone.

13

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

```
 1   Q   Could you describe this warehouse?
 2   A   It was a big warehouse, had like a great big privacy
 3   fence, or just a big fence, like 8-, 10-foot tall.  I can't
 4   remember if it was rock or whatever.  I know in the back, all
 5   the way towards the back of the lot there's like a lean-to, or
 6   whatever, that he had set up back there and had like some car
 7   frames and stuff sitting underneath it.
 8   Q   What kind of car frames were sitting under this thing
 9   that you described as a lean-to in the back of the property?
10   A   They were car frames.  I was under the impression they
11   were Corvette frames, but I couldn't be sure.
12   Q   Who drove the Corvette to that garage?
13   A   I did.
14   Q   Where was the defendant, Mr. Johnson?
15   A   Following me in his car.
16   Q   Do you recall what kind of car he was driving at the
17   time?
18   A   I believe a Chevette.
19   Q   When you got there, was the gate locked or unlocked, when
20   you got to the garage?
21   A   He had to get out to open it.  I'm not sure if he had to
22   unlock it or not, but he had to get out and physically open
23   the -- you know, open the gate.
24   Q   When you say "he," you're again referring to the
25   defendant, Johnson?
```

14

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

```
 1   A   Right.
 2   Q   Did you drive the car into the lot?
 3   A   Yes.
 4   Q   Where did you put the car?
 5   A   Inside the building.
 6   Q   Inside the building?
 7   A   Right.
 8   Q   You didn't put it under the lean-to?
 9   A   No.
10   Q   Who opened the building?
11   A   Mike did.
12   Q   The defendant?
13   A   Yes.
14   Q   Do you recall how -- what, if anything, he used to open
15   it?  Did he have a key?  Did he go turn the door -- how did he
16   open it?
17   A   I don't remember.
18   Q   The door was closed when you-all arrived?
19   A   Yes.
20   Q   Did you leave the car there?
21   A   Yes.
22   Q   And then what happened after that?
23   A   We left.  He took me back home.
24   Q   Did you ever see the car again?
25   A   I don't remember.
```

15

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

```
 1   Q   You don't remember if you saw it again?
 2   A   I know I went to the warehouse again after that, after
 3   that incident.  I can't remember if the car or part of the
 4   car -- I don't remember.  I don't think so though.
 5   Q   Was that the only vehicle that you helped Mr. Johnson
 6   repossess?
 7   A   That's the only one that I ever actually got with him.
 8   We attempted two others.
 9   Q   You attempted two others.  And you said the other one --
10   you told the jury approximately when it was that you got this
11   cream or tan colored Corvette.  With relation to that
12   repossession, when was it that the other two attempts were
13   made?
14   A   I'd say within the next month or two.  I mean it was
15   pretty -- it was pretty recent after that.
16   Q   And, again, whose idea was it to do the additional repos?
17   A   Well, I mean pretty much both of ours, really.
18   Q   But those second attempts were unsuccessful?
19   A   Right.
20   Q   I want to call your attention, sir, to November of 1997.
21   You're still -- at that time were you still friends with the
22   defendant, Mr. Johnson?
23   A   Yes.
24   Q   In mid-November of 1997, did you have a conversation with
25   Mr. Johnson that struck you as unusual or extraordinary?
```

16

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

```
 1   A   Yeah.
 2   Q   Can you tell the jury about that?
 3   A   He asked me if I knew or -- if I knew of anybody or if I
 4   would myself help him kill somebody or kill somebody for him.
 5   Q   And did he say how much he would be willing to pay to
 6   kill this person?
 7   A   $5,000.
 8   Q   And did he say why he wanted this person killed?
 9   A   Just basically told me that it was somebody that was
10   about to cost him a lot of money.  He didn't go into any other
11   detail other than that.
12   Q   When he first raised the subject of paying $5,000 to have
13   someone killed that was about to cost him a lot of money, what
14   did you say?
15   A   I just kind of blew it off, really.  I've known Mike a
16   long time, and about half of what he says is true and about
17   half of what he says isn't, so I just kind of thought maybe he
18   was talking crap.
19   Q   Did you have later conversations with Mr. Johnson, the
20   defendant, that maybe caused you think he wasn't kidding?
21   A   He was pretty adamant about it.  He asked me quite a few
22   times.
23   Q   He asked you quite a few times?  Did you ask him where
24   this person lived?
25   A   Yes.
```

