CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
January 17, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
       DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>COLEMAN LEAKE JOHNSON, JR.,<br><br>*Defendant.* | CASE NO. 3:00-cr-00026<br><br>MEMORANDUM OPINION & ORDER<br><br>JUDGE NORMAN K. MOON |

In 2001, Defendant Coleman Leake Johnson was convicted of capital murder and sentenced to life imprisonment for violating 18 U.S.C. § 844(i) ("Importation, Manufacture, Distribution and Storage of Explosive Materials"). At trial, the jury found that Johnson used an explosive device to damage a building affected by interstate commerce, and that, in doing so, Johnson created a violent danger to the public, killed Tammy Baker, and ended Baker's pregnancy with Johnson's child. Based on these findings, the jury found Johnson guilty of capital murder and was presented with three options for Johnson's sentence: (1) death, (2) life imprisonment without release, or (3) allowing the Court to sentence Johnson to life without release. *See* 18 U.S.C. § 3594. The jury voted to allow the Court to sentence Johnson to life imprisonment without release, and the Court sentenced him accordingly to life imprisonment without release.

Johnson now moves for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A), commonly referred to as "compassionate release." For the reasons explained below, the Court **DENIES** Defendant's motion, Dkt. 268.

I.  **Background**

On or about December 3, 1997, Tammy Lynn Baker picked up a metal box near her apartment in Louisa, Virginia, which triggered a pair of pipe bombs hidden inside a lock box and placed under a trash can lid nearby.[1] *See* Presentence Investigation Report (PSR), Dkt. 252, ¶¶3, 6. When the device exploded, Baker and her 8-month fetus died instantly. *Id*. at ¶¶4, 6. The Government's evidence was such that a reasonable jury could have concluded that Baker and Johnson had been romantically involved, that Baker had become pregnant by Johnson, and that Johnson committed the bombing to avoid paying child support for Baker's child *in utero*.[2] The explosive device also damaged Baker's apartment and sprayed lethal shrapnel more than 600 feet away. *See id*. at ¶6; Dkt. 127 at 2.

In 2000, a federal grand jury indicted Johnson for the malicious use of explosive materials that damaged a building affecting interstate commerce, in violation of 18 U.S.C. §§ 844(i) and 2. *See* Dkt. 3. Section 844(i) authorizes the imposition of capital punishment when conduct that violates its terms also causes death:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, . . . used in interstate or foreign commerce . . . shall be imprisoned for not less than 5 years and not more than 20 years, . . . ***and if death results*** to any person, . . . shall also be subject to ***imprisonment for any term of years, or to the death penalty or to life imprisonment***.

---

[1]  The facts stated in this sentence reflect the Court's understanding of the incident based on the PSR and the parties' motion filings. The PSR states that "[a]s experts began looking closely at the remains of the explosive device, they found that it was actually two pipe bombs hidden inside a lock box that were ignited by rocket engines, supplied electricity by batteries and triggered by a compression switch. The bomb was placed near [Baker's] car, and covered by a nearby trash can lid." Dkt. 252, ¶6. The Government's brief in this case states that Baker "picked up a metal box near her apartment in Louisa, Virginia, triggering a compression switch that set off rocket engines that ignited a pair of pipe bombs hidden inside a lock box." Dkt. 279 at 2 (citing PSR).

[2]  "The investigation revealed that . . . [Johnson] became romantically involved with [Baker];" that Baker became pregnant and notified Johnson; that Johnson "refused to provide information necessary for child support hearings;" and that Johnson later "indicated he had 'taken care of the problem himself.'" Dkt. 252 at 3.

2

*See* 18 U.S.C. § 844(i) (1997 version) (emphasis added). The Government sought the death penalty, *see* Dkt. 45 (notice of intent to seek death penalty), and the Court implemented the bifurcation mechanism of the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 *et seq*.