17

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  Q   And what did Mr. Johnson say?
2  A   He told me that we couldn't ride by there because it was
3  out of town and it would take us a couple hours to get there.
4  Q   A couple of hours to get there?
5  A   Right.
6  Q   Did there come a time where at the end of November that
7  you were incarcerated in Hampton?
8  A   Yes.
9  Q   Locked up for -- why were you locked up in Hampton?
10 A   I don't remember.  I want to say me and my girlfriend had
11 gotten into an argument and I took her car and she called the
12 police on me, or whatever, and I guess she had taken a warrant
13 out for me having her car.  So when they came -- me and her
14 had gotten into an argument again, and when they came to
15 discuss that, whatever, they ran my name and I had a warrant
16 for improper use of a vehicle, or something like that, and
17 they arrested me at the time.
18 Q   Who was your girlfriend at the time?
19 A   Deborah Waddell.
20 Q   Deborah Waddell?
21 A   Right.
22 Q   You were in jail in Hampton for some period of time?
23 A   Three or four days.
24 Q   Okay.  Now, when you got out of jail, did you and
25 Ms. Waddell resume your relationship?

18

U.S. Coleman Johnson, Jr. - 5/15/01

1  A   Not right off the bat.  She actually -- she bailed me out
2  and she dropped me off at another girl that I was seeing,
3  Leah's house.
4  Q   So Ms. Waddell, the girlfriend who made the complaint,
5  actually bailed you out of jail?
6  A   Right.
7  Q   And let you stay with another friend, Leah --
8  A   Leah Kemp.
9  Q   Leah Kemp?
10 A   Right.
11 Q   So you stayed at Leah Kemp's.  Eventually did you resume
12 your relationship with Ms. Waddell?
13 A   Yes, I did.
14 Q   Approximately when was that in relation to when you got
15 out of jail?
16 A   Just a couple of days.
17 Q   Within a couple of days, you're back with Ms. Waddell?
18 A   Right.
19 Q   Did you see Mr. Johnson at Ms. Waddell's home?
20 A   Yes, I did.
21 Q   Did you ask Mr. Johnson anything or have a conversation
22 with him at that time that's relevant?
23 A   I wanted to ask him why he didn't come bail me out of
24 jail, because I actually had a set of keys to one of the cars
25 that we were going to steal.

19

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  Q   And so you asked him, the defendant, Mike Johnson, why he
2  didn't come and bail you out of jail?
3  A   Correct.
4  Q   What did he say?
5  A   He told me he was out of town taking care of that thing
6  that we were talking about.
7  Q   Did he say anything about someone he knew that had been
8  killed?
9  A   Yes.
10 Q   What did he say about that?
11 A   Said an ex-girlfriend of his had been blown up by
12 somebody.
13 Q   His ex-girlfriend had been blown up by somebody?
14 A   Yeah.
15 Q   When he said that to you, what was his attitude and
16 demeanor?
17 A   It was pretty trivial to him, I guess.  I mean he wasn't
18 crying when he said it or upset about it.
19 Q   When he made this comment to you, "I was out of town
20 taking care of that thing we were talking about," when was
21 that in relation to your conversation about his ex being
22 killed by a bomb?
23 A   Can you repeat the question?
24 Q   When he made the comment to you when you said, "Why
25 didn't you come and bail me out of jail?" he said, "I was out