Under the bifurcation process, the jury must consider guilt and punishment in separate phases. Only once guilt has been determined does the jury consider whether the death penalty should be applied. In making that determination, a jury must first consider whether the defendant acted with the requisite intent;[3] second, whether at least one statutory aggravating factor was proven beyond a reasonable doubt;[4] and third, whether any mitigating factors weigh against a sentence of death.[5] In other words, the FDPA asks jurors to conduct a balancing analysis and "to consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist." *Id*. § 3593(e). Based upon this analysis, the jury is required to recommend by unanimous vote whether the defendant should be sentenced to death or life imprisonment. *Id*. § 3594. If the jury does not reach either determination by unanimous vote, the court "shall impose any lesser sentence that is authorized by law." Where the maximum term of imprisonment for the offense is life imprisonment, "the court may impose a sentence of life imprisonment without possibility of release." *Id*. § 3594.

In Johnson's case, after 16 days of trial, the jury first returned a verdict that Johnson was guilty of violating Section 844(i). Dkt. 165 (Guilt Phase Jury Verdict). The jury next found, during the penalty phase, that Johnson had acted with the requisite "intent" when Johnson had "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, . . . such that participation in the act constituted a reckless disregard for

---

[3]    *See* 18 U.S.C. § 3591(a)(2)(A)-(D) (requiring that the Government establish one of four intent criteria beyond a reasonable doubt).
[4]    *See id*. § 3592(c).
[5]    *See id*. § 3592(a).

human life and the victim died as a direct result of the act." Dkt. 268-2 (Special Verdict Form); *see also* Dkt. 165. The jury found that several statutory aggravating factors existed, *see* Dkt. 268-2 at 3, but it did not unanimously conclude that the "aggravating factors proved in this case so outweigh the mitigating factors" so as to require a sentence of death. Dkt. 268-14 (Jury Decision Form E). Furthermore, the jury did not unanimously conclude that Johnson "should be sentenced to life imprisonment without possibility of release." *Id*. However, the jury "unanimously vote[d] to allow the judge to sentence [Johnson] to a term of imprisonment of life imprisonment without possibility of release." *Id.*

Following the jury's verdict, the Court ordered a presentence investigation report, which stated that Johnson's base offense level was 43 because his offense resulted in (or was intended to cause) the death of another. *See* Dkt. 252., at ¶¶45, 11 (citing USSG §2k1.4(c)(1) and §2A1.1(a) (Dec. 2000)). Based on a total offense level of 43 and criminal history category I, the PSR determined that Johnson's guideline range for imprisonment was life. *Id*. at ¶45. In September 2001, this Court sentenced Johnson to life imprisonment without the possibility of release.

Thereafter, Johnson engaged in substantial post-conviction litigation, appealing his sentence and submitting motions to vacate under 28 U.S.C. § 2255, but this Court and the Fourth Circuit denied each. *See, e.g.*, *United States v. Johnson*, 40 F. App'x 808 (4th Cir. July 12, 2002), *cert denied*, *Johnson v. United States*, 537 U.S. 1024 (2002). Johnson is currently incarcerated at FCI Petersburg-Medium, and as of the date of this litigation, he has been incarcerated for approximately 24 years. *See* Dkt. 268 at 1. Since his incarceration, Johnson has filed three requests for a sentence reduction with the Bureau of Prisons (BOP). Dkt. 268 at 3. All three were

4

either denied, returned to Johnson, or ignored, and more than 30 days has elapsed since the requests. *Id*. Thereafter, Johnson filed the instant motion seeking compassionate release.

## II. Legal Standard

A court generally may not modify a term of imprisonment once the court has imposed sentence. 18 U.S.C. § 3582(c); *United States v. High*, 997 F.3d 181, 185 (4th Cir. 2021) (noting "the default position stated in 18 U.S.C. § 3582(c) is that a sentencing court 'may not modify a term of imprisonment once it has been imposed'"). However, a statutory exception under § 3582(c)(1)(A), known as compassionate release, allows the court, on a defendant's motion, to reduce the term of imprisonment if the "court . . . finds that . . . extraordinary and compelling reasons warrant such a reduction," the reduction is "consistent with applicable policy statements issued by the Sentencing Commission," and the § 3553(a) sentencing factors merit a reduction. *U.S. v. McCoy*, 981 F.3d 271, 275 (4th Cir. 2020) (citing § 3582(c)(1)(A)). To make such a motion, the defendant must have first asked the Bureau of Prisons ("BOP") for compassionate release and fully exhausted administrative appeals following BOP's denial of the request. 18 U.S.C. § 3582(c)(1)(A)(i).