20

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  of town taking care of that thing I was talking to you about,"
2  when did he make that statement in relation to when he made
3  the statement about his ex being killed by a bomb?
4  A   It was towards the end of the conversation.  We weren't
5  there very long; we had a couple of mixed drinks.  We were
6  actually getting ready -- because, like I said, when I went to
7  jail, I had the keys to this car.  And now I was out, and that
8  was pretty much why he was coming over there anyway, was to
9  pick me up.  We were going to go try to get that car.  So we
10 were maybe there 30, 40 minutes; so within that time period,
11 all of the above was said.
12 Q   So it wasn't a long period of time?
13 A   No.
14 Q   Did you have another occasion in the late summer of 1998
15 to talk with Mr. Johnson?  Let me ask the question another
16 way, Mr. Tarwater.  Did there come a time in the late summer
17 of 1998 where Agent Riley came to talk to you about this
18 particular offense, the killing of Ms. Baker?
19 A   Yeah.  He came and talked to me a lot of times.
20 Q   After Agent Riley came to talk to you, did you have a
21 conversation with the defendant about that?
22 A   Can I ask is this after I get -- I'm not sure of the
23 year.  I had a conversation with him when I got out of jail.
24 Q   With who?
25 A   With Mike.

21

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  Q    Okay.  And is that -- asking the question another way,
2  did you have that conversation with Mike, the defendant, after
3  you spoke with Agent Riley?
4  A    Yes.
5  Q    Tell the jury about that.  First of all, where did it
6  happen?
7  A    Out in front of his mother's house.
8  Q    That's the house on Maney Drive?
9  A    Right.
10  Q    And what did he say?  What was the conversation about?
11  A    Just asked me had anybody come to jail.  I mean he knew I
12  was in jail, and he wanted to know if anybody had come in
13  there and talked to me about him and this case.
14  Q    Talking about the bombing death of Tammy Baker?
15  A    Right.
16  Q    And what did you tell him?
17  A    I told him, yeah, that somebody had came.
18  Q    And did you tell him who it was that came to talk to you?
19  A    I didn't know his name.  He actually asked me was it
20  David Riley, and I said, Yes.
21  Q    The defendant asked you was it David Riley?
22  A    Right.
23  Q    And you said, Yes?
24  A    Right.
25  Q    When you told the defendant that Officer Riley had been

---

22

U.S. Coleman Johnson, Jr. - 5/15/01

1  to see you, what happened then?
2  A    Just told me basically that they didn't have anything and
3  the only thing that they might have would be my testimony, and
4  he pretty much wasn't worried about it, that he knew he could
5  trust me.
6  Q    That he knew he could trust you?
7  A    Right.
8  Q    Trust you to do what?  What did he say he could trust you
9  to do?
10  A    I would assume he meant to keep my mouth closed.
11        MR. HEBLICH:  Objection to the assumption.
12  BY MR. GIORNO:
13  Q    You can't assume.  Did he say what he trusted you to do
14  or not do?
15  A    No.  I mean no, he didn't.
16        MR. GIORNO:  A moment, Your Honor.
17  BY MR. GIORNO:
18  Q    Mr. Tarwater, do you recall -- you mentioned Leah Kemp?
19  A    Right.
20  Q    Did you ever talk to the defendant, Mr. Johnson, at Leah
21  Kemp's home?
22  A    Yeah.
23  Q    Okay.  And during the course of the conversation with the
24  defendant, Johnson, at Leah Kemp's home, did he -- "he" being
25  Johnson -- bring up the subject of having this person killed?