Accordingly, a court's evaluation of a motion for sentence reduction under 18 U.S.C. § 3582(c)(1)(A) involves three discrete steps. First, the court must have the authority to rule on the motion, *i.e.*, the petitioner must either (1) have "fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the [petitioner's] behalf," or (2) wait "30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). Once 30 days have elapsed following a request, the petitioner has satisfied this threshold requirement, regardless of whether BOP has issued a decision. *See Reed v. United States*, No. 4:96-cr-22-3, 2024 U.S. Dist. LEXIS 111026, at *7 (E.D. Va. June 24, 2024).

Second, once the court has authority to hear the petitioner's motion, then the court must determine whether the petitioner presents an "extraordinary and compelling" reason for a sentence reduction under USSG §1B1.13(b). 18 U.S.C. § 3582(c)(1)(A)(i). The defendant "bears the burden of showing that extraordinary and compelling reasons warrant a sentence reduction." *United States v. Melvin*, 2023 WL 5974872, at *2 (4th Cir. Sept. 14, 2023) (citing *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021)); *see also United States v. Bryant*, 720 F.Supp.3d 450, 455 (W.D. Va. March 12, 2024) ("A defendant seeking relief under § 3582(c)(1)(A) has the burden of establishing that compassionate release is warranted."). Congress did not define the meaning of extraordinary and compelling; instead, it directed the Sentencing Commission to issue a policy statement describing "what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." *United States v. Aruda*, 993 F.3d 797, 800 (9th Cir. 2021) (quoting 28 U.S.C. § 994(t)). After amendments made in 2023, the United States Sentencing Guidelines now provide six extraordinary and compelling reasons justifying relief under § 1B1.13: (1) the defendant's medical circumstances, (2) advanced age, (3) family circumstances, (4) whether the defendant is a victim of abuse, (5) "other reasons," and (6) the defendant receiving an unusually long sentence accompanied by a subsequent change in the law which produces gross disparities in sentencing outcomes. *See* U.S.S.G. § 1B1.13(b).

Finally, once a petitioner shows that the Court has the authority to hear his motion and that extraordinary and compelling reasons exist, the Court proceeds to the third step—evaluating whether the § 3553(a) sentencing factors support a sentence reduction. 18 U.S.C. § 3582(c)(1)(A). A district court has "broad discretion in conducting this analysis." *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021).

### III. Discussion

As a preliminary matter, Johnson successfully demonstrates that he has requested and been denied compassionate release through Bureau of Prisons—thereby meeting the requirement for administrative exhaustion. Dkt. 268, Exhibit A.[6] Johnson next argues that he is entitled to compassionate release based on (1) his "unusually long sentence" and gross disparities in sentencing outcomes, (2) his family's need, and (3) his rehabilitation. Dkt. 268 at 2. However, the Court finds that Johnson fails, on each score, to demonstrate that his circumstances present "extraordinary and compelling" reasons to warrant a sentence reduction. The Court therefore denies Johnson's motion.

#### A. Unusually Long Sentence and Gross Disparity Based on Booker

United States Sentencing Guidelines Section 1B1.13(b)(6) provides that if a defendant "received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law . . . may be considered in determining whether the defendant presents an extraordinary and compelling reason." § 1B1.13(b)(6). However, this consideration only applies where such a change in law "would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances." § 1B1.13(b)(6). The Fourth Circuit, interpreting this guideline policy statement, has therefore observed that "[i]f the intervening change in law would not produce a gross disparity, a defendant cannot rely on the change in law as an extraordinary and compelling reason for release." *U.S. v. Davis*, 99 F.4th 647, 654 (4th Cir. 2024) (finding that a nonretroactive change in law regarding career offender

---

[6]  The Government does not contest that Johnson has satisfied the exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A). *See* Dkt. 279 at 13.

status under the Sentencing Guidelines was relevant as a potential extraordinary and compelling reason for compassionate release).[7]