---

23

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1  A    Yeah, he did.  He said it in front of her and another
2  girl that he was with one time, and it actually kind of made
3  me mad.
4  Q    And what -- other than saying this person was about to
5  cost him money, did he say anything else about this person?
6  A    Well, he asked me, you know, had I checked on it.
7  Q    Had you checked on it?
8  A    Yeah, had I checked on it, had I found anybody to help
9  him out with that thing, or whatever.  But he asked me in
10  front of the girls.
11  Q    Did Mr. Johnson make any statements about child support?
12  A    He was talking about this girl that he had pregnant that
13  wanted child support from him, and he was saying there was no
14  way she was going to get a dime from him.
15  Q    No way she was going to get a dime from him?
16  A    Right.
17        MR. GIORNO:  Thank you, sir.
18        (End of excerpt.)
19
20
21
22
23
24
25

---

24

U.S.A. v. Coleman Johnson, Jr. - 5/15/01

1                    REPORTER'S CERTIFICATE
2
3        I, Judy K. Taylor, hereby certify that I am a duly
4  appointed Official Court Reporter for the United States
5  District Court for the Western District of Virginia.
6        I hereby certify that I was present in the United
7  States District Court for the Western District of Virginia,
8  Charlottesville Division, Charlottesville, Virginia on the
9  15th day of May 2001, and in the regular course of my duties
10  reported the proceedings held in the case of United States of
11  America v. Coleman Leake Johnson, Criminal Action Number
12  3:00-CR-00026.
13        I hereby further certify that the foregoing is a
14  true and accurate transcription of the proceedings as held in
15  the above-styled case on the above-stated date in the United
16  States District Court for the Western District of Virginia,
17  Charlottesville Division thereof.
18
19
20
21  _____
22  Judy K. Taylor, Official Court Reporter
23  Given under my hand this the 15th day of May 2001
24
25

# Transcript of testimony of Robert Collier

70

Robert Collier - Direct

1    THE COURT:  Any redirect?

2    MR. BONDURANT:  No, sir.

3    THE COURT:  All right, take the witness.  Who is the

4  next witness?

5    MR. BONDURANT:  Your Honor, the government calls

6  Robert Collier.

7    THE COURT:  Robert Collier?

8    MR. BONDURANT:  Yes, sir.  Your Honor, can Mr. Perry

9  be excused?

10    THE COURT:  Yes.

11    MR. BONDURANT:  I mean not totally excused, but taken

12  back to jail?

13    THE COURT:  Yes.

14    MR. HEBLICH:  Your Honor, could I move those

15  documents into evidence, those exhibits?

16    THE COURT:  Yes, if they have not been admitted, they

17  will be admitted.

18    (Defendant's Exhibit Numbers 3 and 4 were received.)

19    ROBERT L. COLLIER, GOVERNMENT'S WITNESS, SWORN

20                    DIRECT EXAMINATION

21  BY MR. BONDURANT:

22  Q    Sir, would you please state your full name.

23  A    Robert Lester Collier.

24  Q    Where are you from, sir?

25  A    Newport News.

---

71

Robert Collier - Direct

1  Q    Are you incarcerated at this time?

2  A    Yes, I am.

3  Q    Whereabouts?

4  A    Powhatan Correctional Center.

5  Q    And what are you incarcerated for?

6  A    Two counts of burglary, one grand larceny, one conspiracy

7  to commit burglary, and arson charge.

8  Q    And do you have more criminal charges in your past?

9  A    Yes, I do.

10  Q    What type of charges do you have?

11  A    Forgery, utterance, grand larceny, petty larceny,

12  trespassing, things like that.

13  Q    Would it be fair to say that most of your convictions,

14  both felony and misdemeanor, revolve around larceny-type

15  charges?

16  A    Yes, they are.

17  Q    And the arson you were convicted of, was that a house

18  trailer that you lived in?

19  A    That I had previously lived in, correct.

20  Q    Now, sir, do you know the defendant in this case, Mike

21  Johnson?

22  A    I sure do.

23  Q    And how long have you known the defendant?

24  A    Say, about 12 years, or a little longer.

25  Q    About how old are you now?

---

72

Robert Collier - Direct

1  A    29.

2  Q    And so about how old were you when you first met him?

3  A    I'd say 17, 18, somewhere around there.

4  Q    Where and how did you first meet him?

5  A    I met him at a pool hall named Pockets that had opened in

6  the neighborhood that we lived in.