Here, Johnson contends that there is a "gross disparity" between his sentence and the sentence that he would likely receive if sentenced today. Dkt. 268 at 7–12. Johnson bases this argument on the fact that the jury chose to have the judge in his case sentence him to life without the possibility of release. *See* 18 U.S.C. § 3594 (Where the jury does not unanimously conclude that death or life imprisonment should be imposed, "the court shall impose any lesser sentence that is authorized by law . . . . [I]f the maximum term . . . is life imprisonment, the court may impose a sentence of life imprisonment without possibility of release."). And, at that time, the U.S. Sentencing Guidelines were mandatory and *required* the judge to sentence Johnson within the Guidelines range of life imprisonment. *See* USSG §5A (2000).

The Guidelines have since become advisory, *see United States v. Booker*, 543 U.S. 220 (2005), opening the door to below-Guidelines sentences. So, were the Court sentencing Johnson today, it would have discretion to impose an appropriate sentence under the factors enumerated in 18 U.S.C. § 3553(a) notwithstanding the Guidelines range. Johnson argues that "[b]ecause of this discretion, judges can tailor sentences to better fit the nature and circumstances of the offense and defendant," and that the Court may reach a different result today given this flexibility—thereby creating gross disparity in sentencing outcomes and an extraordinary and compelling reason for compassionate release. Dkt. 268 at 8.

---

[7] Though not applicable to this case, the Court notes that "if a defendant *otherwise establishes* that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *Davis*, 99 F.4th at 654 (emphasis added). Thus, where a defendant can "present another extraordinary and compelling reason but does not otherwise meet the criteria for an 'unusually long sentence,' the court can still use the change in law to determine how much to reduce his sentence." *Id*.

Johnson's argument presents two distinct questions for the Court: (1) Can *Booker* be considered a "change in the law" that may give rise to a "gross disparity" in sentencing outcomes? *See* § 1B1.13(b)(6); and (2) assuming *Booker* can be considered an intervening "change in the law," does it create a "gross disparity" in sentencing outcomes in Johnson's case, such that the Court can consider sentence reduction?

As to the first question, the Court observes that neither the Supreme Court nor the Fourth Circuit has addressed the issue. *See U.S. v. Johnson*, No. 1:97-CR-314-AJT, 2023 WL 5049267, at *6 (E.D. Va. Aug. 8, 2023) ("Unsettled by the Supreme Court or the Fourth Circuit is whether the Court may consider *Booker* as a factor in the extraordinary and compelling analysis."). The Sixth Circuit has held that *Booker* may not be considered an intervening change in the law.[8] However, district courts within the Fourth Circuit have held that *Booker* may be considered an intervening change in the law that constitutes "extraordinary and compelling" circumstances.[9]

Here, the Court need not address the first issue because, even if *Booker* is considered a change in the law, the Court finds that Johnson has not shown a "gross disparity" in sentencing outcomes. This is because, first and foremost, the Guidelines that apply to Johnson today—though no longer binding on the Court—*still recommend life imprisonment*. Johnson's PSR established a base offense level of 43 and a Criminal History Category of I, pursuant to

---

[8] *See U.S. v. Hunter*, 12 F.4th 555, 568–69 (6th Cir. 2021) (holding that "non-retroactive changes in the law cannot be relied upon as 'extraordinary and compelling' explanations for a sentence reduction, regardless of whether the legal changes are offered alone or combined with other personal factors . . . . The district court therefore abused its discretion when it relied on the non-retroactive decision in Booker as part of its extraordinary-and-compelling-reasons analysis.")

[9] *See United States v. Browning*, No. 2:98-00134, 2022 WL 1787133, at *4 n.7 (S.D.W.V. June 1, 2022) (rejecting *Hunter* and noting that the "Fourth Circuit has not explicitly held that pre-*Booker* sentences cannot be a factor for compassionate release. Indeed, given the discretion granted to courts in *McCoy* and [United States v.] *Kibble* [, 992 F.3d 326 (4th Cir. 2021)], the court believes it is permitted to consider this nonretroactive change in sentencing law as a factor for release under § 3582."); *U.S. v. Johnson*, No. 1:97-CR-314-AJT, 2023 WL 5049267, at *6 (E.D. Va. Aug. 8, 2023) (observing that "little jurisprudential reason not to consider *Booker* in determining whether extraordinary and compelling reasons exist").