7  Q    What neighborhood was that?

8  A    I myself lived in the Dresden Drive neighborhood in

9  Newport News.  Mr. Johnson lived in the Main Street area of

10  Newport News.

11  Q    I'd like to draw your attention, if I could, to the

12  summer/spring area of 1998.  Who lived at the address at 19-D

13  Muray Court at Newport News?

14  A    I lived at that address with my mother and my stepfather.

15  Q    What is your stepfather's name?

16  A    Leslie Lee Laubach.

17  Q    Did you see the defendant in a red Corvette at that

18  address during that time period?

19  A    Several times.

20  Q    Do you remember, did he engage in any discussion at any

21  of these times concerning the law harassing him?

22  A    Yes, he did.

23  Q    Would you tell the jury what he said?

24  A    He had came by my house quite a few times that -- I was

25  dating a girl named Roxanne, and he was at the time dating her

---

73

Robert Collier - Direct

1  sister, Amanda Lewis, so he would always come over to my house

2  late at night to meet her.  And then one night he came over,

3  she wasn't there, and we sat there talking.  He pulled in --

4  usually he pulls in and parks -- we've got a gravel drive in

5  front of the trailer.  He usually pulls in and parks right

6  there.  This time he went up, turned around and came back and

7  was sitting in the middle of the road.  And I asked him how

8  come he wouldn't park in the driveway, because the neighbors

9  always complain about people being in the middle of the road.

10  He said that he had had a run-in earlier that day with the

11  state police, that they was following him around, and that he

12  stopped and slammed on the brakes and jumped out of his car

13  and went back there and asked them why in the fuck they was

14  following him.  He said that the people told him if he ever

15  pulled a stunt like that again, that they were going to arrest

16  him.

17  Q    Did you inquire why they were following him?

18  A    Yeah.  I asked him, and he said that they was harassing

19  him about a pipe bomb that killed a girl in Louisa County in

20  '97.

21  Q    Did he make any statements concerning the pipe bomb?

22  A    Yeah.  He told me that he had met the girl while he was

23  working at North Anna.  I guess it's a nuclear power plant.

24  He said that while he was up there working, that he had met

25  her up there and they began dating.  He said that he had ended

74
Robert Collier - Direct

1  up getting her pregnant and that he had been trying to get her
2  to get an abortion.  She wouldn't get an abortion, so when she
3  got eight months pregnant, it was too late.  He said so he did
4  the best thing he knew how to do, and that was to try to make
5  sure she didn't have that baby.  He said he wasn't intending
6  to kill her; he was trying to make sure she didn't have the
7  baby.
8  Q    Did he say how he killed her?
9  A    Yeah.  He said he made a homemade pipe bomb.  Later on
10 that night, he went to the store to get some beer and came
11 back with the chemicals and showed me how to make a pipe bomb.
12 Q    Now, were you incarcerated in July of 1999?
13 A    Yes, I was.
14 Q    Did you have any other conversations with the defendant
15 before your incarceration in July of 1999?
16 A    Yeah.  I got arrested July 29th of '99, and I last seen
17 him at his girlfriend's house, Ashley, on July 27th.  And the
18 conversation I had with him, he told me that -- he had
19 reminded me before in the past that if I had ever said
20 anything about this to anybody that he would do the same thing
21 to me and my family, that I wouldn't never know when it was
22 going to take place.
23 Q    Did you tell anybody about that?
24 A    I told my stepfather, Leslie Laubach.
25 Q    Why did you tell him?