§§2K1.4(c)(1) and 2A1.1(a) under the 2000 Guidelines Manual. *See* Dkt. 252, ¶¶ 11, 45. Under those 2000 Guidelines, Johnson's guideline range was life imprisonment. *See* Dkt. 252, ¶45; USSG §5A (2000). Under the current Guidelines, Johnson's total offense level would be the **same**—43. *See* USSG §§ 2K1.4(c)(1)[10], 2A1.1(a).[11] With a base offense level of 43 and a Criminal History Category of I, his Guideline range is **life imprisonment**—just as it was at the time of his original sentencing.[12] *See* USSG Ch. 5, Pt. A. In short, where Johnson is serving a sentence that continues to fall within the current Guidelines range, the Court is hard-pressed to conclude that Johnson faces a gross disparity in sentencing outcomes that justifies compassionate release.

Nonetheless, Johnson argues that he is "significantly less culpable than the average §2A1.1. defendant," and that he would likely receive a lower sentence if sentenced today. The Court disagrees. *See* Dkt. 268 at 10-12. Johnson argues that he had "a less culpable *mens rea*" but submits no evidentiary basis for this argument. He insists that the lack of evidence on this point arises from the fact that his *mens rea* was not "afforded its due attention at trial" and "could not tip the scales at trial" since the pre-*Booker* Guidelines mandated life imprisonment. Dkt. 268 at 11-12. This is incorrect. The jury was *required* to consider Johnson's *mens rea* in making its findings of intent during the penalty phase of trial. *See* Dkt. 268-2 (Special Verdict Form). True enough, "Johnson's jury found that there was not an 'intentional killing after substantial planning and premeditation,'" *see* Dkt. 268 at 11, but the jury still found Johnson guilty of "intentionally and specifically engag[ing] in an act of violence, knowing that the act created a grave risk of

---

[10] "If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person)." § 2K1.4(c)(1).
[11] *See* § 2A1.1(a) (establishing "Base Offense Level: 43.")
[12] Johnson concedes but minimizes this fact. *See* Dkt. 268 at 9 ("Although his sentencing guideline remains life imprisonment, this is not a barrier to relief.").

10

death to a person, . . . such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act." Dkt. 268-2 (Special Verdict Form), at 2. Accordingly, the Court rejects Johnson's argument that the jury was precluded from considering his *mens rea* and that he deserves a second chance to litigate the issue post-*Booker*. Ultimately, the jury voted unanimously for "allow[ing] the judge to sentence [Johnson] to a term of imprisonment of life imprisonment without possibility of release," knowing that the judge was authorized to do so. Dkt. 268-14 at 1.

Moreover, the Court notes that, according to Judiciary Sentencing Information statistics, between 2019 and 2023, 48% of individuals with a Criminal History Category of I and a Total Offense Level of 43 were sentenced within the guideline range of life imprisonment. Meanwhile, only 32% of similarly situated individuals had a downward departure or variance in sentencing without a § 5K1.1 Substantial Assistance motion.[13] The average length of imprisonment among this population is 415 months (roughly 34.5 years); the median is 470 months (roughly 39 years). Thus, Johnson has served approximately 288 months (24 years)—a number below the mean and median sentence. All of these factors erode Johnson's assertion that he was "significantly less culpable than the average § 2A1.1 defendant."

Finally, we observe that Congress has not changed the penalties for violating 18 U.S.C. § 844(i) and causing the death of another. Where a defendant is convicted of such conduct today, the statute provides for a sentence of imprisonment for "any term of years, or to the death penalty or to life imprisonment," 18 U.S.C. § 844(i), just as it did when Johnson was originally sentenced. Thus, Johnson's 2001 sentence remains consistent with the sentence Congress "deems appropriate" for his offense today. This distinguishes Johnson's case from *McCoy*, where the

---

[13] This data was obtained from the Sentencing Commission's Judiciary Sentencing Information platform, https://jsin.ussc.gov/analytics (last visited August 20, 2024).