75
Robert Collier - Cross

1  A    Because I was worried about my mother.
2  Q    Do you have any deals or agreements for testifying here
3  today?
4  A    None whatsoever.
5        MR. BONDURANT:  May I have a moment, please?  That's
6  all I have, Judge.
7        THE COURT:  All right, Mr. Heblich.
8        CROSS-EXAMINATION
9  BY MR. HEBLICH:
10 Q    Mr. Collier, when did you enter prison this most recent
11 time?
12 A    July.  Well, I got arrested on my charges in July of '99.
13 I never made it to the state penitentiary until July 25th of
14 2000.
15 Q    Where were you in the meantime?
16 A    I was incarcerated in jail.
17 Q    So you've been continuously incarcerated since July of
18 1999?
19 A    Yes, July 29th.
20 Q    What about before that?  Had you been in jail before
21 that?
22 A    Several times, several occasions.
23 Q    When was the most recent prior to July of 1999?
24 A    Might have been six months, six to four months, somewhere
25 around there, on a destruction of private property and grand

76
Robert Collier - Cross

1  larceny charge.
2  Q    And back in the spring of 1997, you were dating Roxanne
3  Lewis; is that right?
4  A    That's correct.
5  Q    And Mike was dating Amanda Lewis?
6  A    He was dating -- he was in between relationships with a
7  woman named Lisa Scott and Amanda Lewis.
8  Q    But did you see him with Amanda Lewis around this time?
9  A    Several times at my house.
10 Q    And during that period of time, did you know anything
11 about this investigation about Mr. Johnson?
12 A    None whatsoever until he told me.
13 Q    And that was that very day that he had this conversation
14 with you the police were harassing him?
15 A    I had had conversations with him on several occasions
16 after that.
17 Q    Well, I'm talking about this particular conversation in
18 which you say that he told you that he killed this girl with a
19 bomb.
20 A    That's right.
21 Q    When was that?
22 A    It was in -- I believe it was in early of '98.
23 Q    Early of '98?
24 A    Right, because I was on a home incarceration program at
25 my parents' house.

77
Robert Collier - Cross

1  Q    And Amanda Lewis and Roxanne Lewis live in that same
2  trailer park you were talking about, don't they?
3  A    That's correct.
4  Q    And the arson that you got convicted of, that was for
5  burning a trailer, wasn't it?
6  A    An unoccupied -- yes, sir.
7  Q    And when that happened, you blamed that on them, didn't
8  you?
9  A    Yes, sir, I did.
10 Q    In fact, you went -- you caused them to be arrested for
11 that, didn't you?
12 A    That's correct.
13 Q    And that wasn't true, was it?
14 A    No, sir.
15 Q    Why did you lie about that?
16 A    We was having a bunch of problems, and I was pissed off,
17 and they had threatened to turn me in on some charges and I
18 figured I would get back at them.
19 Q    In the past, you worked as a narc for the Newport News
20 police at some times, didn't you?
21 A    Yes, sir.  I was a paid informant.
22 Q    And that was a job in which you would go out and
23 misrepresent yourself to people as a drug user -- well, maybe
24 you -- you would go out and buy drugs from people and tell the
25 police who you bought drugs from?

Robert Collier - Cross

1   A    That's correct.

2   Q    When was that?

3   A    Summer of '99.

4   Q    Had you ever testified against someone before?

5   A    No, sir.

6   Q    Have you ever provided information to the police against

7   someone before?

8   A    Yes, sir.

9   Q    Tell me about how many times have you done that.

10  A    Twice.

11  Q    When was the first time?

12  A    The first time was in Davis Mobile Homes against a guy

13  named Joseph Bernardo [phonetic].

14  Q    Were you incarcerated at the time?

15  A    No, sir.  I had just been released.

16  Q    But was this information that you had learned from him

17  while you were incarcerated?

18  A    Learned from who?

19  Q    I'm sorry, the person you provided information against.

20  A    No.

21  Q    No?  What jurisdiction was this?

22  A    Newport News.

23  Q    And what was the other occasions?

24  A    Excuse me?

25  Q    You said there were two, you did it twice.  Who was the