11

Fourth Circuit underscored "the dramatic degree to which" the defendants' sentences "exceed[ed] what Congress now deems appropriate." *McCoy*, 981 F.3d at 285-86, 288 (emphasizing that the defendants were "serving sentences that Congress itself views as dramatically longer than necessary or fair."). The defendants in *McCoy* received sentences 200 months and 30 years, respectively, longer than they would have received by statute if sentenced at the time of their petition. *Id.* Here, by contrast, Johnson faces a sentence of life imprisonment which could equally be handed down today as it was in 2001, despite judges now having discretion to depart from guideline ranges post-*Booker*.

In sum, the Court concludes that Johnson has not met his burden to show that there is a gross disparity between his original sentence and the sentence that would be imposed today. While the Court was originally *required* to sentence Johnson to life imprisonment based on the jury's verdict and the mandatory Guidelines range of life imprisonment, the Court would issue the same sentence today under the now-advisory Guidelines.

### B. Family Circumstances

The Sentencing Guidelines provide that the "incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent" can constitute extraordinary and compelling reasons which may warrant sentence reduction. USSG § 1B1.13(b)(3)(C). However, a petitioner must make a "robust evidentiary showing" that he is his parent's "*only* available caregiver." *United States v. Barlow*, 2023 WL 2755598, at *3 (W.D. Va. Mar. 31, 2023) (emphasis added). The petitioner generally cannot demonstrate extraordinary and compelling circumstances based upon the "incapacitation of the defendant's parent" where alternative caretakers exist for that parent. *See, e.g.*, *United States v. Corin*, No. S7 10 CR 391-64 (CM), 2020 WL 5898703, at *4 (S.D.N.Y. Oct. 5, 2020) (denying compassionate release where

12

"[t]he tragic death of [the mother] did not leave [defendant's] son without a caretaker . . . [because] his son's aunt has been taking care of his son for the past seven years."); *Tucker v. United States*, No. 2:17-CR-87, 2020 WL 4740480, at *3 (E.D. Va. Aug. 14, 2020) (denying compassionate release when the "Presentence Report lists other family members who can care for [defendant's] son during the balance of her sentence."); *United States v. Richardson*, No. 5:18-CR-507-1FL, 2020 WL 2200853, at *2 (E.D.N.C. May 6, 2020) ("declin[ing] to grant compassionate release in the absence of a robust evidentiary showing that defendant is the only available caregiver").

Here, Johnson does not carry his burden to show that he is the only available caregiver. Johnson states that his mother is in very poor health, suffering from dementia and a host of chronic ailments, requiring round-the-clock care. Dkt. 268 at 16. Johnson's sister, Ms. Earls, currently cares for Johnson's mother, though she is "overwhelmed" as a widow who already cares for her own severely disabled daughter and her own health issues. Dkt. 268 at 17. Johnson argues that no person other than himself "can provide the care and attention [his mother] requires." Dkt. 268 at 17.

However, Johnson offers no information about Ms. Earls' other three children—who are grandchildren of Ms. Johnson, the family member requiring care. *See* Dkt. 268-4 at 3. Additionally, Ms. Earls refers to a local church community with a congregation "made up of many members of our family," but there is no indication as to these family members' availability to care for Ms. Johnson. Dkt. 268-4 at 4. In this context—even assuming that Ms. Earls is incapable of caring for her mother[14]—Defendant has not met the burden of showing that he is the

---

[14] The July 2023 letter from Delina Cooley, the "attending provider" for Johnson's mother, Dianne Johnson, states that "patient doesn't want to go in a rest home nor move in with her daughter who has a special needs child and can't get her the right care." Dkt. 268-3. This lacks specificity about deficiency as to Ms. Johnson's care and suggests that a care home may be a viable though undesirable option for Ms. Johnson.

13

*only* available caregiver, such that his family circumstances comprise an extraordinary and compelling reason for relief.

### C. Johnson's Rehabilitation

Johnson demonstrates that he has taken substantial steps to rehabilitate himself while incarcerated.[15] But rehabilitation "is not, by itself, an extraordinary and compelling reason" for purposes of compassionate release. USSG § 1B1.13.(d). Because the Court has determined that none of the other circumstances raised by Johnson comprise extraordinary and compelling reasons for release, Johnson's arguments as to rehabilitation cannot advance his claim for compassionate release.

Accordingly, the Court finds that the circumstances raised by Johnson, either alone or in combination, do not meet the high bar of "extraordinary and compelling" reasons that would allow this Court to grant a motion for compassionate release. Even if they did meet that threshold, the Court would nevertheless deny Johnson's motion based on the relevant § 3553(a) sentencing factors.

### D. Sentencing Factors

At sentencing, the Court must impose a sentence which is "sufficient, but not greater than necessary" to meet a variety of purposes, including "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[.]" 18 U.S.C. § 3553(a). The jury in Johnson's case did not reach a

---

[15] Johnson has worked while incarcerated, attaining positive performance reviews. Dkt. 268 at 19. After making two suicide attempts during his imprisonment, he took on a role as a "watch companion" engaged in suicide prevention. *Id.* at 20. He has completed over 100 educational courses and programs, and has engaged in charitable efforts for hurricane relief and organ donation. *Id.* at 20–22. He has refrained from joining a gang or getting tattoos despite being incarcerated in violent or chaotic facilities. *Id.* at 23–24. Johnson points to his minimal disciplinary history while incarcerated. Dkt. 268, Exhibit V. Notably, however, one of his two infractions is "trying to mail out a shop[p]ing list of items needed to make a pipe bomb, in legal mail." Dkt. 268, Exhibit V.

unanimous verdict to impose the death penalty. Instead, it voted unanimously to allow the Court to impose life imprisonment without the possibility of release, which the Court was authorized to do under the offense of conviction and required to do under the pre-*Booker* Guidelines. To release Johnson now would set aside that jury's decision, reflecting disrespect for the law.

Moreover, Johnson committed an especially heinous crime. The evidence showed that Johnson not only killed Tammy Baker, his eight-months-pregnant former romantic partner, but also that Johnson committed this act specifically to avoid paying child support for Baker's child *in utero*.[16] Johnson also endangered countless other persons by *placing a bomb in public*, sending shrapnel more than 600 feet in a populated area. Dkt. 252 at 3-4. A life sentence reflects the seriousness of this reckless, violent crime and provides just punishment.

Johnson's rehabilitation presents a new, positive characteristic, and his health is concerning. But his health difficulties are not so severe that they cannot be treated in prison. Moreover, the history and characteristic of his offense—and the reckless disregard for human life which it reflects—substantially outweigh his health concerns and the ameliorative effect of his more recent conduct.

Finally, Johnson contends that at age 52, having pursued education while incarcerated and with a supportive network upon release, he is unlikely to recidivate and presents no danger to the public. Even if this is true—and the Court is not convinced that it is[17]—the Court finds that this consideration is outweighed by the factors discussed above. While the Court must

---

[16] "The investigation revealed that . . . [Johnson] became romantically involved with [Baker];" that Baker became pregnant and notified Johnson; that Johnson "refused to provide information necessary for child support hearings;" and that Johnson later "indicated he had 'taken care of the problem himself.'" Dkt. 252 at 3.

[17] The Court is troubled by the fact that Johnson has engaged in conduct related to pipe bombing since his conviction. One of his two infractions while incarcerated is "trying to mail out a shop[p]ing list of items needed to make a pipe bomb, in legal mail." Dkt. 268, Exhibit V.

15

consider Johnson's wellbeing, it must also respect the decision of the jury in Johnson's case and impose just punishment.

## IV. Conclusion

For the reasons explained above, Johnson's Renewed Motion for Compassionate Release is **DENIED**. Dkt. 268. Johnson's previous *pro se* Motion for Compassionate Release, having been superseded by the Renewed Motion, is likewise **DENIED**. Dkt. 245. Johnson's *pro se* Motion to Expand the Record is **GRANTED** in that the Court considered the documents Johnson sought to append to his Motion (some of which were incorporated with his Renewed Motion). Dkt. 246.

It is so **ORDERED**.

The Clerk of the Court is directed to send a copy of this Order to all counsel of record.

Entered this 17th day of January, 2025.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE